# EXHIBIT 3

Page 1

UNITED STATES OF AM███████

UNITED STATES DISTRI██████

FOR THE WESTERN DISTRICT ████

---

BRADLEY KEITH SLEIGHTER,

       Plaintiff,           Case No. 1:12-cv-001008

v                          Hon. Gordon J. Quist

KENT COUNTY JAIL          U.S. District Judge

ADMINISTRATION, and

CORIZON MEDICAL SERVICES,    Hon. Ellen S. Carmody

       Defendants.        U.S. Magistrate Judge

---

DEPOSITION OF BRADLEY KEITH SLEIGHTER

DATE:      Tuesday, April 9, 2013

TIME:      10:18 a.m.

LOCATION:  Varnum LLP

          333 Bridge Street, N.W., 17th Floor

          Grand Rapids, Michigan

REPORTER:  Rebecca S. Renzema, CSR-1435

Page 2

```
 1    APPEARANCES:

 2

 3            Bradley Keith Sleighter

 4            82 - 50th, S.W., Apt. 323

 5            Wyoming, MI  49548

 6                Plaintiff - In Pro Per

 7

 8      VARNUM LLP

 9      BY:  Peter A. Smit

10            Bridgewater Place, P.O. Box 352

11            333 Bridge Street, N.W.

12            Grand Rapids, MI  49501-0352

13            (616) 336-6000

14            pasmit@varnumlaw.com

15                On behalf of Defendant Kent County Jail Administration

16

17

18

19

20

21

22

23

24

25
```

Page 3

1                            INDEX

2  WITNESS:                                            PAGE

3       BRADLEY KEITH SLEIGHTER

4  Examination by Mr. Smit                              4

5                          EXHIBITS

6  NUMBER            IDENTIFICATION                    PAGE

7  Ex. No. 1        Notice of Deposition                4

8  Ex. No. 2        Prescription for methadone dated 1/16/12   46

9  Ex. No. 3        Medical release for Dr. Garza's records    49

10 Ex. No. 4        Medical release for Dr. Amat's records     49

11 Ex. No. 5        Medical release for Dr. Campbell's records  49

12 Ex. No. 6        Medical release for Pine Rest records      49

13 Ex. No. 7        Medical release for Turning Point          55

14 Ex. No. 8        Medical Screening Form                     56

15 Ex. No. 9        Mental Health Screening Form               56

16 Ex. No. 10       Refusal of Clinical Services dated 1/16/12  64

17 Ex. No. 11       Refusal of Clinical Services dated 1/16/12  67

18 Ex. No. 12       Chronological notes from medical staff     68

19 Ex. No. 13       Correctional HealthCare Progress notes     72

20 Ex. No. 14       Kite dated 3/29/12                         75

21 Ex. No. 15       Kite dated 4/11/12                         77

22 Ex. No. 16       Kite dated 5/17/12                         78

23 Ex. No. 17       Complaint                                  81

24 Ex. No. 18       First Amended Complaint                    84

25                  (Exhibits attached)

**Kane & Trap Court Reporting, Inc.**
services@kaneandtrap.com                    **(616) 742-0700**

## Page 4

1  Grand Rapids, Michigan
2  April 9, 2013; 10:18 a.m.
3  * * *
4  (Exhibit No. 1 marked for identification.)
5  BRADLEY KEITH SLEIGHTER,
6  after having been duly sworn, was examined and
7  testified as follows:
8  EXAMINATION
9  BY MR. SMIT:
10  Q.  Let the record reflect this is the deposition of Bradley
11  Sleighter, taken pursuant to notice for all purposes allowable
12  under the Federal Rules of Civil Procedure and the Federal
13  Rules of Evidence.
14  Brad, you and I have met before. My name is
15  Peter Smit. I represent the defendants in this -- well, the
16  Defendant Kent County Jail Administration in this case. You
17  previously also had Corizon Medical Services, who I don't
18  represent.
19  A.  Right. I dismissed them. You can see that they were
20  dismissed.
21  Q.  Yes, I understand that.
22  A.  I also filed for a first amended complaint and Mr. Greenwald
23  had objected to it and I don't even think that they put it in
24  as a -- they put it in as a proposed first amended complaint.
25  So I'm going to have to make my argument for that.

## Page 5

1  Q.  It was attached to another pleading, but the first amended
2  complaint wasn't actually filed.
3  A.  Right. The problem was is that my wife went down there and
4  just handed them the papers. Now, I don't know if they did
5  that by mistake or they intentionally did it that way, but I
6  noticed on the -- it's called a Pacer(ph) site that they had
7  put proposed first amended complaint. So I'm going to address
8  that here within -- by the end of the week, hopefully.
9  Q.  I'm going to be asking you some questions about the claim that
10  you've made in this case and if at any time you don't
11  understand the questions, just indicate that to me. I'll try
12  to rephrase them so you do understand them. You and I have
13  been in a deposition before in your companion case dealing
14  with the dietary tray. So you know basically how the
15  questions and answers go and that it's important that each
16  of us not talk over the other so that she can get a good
17  transcript. And if at any time you need to take a break, just
18  flag me and I'm happy to accommodate that.
19  With that said, I'll ask you to again state your
20  full name and middle name or initial for the record.
21  A.  Bradley Keith Sleighter.
22  Q.  Your date of birth is May 5, 1958, correct?
23  A.  Yes, sir.
24  Q.  And what's your current address?
25  A.  82 50th Street, Southwest, Wyoming, Michigan, 49548.

## Page 6

1  Q.  With whom do you live there?
2  A.  I live there with my wife.
3  Q.  That is Kathie Moore?
4  A.  Kathie Moore.
5  Q.  How long have you and Kathie been married?
6  (Short pause)
7  Those are the tough questions.
8  A.  Well, I've been with her since 1983, but I've been married to
9  her -- we've divorced and remarried several times, so --
10  Q.  You've divorced and remarried several times? That's kind of
11  like Liz Taylor and Richard Burton.
12  A.  Well, it was for financial reasons.
13  Q.  Okay. Oh, you mean in terms of benefits and --
14  A.  Well, she had some property willed to her and she was worried
15  that they might try to put a lien on the property because of
16  some outstanding college student loans I had. So I thought,
17  well, we'll go ahead and do that. So then after she got rid
18  of the property, then we remarried.
19  Q.  You married her roughly when the first time?
20  A.  I don't know. Maybe 2007 or something and then divorced in
21  2009 or something and then remarried maybe six months ago or
22  so.
23  Q.  Lived together essentially as husband and wife since '83?
24  A.  Yeah.
25  Q.  What does she do?

## Page 7

1  A.  Well, she's disabled right now, but she cut hair for a lot of
2  years.
3  Q.  I did notice on one of her return e-mails it was Grand Rapids
4  Community College.
5  A.  Yes. She goes to college downtown.
6  Q.  Okay. So is she working or is she a student or both?
7  A.  She's a student. She doesn't work. She's a student, you
8  know. She took this term off, but she's trying to get an
9  associate's degree.
10  Q.  What's her area of study?
11  A.  I think she's just trying to catch up, you know, to where she
12  can get in. She's taken English classes and stuff like
13  that.
14  Q.  Does she have any background in the legal or the like?
15  A.  No.
16  Q.  I do note that frequently she assists you in the lawsuit.
17  A.  Well, because from my understanding under federal rules, I
18  can't serve the lawsuit upon the defendants. Therefore, I
19  utilize her to serve the lawsuit.
20  Q.  But that's the extent of her role in this?
21  A.  Yes, that's it.
22  Q.  Has anyone assisted you in preparing your original complaint
23  or your amended complaint?
24  A.  No.
25  Q.  Do you have any aliases or have you gone by any aliases, other

4 (Pages 4 to 7)

## Page 8

1      names? I don't mean that pejoratively, but –
2   A.   I'm trying to remember. I mean, I've got some aliases that
3      were, I think, when I was younger. I think they have me
4      listed for my brother's name and – I really can't remember.
5      It's been so long ago. But I think they list some on there.
6      I think there's some with – I don't know what they are. I
7      know one of them was my brother's name.
8   Q.   Let me show you what I marked as Exhibit 1, which is the
9      notice that we sent out for your deposition.
10   A.   Oh, it was 10:00. I don't know why I got 9:00. Maybe I just
11      thought it was 9:00 from the last time.
12   Q.   Better to be early than late.
13   A.   Well, yeah. And today, actually, I thought I was late. Yes,
14      I saw this. I got it.
15   Q.   This asks you to bring certain documents in your possession,
16      to the extent you have them. Did you go through that list of
17      four categories?
18   A.   Yeah. I really don't have any documents as far as, you know,
19      I figured that any medical release information would be taken
20      care of here. I attached a prescription that I had on the day
21      that I was arrested to the –
22   Q.   I have that.
23   A.   – first amended complaint. Other than that, then we also
24      have the – I don't know if – I mean, I don't need any
25      further copies because I've got all the copies of the jail

## Page 9

1      records from the medical for the other case. It's not going
2      to be any different for this case, so I have no reason to
3      request it a second time. Other than that, all I have is
4      like – and I don't have it in print form, but I have research
5      that I've done on, you know, federal rulings and case laws
6      concerning this.
7   Q.   Do you have an e-mail address?
8   A.   Yes.
9   Q.   And what is that?
10   A.   It's brad – just small case, bradsleighter@gmail.com.
11   Q.   Do you have any e-mails that you have sent anyone that deal
12      with this lawsuit?
13   A.   Yeah. I've been in correspondence with Kimberly Koester at
14      Chapman and Associates in Detroit.
15   Q.   Okay. Any other e-mails –
16   A.   No.
17   Q.   – to friends or relatives?
18   A.   No.
19   Q.   No e-mails that in any way deal with this lawsuit?
20   A.   Not with this lawsuit, no, I don't believe so.
21   Q.   Okay. Well, any that deal with any of your lawsuits against
22      the county?
23   A.   I did send the one for the kosher. I had sent some copies of
24      some of the stuff that I filed in the court to some of the
25      people who had written newspaper articles. And I also sent

## Page 10

1      several things to several Jewish organizations for
2      informational purposes only. I was looking for some feedback.
3   Q.   Okay. Are you on Facebook?
4   A.   No. Well, I did. I just posted a – I did. I just opened a
5      Facebook and posted the Grand Rapids newspaper article on
6      there and that's all that's on there.
7   Q.   When were you first incarcerated?
8   A.   In what respect?
9   Q.   Put in jail of any type.
10   A.   Ever in my entire life?
11   Q.   Any detention facility, yes.
12   A.   In 1974.
13   Q.   What facility was that?
14   A.   Kent County Jail.
15   Q.   And what were you there for?
16   A.   I believe it was UDAA.
17   Q.   You'll have to help me with that.
18   A.   Unlawfully driving away in an automobile. I was 15 years old.
19   Q.   How long were you there, roughly?
20      (Short pause)
21   A.   I'm trying to think. Maybe five or six months. I don't
22      really – it's a long time ago.
23   Q.   When were you next incarcerated?
24      (Short pause)
25   A.   I'm trying to think. Maybe -- I don't know the dates. Maybe

## Page 11

1      '84 or something like that, '83.
2   Q.   Just an estimate. You know, if it's '83 or '84, it's not a
3      big thing.
4   A.   '84.
5   Q.   '84? Kent County again?
6   A.   Yeah.
7   Q.   What was it that time?
8   A.   I think it was CCW.
9   Q.   How long?
10   A.   In the jail? I don't know. I think it's like a standard
11      thing sort of. Spent six months there.
12   Q.   And the next time?
13   A.   I think I had a retail fraud in '86 and then in '90-something
14      and then that's it.
15   Q.   How long were you in for the retail fraud? Six months again?
16   A.   Yeah. You know, it's like you spend six and by the time you
17      get through the criminal proceedings and everything -- it was
18      a little slower back then. Now days you can get through in,
19      like, 90 days. And then in 2001 I was in jail for leaving the
20      scene of a personal injury accident.
21   Q.   Nothing between '86 and 2001?
22   A.   No, I think there was something in the early '90s, like '94 or
23      something like that, for retail fraud.
24   Q.   Okay. And then what year –
25   A.   In 2001 it was leaving the scene of a personal injury

5 (Pages 8 to 11)

## Page 12

1  accident. And then the last time, which was November -- or
2  January 16th of 2011 where I spent a year, you know, ten
3  months. A one-year sentence, but ten months.
4  Q.  You mean January 16th, 2012?
5  A.  Oh, is it 2012? I'm sorry. Yes, it was 2012. Right.
6  Q.  Were you in the Kent County facility in 2011?
7  A.  No, I don't believe so.
8  Q.  I thought I saw a reference to 2011, but --
9  A.  I don't believe I was. Not that I remember.
10  Q.  Okay. So you hadn't been in the facility for a good ten
11  years --
12  A.  Yes.
13  Q.  -- when you came in this time?
14  A.  Right.
15  Q.  And in 2012 it was for what charge?
16  A.  Retail fraud.
17  Q.  And tell me what it was. I mean in lay terms. What did you
18  do?
19  A.  I shoplifted.
20  Q.  From?
21  A.  A computer store.
22  Q.  Where?
23  A.  28th Street and Kalamazoo. It was called Comprenew(ph).
24  Q.  What did you take?
25  A.  A computer.

## Page 13

1  Q.  How did you get caught?
2  A.  My wife used her credit card and I didn't know it.
3  Q.  Oh, you mean on the visit?
4  A.  No. Me and her went to the store and she was up there doing
5  something and I walked out the door with a computer. And she
6  had used her credit card and they basically called her up and
7  I went down there and gave them back the computer.
8  Q.  Do you know what the price was on the computer?
9  A.  I think $250.
10  Q.  It was over a hundred dollars?
11  A.  Oh, yeah. I was charged with first degree retail fraud.
12  Q.  Why did you do that?
13      (Short pause)
14  A.  Just -- it's a difficult thing, I mean, you know, to say why I
15  did it at that particular moment. It was, like, I saw the
16  opportunity. It was something that I had done before. Not
17  that particular scenario, but I had shoplifted before and I
18  just did it. You know, not thinking, dumb move.
19  Q.  Well, I guess the reason I ask that is one of the things
20  about proceedings like this is people's honesty --
21  A.  Right.
22  Q.  -- in testifying and truthfulness and those things are
23  important. And as I look at this, I've got one, two -- I've
24  got at least three stealings, shoplifting. Are you a
25  trustworthy person?

## Page 14

1  A.  Am I a trustworthy person?
2  Q.  Yes.
3  A.  I've never stole from an employer. I've never stolen from
4  where I went to school. You know, I can say those things,
5  but, you know, there's no real proof that that's true. I
6  remember when i went and saw the detective for this retail
7  fraud, he says, "Oh, you're an honest thief." And I said, "I
8  mean, there's no point in lying about it. I did it. I made a
9  mistake and I might as well admit to what I did. I'm not
10  going to argue with you," you know.
11  Q.  Well, I mean, you didn't turn yourself in. You got caught.
12  A.  Yeah. In a sense, yeah. I didn't realize, "Oh, I made a
13  mistake" and I took it back. You're right. Yeah, I got
14  caught.
15  Q.  If she hadn't used a credit card, you'd still have the
16  computer and everybody would be happy?
17  A.  Probably. That is the truth. But, you know, you could allege
18  that, you know, and I'm sure in a criminal trial this would
19  all be used against me.
20  Q.  Well, credibility is important in civil trials, too.
21  A.  Exactly, but --
22  Q.  But in any event, you say despite the fact that you have
23  multiple times of stealing --
24  A.  Uh-huh.
25  Q.  -- that the court should believe you when you say things?

## Page 15

1  You're trustworthy, credible?
2  A.  I am, but the thing is is that in this particular case and in
3  the other particular case --
4  Q.  And the one before that?
5  A.  What case?
6  Q.  Oh. I thought you were talking about the cases of theft.
7  A.  No. In the civil cases that I have against the Kent County
8  Jail, most of my statements are based on facts as opposed to
9  allegations. I don't think that there's a lot of, you know,
10  material facts in the case that need to be decided upon
11  because I'm alleging a violation of civil rights. And it's
12  either -- you know, it's almost like, yes, the court agrees or
13  the court doesn't agree and it doesn't really rely a lot on
14  what I have to say. It has to do with what the law says.
15  Q.  Well, you'll agree with me, for example, that in the dietary
16  case, one of the issues is whether or not you have a heartfelt
17  belief?
18  A.  Yes.
19  Q.  And to that extent, you're testifying under oath that you do
20  have a sincere heartfelt belief?
21  A.  Yes.
22  Q.  And so you're asking the court to accept that as true as
23  opposed to you're just trying to sue and make some money and
24  you're cobbling this up. That's fair, isn't it?
25  A.  You know, I could substantiate that. I probably could

**Kane & Trap Court Reporting, Inc.**
services@kaneandtrap.com                    (616) 742-0700

Page 16

1    substantiate it through a history of encounters that would
2    establish that I have a sincere --
3    Q.  For example, you don't go to temple.
4    A.  Right.  But, for example, you know, to understand a sincerely
5        held religious belief, you know -- it's a relatively broad
6        definition according to the law.  And even if I didn't attend
7        any religious services at all, I still could claim a sincerely
8        held religious belief just on moral grounds alone.
9    Q.  If it's true.
10   A.  Absolutely.
11   Q.  And you're asking people to believe it's true and to trust
12       your honesty.
13   A.  Well, now, let's see here.  I had a paper from the Pine Rest
14       treatment program that I was in that said I was making a
15       complaint there about the food, not being able to get food.
16       I could establish that.  The thing is is that regardless of
17       whether I have a sincerely held religious belief or not, the
18       jail set a policy saying, "You can't get it."  They don't
19       really at this point care whether you have a sincerely held
20       religious belief or not.  They said the policy is, "You're not
21       getting it."  So the policy I'm attacking before -- now,
22       if they had a jail policy that said, "Yes, you can get a
23       religious meal if you have a sincerely held religious belief"
24       and said, "Well, Mr. Sleighter, you're not getting a meal
25       because you don't have a" -- then that's a different

Page 17

1    challenge.  Different argument.
2            I can see where you're coming from for a defense,
3        but I'm saying, here's a jail that has a policy that just says
4        it straight out.  And they've set up things, generally through
5        like a chaplain or a minister at the jail who would say,
6        "Okay, if you want this diet, then we're going to see how
7        sincere your belief is," and they'll sit down with you and
8        question you and ask you certain things.  And if the chaplain
9        feels that it's a sincerely held religious belief, then he'll
10       say, "Okay, he's approved for the diet."  But Kent County Jail
11       doesn't have anything set up like that.
12   Q.  Well, I got off on a little bit of a tangent here.
13   A.  I understand.
14   Q.  Let's go back to the list here.  You don't have any of your
15       Pine Rest records in your possession?
16   A.  No.
17   Q.  And you don't have any of your medical records, other than
18       this prescription in your possession?
19   A.  That's right.
20   Q.  Have you since you were released in -- what, last November?
21   A.  Yes.
22   Q.  -- have you worked at all in gainful employment?
23   A.  No.
24   Q.  Are you trying to find work?
25   A.  I have gone out, yes.  Periodically, I have gone out.  I've

Page 18

1    got some medical issues.  I'm actually applying for
2        disability, so --
3    Q.  You're applying for Social Security Disability?
4    A.  Yeah.  That takes time.
5    Q.  Did you have in your prior -- in your prior confinement at the
6        Kent County facility in '94 or 2001, did you have any specific
7        medical issues while you were there?
8    A.  Yeah.  I mean, the thing was is that each time I went to jail,
9        I had to go through opiate withdrawal.
10   Q.  Why?
11   A.  Because I was on an opiate, a prescription opiate, while I
12       was -- you know, before I got locked up.
13   Q.  When you say opiate, what do you mean?
14   A.  A pain medication.  You know, the term opiate.  It generally
15       replaces an older term called narcotic.  These things would
16       be -- not that I've been -- I have been prescribed it, but not
17       that I was taking at the time of jail, but would include,
18       like, Oxycontin, morphine, methadone.
19   Q.  Vicodin?
20   A.  It includes that, but I've never -- I've never had to go to
21       jail and request that.
22   Q.  Have you used -- you've indicated you've had back pain?
23   A.  Yeah, I've had back problems.
24   Q.  And that's the reason that you were taking the methadone,
25       correct?

Page 19

1    A.  Yes.
2    Q.  And you've also indicated that at times you took other pain
3        meds for your back?
4    A.  Yes.
5    Q.  Oxycontin for one?
6    A.  I have taken that.
7    Q.  Okay.  Do you know, does the jail have a policy that there is
8        no pain medication dispensed?
9    A.  That is -- when you go to jail, you know, they'll tell
10       you right out that basically no, you -- the jail policy,
11       per Undersheriff Hess -- I'm not sure if it was per
12       Undersheriff Hess or per Captain Randy Demory.  I'm almost
13       thinking it was per Captain Randy Demory, but I'm not certain.
14       It was one of the two.  That the jail policy is that no
15       narcotic medication or opiate medication is allowed in the
16       jail.
17   Q.  What about other pain medication?
18   A.  Well, they use drugs like ibuprofen and there really isn't a
19       lot of others for pain.  The main issue is that when you're
20       taking these types of drugs, to immediately be taken off of
21       them causes withdrawal and, you know, causes pain and --
22   Q.  Well, my understanding from medicine is that the medical
23       community does not want patients to become drug dependent,
24       period.
25   A.  Well --

7 (Pages 16 to 19)

Page 20

1  Q.  Unless you're in hospice or the like.
2  A.  This would be the idea and it's compared in the medical field
3     to, like, insulin.  You need insulin every single day.
4     Insulin keeps you normal.  It's the same idea with the pain
5     medication.  But if you immediately stop taking your insulin,
6     you'd be in trouble.  It's the same idea.  Doctors generally
7     will reduce the dosage over a period of time.  I was just
8     reading the medical literature for methadone and they say that
9     in people who are at very high doses, above 100 milligrams, it
10    can take up to a year to slowly lower the dose down to where
11    they have no withdrawal symptoms.
12 Q.  Well, didn't the jail put you on a withdrawal program?
13 A.  No.
14 Q.  Okay.  And I guess it's your testimony that if you're going to
15    take somebody suddenly off of a pain medication such as that,
16    they need to accommodate it with some type of withdrawal
17    program?
18 A.  An approved withdrawal program, absolutely.
19 Q.  You can't just say, "Oh, you don't get it anymore" and then
20    just kind of say, "Okay, well, we're done"?
21 A.  That's exactly what I'm saying.
22 Q.  How long have you been on methadone?
23 A.  At least five years.  Maybe five or six years.
24 Q.  And at no time during those five or six years were you in any
25    type of incarceration/detention facility?

Page 21

1  A.  As a matter of fact, there was -- now that you mention it,
2     there was a time that I had a traffic ticket and I had to
3     go do 30 days in the Kent County Jail, like, July 29 -- or
4     June 29th to, like, August something in the Kent County Jail
5     and I was on methadone at that time.
6  Q.  I'm sorry.  Of what year?
7  A.  2011.  And I went through withdrawal at that time, too.
8  Q.  At that time did you come in with a prescription for your
9     methadone?
10 A.  I didn't, per se, have a prescription for it, but I pretty
11    much knew that their jail policy was that I wasn't going to
12    get it.
13 Q.  Well, how in heaven's name did you know that if you hadn't
14    been at the jail since, like, ten years?
15 A.  Pretty much from just people who I've known that have gone to
16    jail.  You know, I had heard that they implemented something.
17    I knew a couple of the nurses that worked there at the jail.
18 Q.  Who?
19 A.  Miranda and her mother.  They were from Muskegon.  The
20    mother's name was Miranda and the daughter's name -- no.
21    The mother's name was Nerva(ph) and the daughter's name was
22    Miranda and they worked at the Kent County Jail.  And I had
23    asked them if they had implemented any -- because they came
24    out with a new medication and I was told that the jail was
25    giving it and they told me, "No, that is not true."  And I

Page 22

1     don't believe either of them work there anymore.  I can't
2     remember their last name.
3  Q.  Did you -- in 2011 when you were there for a month, how was it
4     that you made it through without your methadone?
5  A.  I mean, it's that -- you know, I got sick and the bottom
6     line is that I just had to deal with it.  I mean, it was
7     difficult.  I stayed in the cell the whole time.
8  Q.  Did you ask to see the doctor in 2011?
9  A.  I honestly don't remember.  2001 or 2011?
10 Q.  '11.  The summer before this, you were there a month you said.
11 A.  And I don't remember if I asked to see the doctor or not.  I
12    don't remember how sick I got.
13 Q.  Were you in pain?
14 A.  Oh, yeah, I was in pain.  I couldn't even get off the floor.
15 Q.  Did you report that to the medical staff that you were in
16    pain?
17 A.  I don't remember, honestly.  I think the standard was that,
18    you know, they're just not going to give you any medication.
19 Q.  That wasn't my question.  Let's try to keep it focused.
20 A.  I don't know if I did, but I've come to the conclusion that
21    medical just doesn't provide any adequate treatment for it
22    that's helpful and, therefore -- I'm trying to remember.
23 Q.  Brad, we do have to keep a little focused here.  My question
24    to you is this.  You went in -- listen carefully.  You went in
25    in the summer of 2011 --

Page 23

1  A.  Yeah.
2  Q.  -- for about a month?
3  A.  Yeah.
4  Q.  And at that point in time you were being treated with a
5     prescription of methadone for your back?
6  A.  Yeah.
7  Q.  And my question is, number one, at screening, did you tell the
8     nurse that you were on methadone and wanted methadone?
9  A.  I'm sure I did, yes.
10 Q.  What, if any, response do you recall from the nurse?
11 A.  I think they put me on some kind of restriction to where I
12    couldn't go to do any activities, you know.
13 Q.  Did they give you any medication for your back pain as a
14    substitute for the methadone?
15 A.  No.
16 Q.  Did you ask for a substitute for your methadone or something
17    for your back pain?
18 A.  I don't recall, but I know from experience that basically
19    they're not giving you anything for it.
20 Q.  Your answer is you don't recall?
21 A.  Well, the thing is they tell you right there, "You're not
22    going to get any medication for pain."
23 Q.  Okay.  This is what the nurse told you --
24 A.  Yes.
25 Q.  -- when you presented yourself at that facility in 2011?

Page 24

1  A. Yeah.
2  Q. She said, "Hello, Mr. Sleighter," and you said, "I've got back
3     pain, I'm on methadone."  And she said, "You're not getting
4     any medication for your pain here at the facility," period,
5     end of story?
6  A. Yeah, pretty much.
7  Q. Okay.
8  A. They pretty much tell you that when you come right in.  You
9     know, they ask you to list the names of the medications that
10    you're on, you tell them, and the minute you say that you're
11    on methadone, that's it.
12 Q. No, I'm not talking methadone.  I'm talking any pain
13    medication.
14 A. Right.  Pretty much, yeah.  I went to the --
15 Q. See, we don't -- lawyers don't deal with terms like pretty
16    much.
17 A. Yeah.
18 Q. We're more precise than that.
19 A. Yeah.
20 Q. Did they tell you that other than ibuprofen or aspirin, you
21    could not receive any medication for your back pain while you
22    were in the facility?
23 A. Yes.
24 Q. And did a nurse tell you that?
25 A. Yes.

Page 25

1  Q. Did you then ask to see a doctor about your back pain in
2     2011?
3  A. I doubt it because I was only there for a short period of
4     time.  I don't remember if I asked to see a doctor.
5        (Short pause)
6  Q. When did you injure your back?
7  A. In the '70s and it's just got worse over the years.
8  Q. Have you ever had medical treatment other than
9     prescriptions?
10 A. Yes.  I've had physical therapy and I've had basically x-rays
11    and stuff.  I've had some nerve damage in my left arm, so --
12 Q. That was job related, as I recall.
13 A. Huh?
14 Q. Was that job related?
15 A. No.  I think, you know, it was an injury.  And I think that,
16    you know, arthritis -- they were saying that because it's up
17    in the upper part of the back that it's perceived differently
18    than lower back pain.  They took some x-rays, said it looked
19    like there was a lot of arthritis in there.  And then I had
20    nerve damage that caused -- a lot of nerve damage in my left
21    arm and that was real painful.
22 Q. How did that happen?  Were these just an aging process or did
23    you have injuries?
24 A. Some of it was.  I mean, the one was that I basically had torn
25    some muscles in my shoulder and stuff and the other one was --

Page 26

1  I had fallen and struck my back, so, you know, I've got a big
2  scar on my back.
3  Q. But not a surgical scar?
4  A. No.
5  Q. So roughly in the '70s, you had this back injury.  And who
6     first prescribed methadone for your back?
7        (Short pause)
8  A. I'm not sure.  Well, first of all, methadone was only
9     available through methadone maintenance treatment up until --
10    I'm not sure -- I think, like, the late '80s, early 90's when
11    they allowed it to be used for pain.  It had been allowed
12    prior to the '60s, but then there was a period from, like, the
13    '60s through the '70s and I think most of the '80s that it was
14    only through a clinic that you could get it.  So I think that
15    was the first time that I actually had methadone was from a
16    clinic in Muskegon.
17 Q. For your back?
18 A. Yeah, in 1989.
19 Q. What clinic?
20 A. It was -- I'm trying to think what the name of that clinic
21    was.
22        (Short pause)
23        Possibly Eastside Methadone Clinic.  I'm not sure.
24    I mean, that's '89, 90.
25 Q. And you went to see them for your back injury?

Page 27

1  A. Well, I went to see them for methadone.  I mean, it's like
2     they can't prescribe it for pain, but they can prescribe it
3     for ongoing -- basically they prescribed it for people who
4     have already been using some type of medication, whether it's
5     Vicodins or whatever, and I think I had prescriptions for
6     Vicodins and -- well, back then it was, like, Tylenol for my
7     back with codeine.
8  Q. Who was treating your back?  What doctor was treating you for
9     your back?
10 A. Different doctors.  There was a doctor here in Grand Rapids
11    that, you know, pretty much saw anybody, would treat ya.
12    I'm just trying to remember.  This was a while ago.  I don't
13    remember the doctors' names and stuff.  I do know the last
14    recent doctors I had.
15 Q. I'll get to that, but I'm trying -- I'm going back to --
16 A. I know you are.
17 Q. -- when this started.  Well, let me ask you this.  Have you
18    ever gotten methadone as part of a drug rehab or as part of a
19    drug withdrawal program?
20 A. Yeah.  That time and at the Eastern Clinic on Eastern here in
21    Grand Rapids.
22 Q. And what drug were you in withdrawal from?
23 A. Methadone.
24 Q. Well, they don't give you methadone as withdrawal for
25    methadone.  I mean, did you take heroin?  Did you take --

9 (Pages 24 to 27)

## Page 28

1  A. What they'll do is they'll let you -- say, for example, if
2    you're on prescription medications and either -- there can
3    be a number of reasons, whether the doctor decided to quit
4    prescribing or whether you wanted to get off. They'll tailor
5    a withdrawal program for you to lower the dose down, slowly
6    lower it down to get off the methadone.
7  Q. Have you ever gone to a drug rehab center for treatment?
8  A. Yeah. I went to a drug rehab center right before I got locked
9    up in the jail.
10 Q. And what drug rehab center did you go to?
11 A. I went to Pine Rest. That was the one we had talked about
12    before.
13 Q. What were you getting rehab for?
14 A. Basically I had said that I had drug abuse problems.
15 Q. What drug were you abusing?
16 A. Well --
17 Q. Or had you abused?
18 A. I don't remember exactly what particular drug I was saying
19    that I had abused. I needed to get into the program. I had a
20    prescription for the methadone. That's the same prescription
21    I was seeing the doctor for.
22 Q. Was one of the reasons you went to Pine Rest to get off
23    methadone?
24 A. Yeah.
25 Q. Were you addicted to methadone when you went to Pine Rest?

## Page 29

1  A. Yes.
2  Q. Were you addicted to any other drugs?
3  A. No.
4  Q. If you were addicted to methadone when you went to Pine Rest
5    and trying to get off methadone, why were you upset that the
6    jail didn't feed that addiction by giving you methadone?
7  A. Well, I guess that's the argument. It's not -- you know,
8    in looking at it as an addiction as opposed to a treatment.
9    You know, the same argument is that instead of just taking it
10    away from you that they would slowly lower the dose down.
11    Little did I know that when I went to the treatment program,
12    they had switched me over to a different drug to help
13    withdrawal from that and Pine Rest wouldn't let me have it.
14 Q. What drug was that?
15 A. Suboxone.
16 Q. Who had switched you over to that?
17 A. What is that place downtown called? Turning Point.
18 Q. Is that part of Pine Rest?
19 A. It's sort of like they put you there for five days to monitor
20    you physically with nurses and everything and then they set
21    you up with any medication that you may need. Then you go
22    to, like, a cognitive type of behavioral program to teach you
23    different coping mechanisms as opposed to relying on drugs for
24    either psychological or medical needs.
25 Q. Let me ask you this. Going back, roughly when would you say

## Page 30

1    was the very first time you took methadone?
2  A. Probably in 1989 or '90, something like that. Late '89 or
3    '90.
4  Q. Who prescribed it at that time?
5  A. I believe it was the doctor -- it was the doctor in Muskegon,
6    yeah.
7  Q. At the methadone clinic?
8  A. At a methadone clinic.
9  Q. Did he prescribe the methadone for your back pain or to treat
10    you for drug withdrawal?
11 A. For drug withdrawal.
12 Q. When was the first time a doctor prescribed you methadone for
13    treatment of your back pain? Unrelated to withdrawal.
14 A. I know. I'm trying to remember. I'm trying to remember. Oh,
15    I saw Dr. Probe here in -- what year was that? It must have
16    been 2000, 1999, 2000. Lawrence Probe.
17 Q. P-r-o-b-e?
18 A. Uh-huh.
19 Q. What is his organization?
20 A. He's no longer around, but he was -- I think he was a clinical
21    psychiatrist that dealt in pain management.
22 Q. Prior to that, had you continually taken the methadone for
23    drug withdrawal?
24 A. No.
25 Q. Okay. So you had taken it for a while for drug withdrawal?

## Page 31

1  A. Yeah.
2  Q. Then you were off methadone?
3  A. Uh-huh.
4  Q. You have to answer verbally.
5  A. Yes. I'm sorry.
6  Q. And then he put you back on methadone, but this time not for
7    withdrawal, for drug issues; he put you on methadone for your
8    back pain?
9  A. Yes.
10 Q. Have you been on methadone ever since for your back pain?
11 A. No, not necessarily. Like right now I'm not on methadone for
12    back pain. I'm not taking methadone for back pain.
13 Q. What are you taking for back pain?
14 A. I've got a prescription for something that's a pain
15    medication. It's called Ultram. It's not nearly as strong
16    or --
17 Q. Who prescribed that?
18    (Short pause)
19 A. Dr. Amat.
20 Q. And that's A-l-t-r-a-m?
21 A. A-m-a-t.
22 Q. No, Ultram.
23 A. U-l-t-r-a-m, yes.
24 Q. U-l-t-r --
25 A. -- a-m.

10 (Pages 28 to 31)

**Kane & Trap Court Reporting, Inc.**
services@kaneandtrap.com                          (616) 742-0700

Page 32

1  Q. Did you ask Dr. Amat for methadone?
2  A. No. I did show her that I had prior been on methadone to show
3     her that I had a history of pain issues and that I just needed
4     something to help me with my back pain.
5  Q. Why didn't she prescribe methadone?
6  A. Because they don't prescribe methadone at the place I'm
7     going.
8  Q. She's an M.D., isn't she?
9  A. I think it's a policy of the place that I go. It's called
10    Heartside Ministries. There's a sign right on the front door
11    that says, "We do not prescribe controlled substances."
12 Q. Just like the jail?
13 A. Pretty much.
14 Q. Did you sue them?
15 A. Well, first of all -- that's an interesting question.
16 Q. I thought so.
17 A. Because you asked me that before about, well, did I sue
18    Pine Rest. First of all --
19 Q. I'm just trying to figure out why you're picking on us.
20    Nobody will give you methadone.
21 A. Because one of the issues is it deals with, like, you know, a
22    1982 claim that when a government body acts in an official
23    capacity and violates somebody's civil rights that is in
24    custody, there's a lot more legal case law and there's a lot
25    more precedent in the federal courts that will help support a

Page 33

1     claim as opposed to state law. Secondly, most of your federal
2     laws are all electronically filed. It's public information.
3     It's very easily accessed. State law is a little bit more
4     difficult to access electronically. So a lot of the case law
5     and stuff for state law has to be done sort of manually or,
6     you know, through other types of web bases.
7  Q. But it's your position that medically, both Amat and Pine Rest
8     should have prescribed you methadone when you asked for it?
9  A. Well, my only argument would have been against Pine Rest
10    is that they receive possibly federal funding to support their
11    programs. And the idea that they accept federal moneys or
12    state moneys would give me the ability to make a claim.
13    But in the same respect, though, I also had a choice to go
14    anywhere I wanted to. I chose to go to this doctor. I wasn't
15    actually looking for -- generally what happens when you get
16    methadone, it's you start out on something a lot lower, like
17    Vicodins. You take them for so long. Then pretty soon they
18    increase it because they're not working anymore. And it
19    eventually ends up with something like methadone which, in
20    some doctors' opinions, is, you know, like the top of the rung
21    for pain management. You know, some doctors may feel that
22    something else is more appropriate.
23 Q. Have you ever used heroin?
24 A. Have I ever used heroin?
25 Q. Yes.

Page 34

1  A. I have used heroin.
2  Q. Have you ever been addicted to heroin?
3  A. I'm not sure that I have been, but I know that I probably have
4     claimed to be to participate in drug programs.
5  Q. Have you ever taken or been prescribed methadone as part of
6     withdrawal from heroin use?
7       (Short pause)
8  A. I'm not sure. I'm honestly not sure.
9  Q. Have you ever used cocaine?
10 A. When I was younger.
11 Q. Have you ever been addicted to cocaine?
12 A. No.
13 Q. Have you ever used marijuana?
14 A. When I was younger, yeah.
15 Q. Have you used any other illegal, nonprescription controlled
16    substances?
17      (Short pause)
18 A. I think in the '70s I probably had tried a couple different
19    things. But as far as use on a regular basis, I haven't used
20    anything on a regular basis.
21 Q. Since 1990 have you used heroin?
22 A. I believe I have.
23 Q. Since 2000 have you used heroin?
24 A. I believe so, yes.
25 Q. When did you last use heroin?

Page 35

1  A. Probably -- probably in 2011. When I was arrested and taken
2     to jail for the traffic tickets, I believe that that was
3     the driving force behind the 30 days that I did in jail. I
4     wasn't convicted of it, I wasn't arrested for it, but I
5     believe that was what was the problem.
6  Q. Were you a regular user of heroin --
7  A. No.
8  Q. -- in 2009, 2010?
9  A. No.
10 Q. Were you addicted to heroin in 2009, 2010?
11 A. No, but I was addicted to methadone that was prescribed to me.
12 Q. Were you addicted to anything besides methadone in 2011?
13 A. No.
14 Q. So you were addicted to methadone, but you were using
15    heroin?
16 A. I had used it occasionally, yes.
17 Q. What about cocaine? When was the last time that you had used
18    cocaine?
19 A. Probably late '80s.
20 Q. In the last two years, have you used any controlled substances
21    illegally other than heroin?
22 A. No.
23 Q. When was the last time that you were in a drug rehab program
24    or treated for drug rehab?
25 A. I'm trying to remember the date.

11 (Pages 32 to 35)

**Kane & Trap Court Reporting, Inc.**

## Page 36

```
 1    Q.  Was that Pine Rest?
 2    A.  Yeah.  And it was, like, I left on January -- let's see.
 3        It was, like, two days before I went to jail on January 16th.
 4        So it was, like, the 14th or 13th that I had left the
 5        program.
 6    Q.  How long had you been in the program?
 7    A.  Two months.
 8    Q.  Was that inpatient or out?
 9    A.  Inpatient.
10    Q.  You had been an inpatient at Pine Rest in November and
11        December of 2011?
12    A.  Yes.
13    Q.  So in the summer, you were in the Kent County Correctional
14        Facility for about a month?
15    A.  Yes.
16    Q.  When, roughly, did you get out?
17    A.  August 1st.  I believe August 1st or August 2nd.
18    Q.  When, roughly, did you go into Pine Rest Rehab?
19    A.  November 16th or so, yes.
20    Q.  So that's three months?
21    A.  November, December.
22    Q.  No.  August to September, October, November.
23    A.  Oh, from being out.
24    Q.  You've got three months between being at the Kent County
25        Facility and entering Pine Rest.
```

## Page 37

```
 1    A.  Right.
 2    Q.  What did you do during those three months?
 3    A.  As far as?
 4    Q.  On a daily basis.  Were you employed?  What did you do?
 5    A.  At the time I had -- me and my wife had a house and most of
 6        the time I was working on the house.  It had a lot of work
 7        that needed to be done on it.  What I did, I think I had done
 8        some, you know, self-employment type jobs.  I do work for
 9        people, fix their homes.  I did heating and air for a number
10        of years.  So there were things that I had where customers
11        would need things done and would call me, so --
12    Q.  Were you on any prescription medications between the time you
13        got out of jail and the time you went to Pine Rest?
14    A.  Yeah, I was on the methadone.
15    Q.  What else?
16    A.  Well, I think I had my blood pressure medication for high
17        blood pressure and I think that's pretty much it.  High blood
18        pressure medication and the methadone.
19    Q.  You were booked at the Kent County Correctional Facility on
20        January 16 for what charge?
21    A.  The retail fraud.
22    Q.  And was that the one where you stole the computer?
23    A.  Yes.
24    Q.  When did you steal the computer?
25    A.  It was probably a couple of weeks or so -- well, no, it was in
```

## Page 38

```
 1        November.  I believe it was in November before I went to the
 2        treatment program.  Because I talked to the detective over the
 3        phone while I was in the treatment program and he just said,
 4        "Well, just take care of it when you get out of the treatment
 5        program."
 6    Q.  So sometime the first couple of weeks in November --
 7    A.  Yeah.
 8    Q.  -- you stole the computer and got arrested?
 9    A.  I got arrested in January.
10    Q.  You got arrested in January?
11    A.  They knew about it, but I had told them that I was in the
12        treatment program and they said that, you know, it was
13        something I could take care of when I got out of the treatment
14        program.
15    Q.  In November and December, what were you treated at for at
16        Pine Rest?
17    A.  You know, basically like drug addiction, I guess, you know.
18    Q.  Was Pine Rest providing you with methadone in November and
19        December?
20    A.  No, they weren't.  And I was kicked out of the -- I was kicked
21        out of the Pine Rest program because I was still taking the
22        methadone.  I found out after I got there that they wouldn't
23        allow me to take it, so I just saw my doctor and got the
24        prescription and took it.  And they took a urine drop and
25        said I tested dirty for methadone and then said, "You're not
```

## Page 39

```
 1        allowed to be on methadone here."  And I said, "Okay," and
 2        that was it.
 3    Q.  All right.  That's a lot.  Let's go back.  Did you complain
 4        about your back pain while at Pine Rest in those two months?
 5    A.  No, probably not because I was taking the methadone.
 6    Q.  Where did you get the methadone if you were at Pine Rest
 7        inpatient?
 8    A.  They let me leave.  They didn't have a doctor out there, so
 9        I'd leave to go to the doctor, my own personal physician.
10        Take a city bus to the doctor, get my prescription, stop off,
11        pick it up, go back to the treatment facility.
12    Q.  What was the point of being at Pine Rest Rehab if you were
13        making drug runs for methadone?
14    A.  Well, I was hoping that what they would do is that they would
15        treat me.  I didn't realize that they weren't going to allow
16        me to have it.  Like I said, I went to this other program
17        downtown.  You had to go there for five days first and they
18        put me on some different medication.
19    Q.  This is Turning Point?
20    A.  Yeah.  And then when I got out there to Pine Rest, they
21        wouldn't let me have it.  They said, "We don't have a doctor
22        to prescribe it."
23    Q.  You wouldn't expect to go to Pine Rest for a heroin addiction
24        and have them give you heroin?
25    A.  Well, they've got new drugs now that they use for that.  One
```

**Kane & Trap Court Reporting, Inc.**

services@kaneandtrap.com                                    (616) 742-0700

Page 40

1  of them is called Suboxone and it's --
2  Q.  Isn't the reason that you went to Pine Rest to get free of
3     methadone?
4  A.  Well --
5  Q.  To cure your methadone addiction?  That was why you checked
6     into Pine Rest?
7  A.  I think the reason was that I was having more social
8     problems.  I was having problems with my wife.  I needed a
9     break from that.  Yeah, I figured that if I was able --
10 Q.  I have problems with my wife, too, but I don't check into Pine
11    Rest.
12 A.  Right.  But the thing is is that, you know, a lot of the
13    problems she felt revolved around the prescription for the
14    methadone.
15 Q.  The drug issues?
16 A.  Yeah, the drug issues.  The drug is not benign and free from
17    side effects.  One of the things is, yes, it kills pain, but
18    the other thing is that it makes you very tired.  And, you
19    know, she felt that me being tired all the time and not having
20    a lot of motivation was a direct result of the pain medication
21    I was receiving.  So she sort of had said, "You need to get
22    off of it."  And that was my full intention when I went to
23    the treatment program was to get off of the medication, but
24    I didn't intend on just stopping it.  And so they had
25    prescribed me this Suboxone, but like I said, when I got

Page 41

1  out there, they didn't have a doctor who would prescribe it.
2  They didn't even have a doctor period for me to even see for
3  my blood pressure medication.  So I had to go back to my
4  personal physician and I just basically went back to him
5  and --
6  Q.  Dr. Garza?
7  A.  Yeah, Dr. Garza.
8  Q.  When did you first see Dr. Garza for treatment?
9  A.  I'm not sure what year it was, but it -- I'm thinking it was
10    somewhere in 2007 maybe.
11 Q.  What problem did you go to Dr. Garza to address?
12 A.  I think the back pain issue.
13 Q.  When did he first prescribe methadone for you?
14 A.  After a couple of months, I think.  I tried some other
15    medications and eventually he prescribed it.
16 Q.  Do you know what other ones you had tried?
17 A.  I believe I had taken Suboxone.
18 Q.  Did you tell him that you had previously had methadone for
19    your back pain with good result?
20 A.  Yeah.
21 Q.  Did you ask him or encourage him to give you a prescription of
22    methadone for your back?
23 A.  Yeah, I probably asked him.  Yeah.
24 Q.  And after a couple of months, he agreed and prescribed it?
25 A.  Yes.

Page 42

1  Q.  For the next five years, would he provide you with ongoing
2     regular prescriptions of methadone?
3  A.  Yeah, I'd have to see him every month.
4  Q.  Did you tell him that you were addicted to methadone?
5  A.  I think there were times that I had told him that I wanted to
6     get off of it and we worked at lowering the dose down and I
7     think we tried a couple of things a few times.
8  Q.  Did you tell him that your wife wanted you to get off
9     methadone?
10 A.  No, I don't think I told him that.
11 Q.  Did you tell him that you were checking into Pine Rest for
12    drug rehab pertaining to methadone?
13 A.  No, I did not.
14 Q.  When you went to see him -- when did you go to see him while
15    you were at Pine Rest?
16 A.  I think I saw him in November and December.  And then I
17    eventually saw him in January, but that was the day I was
18    arrested, so --
19 Q.  You saw him in November and December.  So you were spending
20    nights living at Pine Rest?
21 A.  Uh-huh.
22 Q.  Correct?
23 A.  Yes.
24 Q.  But Pine Rest, as part of your rehab program, did not confine
25    you to the facility; you could come and go as you chose?

Page 43

1  A.  To a degree.  I mean, I needed a pass and I needed approval to
2     go to the doctor.  So I had to, you know, submit a request
3     asking may I go to the doctor and they would approve it and
4     then I would leave and then I would be expected back at a
5     certain time.  No, you couldn't just come and go.  But
6     anything like that --
7  Q.  Did you have to tell them why you were going to the doctor?
8  A.  No.
9  Q.  So you would tell them, "I need to see Dr. Garza."  They
10    would give you a pass.  You would go to Dr. Garza and say,
11    "More methadone."  He would prescribe it.  You would go to
12    Meijer or somewhere, you would fill it, you'd put it in your
13    pocket and you'd go back to Pine Rest?
14 A.  Yes.
15 Q.  And you'd be taking your methadone?
16 A.  Yes.
17 Q.  At the time while Pine Rest was treating you for methadone
18    addiction?
19 A.  Well, I don't really know what their claims are.  It's more
20    of like a behavioral cognitive program.  It's not like, say,
21    for example, a methadone maintenance program or detoxification
22    program that -- like they have a program here in Grand Rapids
23    called, I think, Life Guidance.  And then there's one on
24    Eastern that's the Eastern Clinic and they call it medication-
25    assisted treatment.  And they don't have medication-assisted

13 (Pages 40 to 43)

## Page 44

1    treatment. As a matter of fact when I got there, they told me
2    that if I exhibited any symptoms of withdrawal that they'd
3    kick me out of the program immediately.
4         So before you got there, you had to be basically not
5    addicted. Well, I got there and I had a prescription, but I
6    didn't have a -- they didn't have a doctor there to continue
7    the prescription for the medication, which I didn't
8    understand. Because the place that gave it to me, Turning
9    Point, said, "Oh, yeah, when you get to Pine Rest, they'll
10   give you a prescription for this medication." Well, they
11   didn't. So I was sort of misled and basically felt that, you
12   know, I was unable to participate in the program without some
13   type of medication to assist me through that period.
14   Q. Have you taken methadone since January 16 of 2012?
15   A. No. I was in jail until November, but no, I haven't.
16   Q. So you're meth-free now?
17   A. Yeah, I don't take methadone now and I personally don't know
18   that I particularly want to take it in the future. It's sort
19   of based on pain levels. It has to do with how much pain you
20   perceive and your ability to deal psychologically with pain
21   issues. And at those times of my life, somehow medication
22   seemed to be the only alternative that I saw for pain.
23   Q. So be the motives good or bad, your 11 months in the facility
24   accomplished what your wife wanted and you wanted, which is
25   getting you off methadone?

## Page 45

1    A. Yeah, I wouldn't have to deny that.
2    Q. And Dr. Amat, what pain medication does --
3    A. It's called Ultram. It's a noncontrolled substance. You can
4    buy it off the Internet. But it does provide pain relief.
5    Q. Do you know whether you could have gotten Ultram at the
6    facility?
7    A. No, they don't allow that either.
8    Q. How do you know that?
9    A. Because I was taken to the emergency room at Saint Mary's and
10   the doctor prescribed me the Ultram and when I got back to the
11   jail they said, "No, you're not getting Ultram."
12   Q. When were you taken to Saint Mary's?
13   A. I don't remember what year that was, but I had to be taken
14   because I was -- the withdrawal was so bad. It may have been
15   2001.
16   Q. Oh, we're talking a decade ago.
17   A. Yes. I mean, it's nothing that I am raising a claim about.
18   Q. What were you addicted to then?
19   A. Well, I was on [sic] a methadone clinic. I was either in a
20   methadone clinic or I was getting it from Dr. Probe, one of
21   the two. I can't remember who it was.
22   Q. Besides your back, the arthritis issue in the back, what other
23   physical issues did you have when you were booked in January
24   of 2012?
25   A. High blood pressure.

## Page 46

1    Q. What else? Anything?
2    A. As far as physically?
3    Q. Yes.
4    A. Nothing else that I'm aware of.
5    Q. And to the best of your recollection, your prescription
6    medications January 16 of 2012 were methadone and a blood
7    pressure med?
8    A. Lisinopril.
9    Q. Since 2005 you had seen people at Turning Point, Pine Rest,
10   Dr. Garza. Anybody else since 2005?
11        (Short pause)
12   A. I'm trying to think who else I would have seen.
13        (Short pause)
14   I don't really think -- I don't think since 2005
15   I've seen anybody else.
16   Q. Had you been to any other clinics or hospitals other than
17   Pine Rest and Turning Point in the seven years before this?
18   A. No.
19   Q. The Muskegon clinic was --
20   A. Like '89, '90.
21        MR. SMIT: Okay.
22        (Exhibit No. 2 marked for identification.)
23   BY MR. SMIT:
24   Q. First let me ask you, when you went to the jail, you told the
25   nurse that you had a prescription for methadone?

## Page 47

1    A. Yes.
2    Q. Did you show her the prescription?
3    A. No. They take it from you at booking and then --
4    Q. Did you have the prescription sheet with you at booking?
5    A. Yes, because I was actually arrested when I was filling the
6    prescription at the Meijer's store.
7    Q. So you did not accomplish getting it filled?
8    A. No, I didn't get it filled. Actually when the police got
9    there and said I was going to jail, the pharmacist had the
10   prescription and he just said, "Well, I would prefer just
11   giving you the paper, the written prescription, and then if
12   the jail wants to fill it, they can fill it there."
13   Q. That was at Meijer's?
14   A. At Meijer's, yes.
15   Q. Which Meijer's?
16   A. 28th Street and Kalamazoo. And I think I got my prescriptions
17   filled there for that for a number of years.
18   Q. What was the regimen of methadone?
19   A. In what respect?
20   Q. How much were you taking and how often?
21   A. I took 60 milligrams a day and I can't remember if I -- I
22   think I took 20 three times a day, 20 milligrams three times a
23   day, like in the morning, in the afternoon, and before I went
24   to bed.
25   Q. So three pills?

14 (Pages 44 to 47)

## Page 48

1  A.  Well, actually they're 10-milligram pills.
2  Q.  Two, two and two?
3  A.  Two in the morning, two at lunch, and two at night, yeah.
4  Q.  And you had done that how long?
5  A.  Probably for a good seven years, at least, I would say.
6  Q.  Let me show you what's marked as Exhibit 2. Is this the
7     prescription we're talking about that you had with you at the
8     time?
9  A.  Yes, it is.
10 Q.  This says three in the morning and three at night.
11 A.  Yeah.
12 Q.  But you were taking two, two and two?
13 A.  I may have. I don't remember. I've had it so many different
14    ways. I'm sure that it was written this way and I may have
15    taken two, two and two.
16 Q.  If we depose Dr. Garza, he would say that this was
17    specifically for your back?
18 A.  Yes.
19 Q.  It then says, "The patient will be going out of the city."
20    Where were you planning on going?
21 A.  Yeah. When I got this prescription I was -- I had a friend
22    who does -- they work for Comcast. They go down to other
23    states and sometimes I go down there with them to do work and
24    I was looking into going -- I had gotten a call to go do work
25    and then basically I backed out because I was in the treatment

## Page 49

1     program. I decided the treatment program was what I needed to
2     do as opposed to leaving and going out of town.
3  Q.  So you didn't know January 16th that you were, in fact, going
4     to be arrested?
5  A.  No, I didn't.
6  Q.  You told him you were going out of the city and that's the
7     reason he says, "I'm going," I assume giving, "him this
8     prescription." How did this differ from your basic --
9  A.  I think the reason that I got this was because I believe that
10    I saw him earlier than I normally would, like in the period
11    exactly for one month. I think I saw him a week earlier or
12    something so then I could go out of town.
13 Q.  So if they hadn't arrested you on the 16th, you would have
14    been gone?
15 A.  I may very well had, yeah. I was debating whether I was or
16    not. I mean, it's cold up here. They were doing work down in
17    either Texas or Florida or something and I thought, "Oh, that
18    sounds good."
19 Q.  Is this the only thing Garza has treated you for?
20 A.  High blood pressure and the pain. Yeah, pretty much.
21 Q.  You didn't tell him that you were going to jail?
22 A.  No, he didn't know that I was going to jail. I didn't know I
23    was going to jail.
24       (Exhibit Nos. 3 through 6 marked for
25       identification.)

## Page 50

1  Q.  I'm going to show you what's been marked as Exhibit 3, which
2     is a medical release for Dr. Garza's records and ask you to
3     sign that. Exhibit 4 is Dr. Amat.
4  A.  Uh-huh.
5  Q.  Exhibit 5 is Dr. Campbell and 6 is Pine Rest.
6  A.  All right.
7  Q.  Just sign and date in the box, if you're willing to do so.
8     By the way, what was your role with Dr. Campbell?
9  A.  Now that I think of it, Dr. Campbell did -- I think he did
10    treat me with methadone, too.
11 Q.  When?
12 A.  I think it was prior to seeing Dr. Garza.
13 Q.  Okay.
14       (Short pause)
15 A.  Okay. And the date today is the 9th? Okay.
16       (Short pause)
17 Q.  And before you leave, I'll give you a copy of those.
18 A.  That would be fine.
19 Q.  When did you first start seeing Dr. Amat?
20 A.  When I got out of jail.
21 Q.  How did you come to see her?
22 A.  I think they offer some type of, you know, free clinic or
23    something. Somebody had told me that I could go down there.
24    I needed blood pressure medication.
25 Q.  They? Who are they?

## Page 51

1  A.  I think my brother-in-law and other people that I know. I
2     think I had called the Kent County Health Department and they
3     said, "Yeah, you can be seen at this clinic" or "that clinic."
4  Q.  Is that like a Cherry Street Clinic kind of thing?
5  A.  Yeah. I don't know --
6  Q.  It's, like, free medical or low-cost medical?
7  A.  Yeah.
8  Q.  All right. Why didn't you go back to Garza?
9  A.  Well, the insurance I had stopped.
10 Q.  What insurance?
11 A.  Well, I had some Medicaid-type insurance and because I was in
12    jail, it lapsed. So I had to reapply. I just reapplied, so
13    it's a matter of that.
14 Q.  Are you going to stay with Amat or go back to Garza?
15 A.  I don't know yet. I like Dr. Amat and I also like
16    Dr. Garza.
17 Q.  But Dr. Amat won't give you methadone?
18 A.  But it doesn't matter.
19 Q.  No, no, no. It doesn't matter whether it matters. The point
20    is, I'm asking you, she won't give you methadone?
21 A.  No.
22 Q.  Okay. Dr. Garza, you don't know if he would or not if you go
23    back?
24 A.  No, I wouldn't know if he would or not.
25 Q.  But you don't want to go back on methadone?

15 (Pages 48 to 51)

## Page 52

1    A.   Right. So if I went to see Dr. Garza, you know, unless I had
2    issues, pain issues, that got to that point, I wouldn't ask
3    for it. I don't want to just be on it for the sake of being
4    on it.
5    Q.   You don't need it now is what you're saying?
6    A.   No, I don't need it right now.
7    Q.   All right.
8        (Short pause)
9        Heartside Clinic, is that different than Turning
10    Point?
11    A.   Yeah. Turning Point is on Sheldon.
12    Q.   When were you at Turning Point?
13    A.   Just a few days before November 16th of 2012 before I went
14    into Pine Rest. Like five days before. I don't remember what
15    the date was. It was somewhere in that vicinity. The 11th
16    through the 16th, something like that.
17    Q.   I thought you were at Pine Rest then.
18    A.   Well, you go there for five days.
19    Q.   You go where?
20    A.   To this Turning Point over on Sheldon.
21    Q.   Okay.
22    A.   They stabilize you on some medication and then sent me to Pine
23    Rest. When I got to Pine Rest they said, "Well, we don't give
24    any medication; you'll have to get that on your own."
25    Q.   You told me you went to Pine Rest the middle of November.

## Page 53

1    A.   Yeah. What did I just say, a wrong date?
2    Q.   You said you went to Pine Rest the middle of November.
3    A.   Right.
4    Q.   And you were at Turning Point five days before January 16th.
5    A.   No. Five days before the – I misspoke then. Five days
6    before November 16th when I went into the treatment program,
7    you know.
8    Q.   So you went to Turning Point. Was that a requirement before
9    Pine Rest?
10    A.   Yes.
11    Q.   When were you at Heartside?
12    A.   Well, Heartside when I got out of jail on the 11th. I don't
13    know if I went in there in November. I think – I've seen
14    them twice and I think I saw them once in November and I just
15    saw her within the last week or so.
16    Q.   What are you going to Heartside for?
17    A.   I need blood pressure medication and –
18    Q.   Why aren't you getting that from Dr. Amat?
19    A.   Heartside is Dr. Amat.
20    Q.   Okay. Heartside is Dr. Amat?
21    A.   Yeah. She's Saint Mary's doctor who sees people at the
22    Heartside Clinic.
23    Q.   Okay. I see that.
24    A.   And she's treating me for a sleep disorder. Temporarily,
25    until I can be seen by a specialist.

## Page 54

1    Q.   How did the police, if you know, happen to nab you at the
2    pharmacy counter at Meijer? How did they know you were
3    there?
4    A.   One of the store security had banned me from the store years
5    ago and –
6    Q.   But I thought you said that was where you filled all your
7    prescriptions.
8    A.   I did. He just hadn't been working there for a number of
9    years. And when he came back to work, he saw me and called
10    the police and I had this warrant out for the computer.
11    Q.   Why had he banned you?
12    A.   They suspected that I hadn't paid for a prescription in the
13    past. Thought I was trying to steal a prescription.
14    Q.   And this guy remembered you after a number of years and
15    happened to see you that day and called the police?
16    A.   Yes.
17    Q.   Lucky day, hey?
18    A.   Oh, well. Things happen. But, yeah, I had been getting it
19    filled there for a number of years and he had tried to say
20    that I didn't have permission to be in the store. But he
21    wasn't there when I got permission to fill my prescriptions,
22    so –
23    Q.   Do you remember roughly what time you were arrested?
24    A.   Probably about 4:00 in the afternoon, 5:00.
25    Q.   So you got – where did they take you? Directly to Kent

## Page 55

1    County Correctional Facility?
2    A.   Yes.
3    Q.   Was this Grand Rapids PD?
4    A.   Yes.
5    Q.   So you got to Kent County what, 4:30 or so?
6    A.   Maybe 5:00. Maybe 4:30. I'm not sure.
7    Q.   And you didn't have any medications on you at that time?
8    A.   No. Just the prescription for my blood pressure medication
9    and for the methadone.
10        MR. SMIT: All right. We've been going an hour and
11    a half. Let's take a ten-minute break.
12        (Exhibit No. 7 marked for identification.)
13    BY MR. SMIT:
14    Q.   Is Salvation Army Turning Point the one on Sheldon? Is that
15    the one that you went to?
16    A.   Yeah.
17    Q.   Okay. That's the only release we don't have. So I need one
18    for Turning Point. I've marked that as Exhibit 7.
19        (Short pause)
20        Once you were booked into the facility on
21    January 16th, as part of booking you saw the nurse, right?
22    A.   Yes.
23    Q.   The nurse at that time asked you a lot of questions for a
24    medical screening?
25    A.   Yes.

16 (Pages 52 to 55)

Page 56

Q. Do you remember that?
A. Yes.
Q. She went through a list of prior medical conditions, the usual lengthy -- and looking at the medical screening form that was in the documents we produced to you, number 17 says, "Are you currently receiving treatment for a medical condition?" And she writes, "Methadone for my back for six years. Doctor writes script, Dr. Garza on Burton Street." So that's based on -- that is, in fact, what you told her?
A. Yes.
MR. SMIT: We might as well mark that.
(Exhibit Nos. 8 and 9 marked for identification.)
BY MR. SMIT:
Q. There was also a mental health screening form. So they do one physical one, medical, and they do one mental health one?
A. Yeah. They do that separately.
Q. This one, 3, it says, "Do you use illegal drugs?" And she has "No."
A. At that time I hadn't been using any.
Q. Well, how recently had you used heroin?
A. Probably, you know, I think maybe six months earlier or something. I think I had it done at one time.
Q. Did you have possession or control at that time at your home or otherwise of heroin?
A. No. I was -- I was picked up on June 29th of 2011 and I was

Page 57

in a car with -- and that was the suspicion, that me and somebody else was using heroin. So it was, you know, alleged that that's what I was doing. I had a warrant for a ticket that I hadn't paid in Wyoming, so I went to jail on that and did the 30 days.
Q. When you told her that you had been on methadone for six years, what did she say?
A. "You're not going to get methadone in the Kent County Jail."
Q. Did you tell her that you were concerned about that? Or did you say, "Okay, that's fine, I can do without"? Or what did you say?
A. No. You know, I don't know what I told her. I do know that she told me that it was the jail policy that "You will not receive any opiate medication while you're in jail."
Q. That's what she said?
A. Yeah.
Q. Okay. Did you tell her your concern that you're going to have a withdrawal issue?
A. I don't know if I told her that or not.
Q. Did she ask you?
A. I don't know that -- she must have because she automatically signed me up for it. And they would call me and take my blood pressure and ask me how I was feeling and stuff. So she must have put me down as having or suspected of going to have.
Q. Well, take a look at 3B. It says, "Do you have any drug

Page 58

withdrawal concerns?" And she put, "No." Do you remember her asking you that?
A. Right. And I didn't honestly at that time know, probably know how bad I was -- how bad the drug withdrawal was going to be.
Q. I thought you had drug withdrawal in the months you were there in the summer?
A. Right, I did, but, you know, I guess until it actually happens, you don't really know how bad it's going to be.
Q. Number 6 then says, "Have you ever received treatment for substance abuse?" You say, "Yes, Pine Rest recent and Turning Point."
A. Yeah.
Q. That's accurate, correct?
A. Yeah.
Q. All right. And that's marked Exhibit 9?
A. Yeah. This must be the psychiatric test, yeah.
Q. One is physical-medical and the other one is a psych.
A. All right. Well, the problem with that is, and I'm going to tell you right out, it's something that's addressed in a report by the National Institute of Health under a government-sponsored study that most people will not admit to having withdrawal symptoms when they go to the jail because they're generally isolated and deprived of other things that other inmates would be allowed. You're put in a restriction cell,

Page 59

you're monitored, generally with no phone calls. So a lot of times you don't want to say, just like, for example, I was once told --
Q. So they lie?
A. Yeah, absolutely.
Q. Did you?
A. I don't know that I did at that time, but -- for example, they ask you, "Have you ever attempted suicide or have you had suicide thoughts?" I think that most people probably who have had those kinds of thoughts will lie because generally what they do is they will strip you down with no clothing and put you in a cell, naked, and, you know, basically, you're sort of -- even though they don't call it punishment, you end up getting punished for it. So the same thing with the withdrawal. It becomes somewhat problematic as to what they're going to do if you exhibit --
Q. So I'm back to my question.
A. I don't remember what I told them.
Q. You've got to let me ask it. I have to ask the question before you answer. It's a rule.
A. Yeah.
Q. Did she ask if you were concerned about withdrawal and did you say no, because of that concern?
A. I don't remember.
Q. But could have?

Page 60

1  A. Honestly, I don't remember.
2  Q. But could have?
3  A. I know that I was upset about being in jail and oftentimes
4     being upset about being in jail sort of overrides your memory
5     of a whole lot of other things.
6  Q. Did you ask her what, if any, medications could be provided as
7     a substitute to address your back pain?
8  A. No.
9  Q. Did you ask to see a doctor regarding your back pain since
10    she had told you you wouldn't get the meds -- the prescription
11    you're on?
12 A. Probably not.
13 Q. Why not?  Why wouldn't you ask to see a doctor?
14 A. Because I knew that the doctor was not -- you know, one, I
15    knew the doctor was restricted by jail policy and that he
16    couldn't prescribe the medication.
17 Q. Well, you're not a doctor, are you?
18 A. No.
19 Q. Darn near a lawyer, but not a doctor.
20 A. Not a doctor.
21 Q. Okay.  But here's my question.  My question is, you don't know
22    medically or pharmacologically what's available to treat your
23    back pain whereas a doctor would.  Fair?
24 A. I am aware of what's available, but unfortunately, the Kent
25    County Jail has placed restrictions on its medical providers

Page 61

1     in that they are not allowed to prescribe from a certain class
2     of drugs for those problems.
3  Q. So based on your belief or assumption --
4  A. Yes.
5  Q. -- as to what the jail would allow, you chose not to see the
6     medical doctor at the facility --
7  A. Absolutely.
8  Q. -- and ask him to address your back pain with some other type
9     of medication that was allowable.  That's fair, isn't it?
10 A. Yes, it is.
11 Q. Okay.  Did you ever send a kite about not getting your
12    methadone?
13    (Short pause)
14 A. Probably not.
15 Q. Did you ever send a kite asking for a medical referral for
16    back pain?
17 A. Throughout the period of time that I was there, I did end up
18    asking to see the doctor for the back pain.
19 Q. How many times did you ask to see a doctor for back pain?
20 A. I probably asked several times before I was actually seen.
21 Q. Was that done by means of a kite?
22 A. Yes.
23 Q. How many kites, roughly, do you believe you wrote asking to be
24    seen for back pain?
25 A. I'm not certain.  Probably one at minimum.  I know he

Page 62

1     prescribed me some Motrin for the back pain.  You know, this
2     was long after I had been there.
3  Q. Well, wait a minute.  You went in on the 16th?
4  A. Yes.
5  Q. When did you first experience back pain that prompted you to
6     ask to see the doctor?
7  A. After I had withdrawal off the medication.
8  Q. So roughly what, a week, a month?
9  A. Probably two months, yeah.
10 Q. Okay.  So sometime, we'll call it middle March, give or
11    take --
12 A. Yeah.  I'm just trying to remember.
13 Q. -- you were off the methadone long enough so you started
14    having back pain to the point where you needed to see the
15    doctor?
16 A. Yeah.
17 Q. You then asked to see the doctor by means of a kite, correct?
18 A. Yes.
19 Q. What doctor did you see?  Yacob?
20 A. Yeah.
21 Q. You saw Dr. Yacob.  Specifically did you tell Dr. Yacob, "I am
22    having back pain, I've had back pain for six years, this is
23    my history of back pain and in the past I've been treated with
24    methadone on it"?  Did you tell him that?
25 A. I don't know what I told him, but I did tell him that I was

Page 63

1     having, you know, back and shoulder pain and I think upon my
2     insistence he had prescribed -- I didn't ask for Motrin, but
3     that's what he chose to prescribe to me.
4  Q. Did you tell him that you had been on methadone previously for
5     the back pain?
6  A. I may have.  I don't know.  I don't know what I talked to him
7     about, honestly.
8  Q. Did you tell him that you had been addicted to methadone and
9     had been in rehab for methadone?
10 A. Probably not.
11 Q. So he evaluated you, correct?  Met with you personally?
12 A. Yeah, I met with him personally.  Yes.
13 Q. Okay.
14    (Short pause)
15    Where did you meet with the doctor?  In your cell?
16 A. No.  I'm trying to remember.  I believe I went down -- they
17    have like a health care center down there.  You go down to
18    them and see them in their little office and he comes in and
19    sees people.
20 Q. Had he worked for Corizon?
21 A. Yes.
22 Q. And he spoke with you and evaluated you for your back pain,
23    correct?
24 A. Yes.
25 Q. And prescribed Motrin for it, correct?

18 (Pages 60 to 63)

## Page 64

1   A. Yes.
2   Q. Did he do any diagnostic testing? X-rays, MRIs, anything?
3   A. No.
4   Q. Okay. Did you then receive the Motrin?
5   A. I did.
6   Q. And did you take it faithfully?
7   A. No, I did not.
8   Q. Why not?
9   A. Because I told him that -- you know, when he prescribed it,
10     I told him that Motrin caused me -- you know, it really
11     didn't work for pain and that it caused a lot of side effects.
12     I took, I think, one dose and never took it again.
13   Q. Did you do any further requests to see the doctor for the back
14     pain or was that just the end of it?
15   A. I'm thinking it might have been the end of it, yeah. I mean,
16     it was so hard getting the Motrin, it was like -- you know, it
17     just was not worth the effort.
18   Q. And then for the remaining months, you just muddled through
19     and dealt with it?
20   A. Yes.
21   Q. Okay. Did you ever refuse medical treatment?
22   A. I'm not sure.
23        (Exhibit No. 10 marked for identification.)
24   BY MR. SMIT:
25   Q. Let me show you Exhibit 10. Is that your signature on that

## Page 65

1     document?
2   A. Yes.
3   Q. And what's it titled?
4   A. "Refusal of Clinical Services."
5   Q. And it's dated what? January 16, 2012 on the bottom?
6   A. Yes.
7   Q. At about 10:00 at night?
8   A. Yeah. I don't remember -- well, maybe that's about -- what
9     date is this?
10   Q. January 16.
11   A. Yes. So it must have been quite late when I got into the jail
12     there.
13   Q. What's going on there? What are you refusing?
14   A. Oh. I probably refused medical treatment. When I had been
15     in jail in July, they had attempted to give me medication for
16     the withdrawal.
17   Q. Yes.
18   A. They put it in a glass of water. The pills dissolved in the
19     water. When I drank it, I threw up all over their cart. On
20     two separate occasions. And not only did I throw up, I
21     continued to throw up for hours afterwards. And I didn't see
22     any improvement in the symptoms from that. It made the
23     symptoms worse. So I knew this time that I didn't want to
24     participate in any of their treatments.
25   Q. What were they wanting to give you that you refused?

## Page 66

1   A. Some medication that was to help out with nausea. I'm trying
2     to think what else they put in there. I think they put a
3     blood pressure pill in there.
4   Q. They were going to give you medication to address possible
5     withdrawal from the methadone you were on, weren't they?
6   A. I'm not certain what they were going to give the medication
7     for.
8   Q. Well, take a look. It says, "I understand there are the
9     following possible risks, complications, and/or side effects
10     involved in refusing clinical services; altered cardiac output
11     and risk of withdrawal from methadone." So you're saying in
12     the line above this, you wrote, "I cannot swallow pills that
13     have been dissolved in water," and they're saying, "Okay, but
14     if you don't take what we're medically suggesting you take
15     here, you might suffer withdrawal effects from the methadone."
16   A. But I had --
17   Q. No. That's what it says?
18   A. Right.
19   Q. And you signed it saying, "I understand the information on
20     this form and have had the opportunity to ask questions"?
21   A. Yes.
22   Q. Correct? And you said, "I don't care about the withdrawal
23     from methadone, I'm not taking what you're prescribing for me
24     here because it makes me sick to my stomach." Fair?
25   A. Yeah, that would be fair. Something that's going to make me

## Page 67

1     more sick than I already am, I'm not taking it.
2   Q. In your opinion?
3   A. Well, I think my opinion is the only opinion that counts.
4   Q. Not the doctor?
5   A. Absolutely not.
6   Q. Okay.
7   A. He's not experienced in withdrawal or experienced, for that
8     matter, in pain management. He's not an expert in the
9     field.
10        (Exhibit No. 11 marked for identification.)
11   BY MR. SMIT:
12   Q. Let me show you what's been marked as Exhibit 11.
13   A. Same one or different one?
14   Q. Different. It's another Refusal of Clinical Services, isn't
15     it? Top of the page.
16   A. Yeah. What date was this?
17   Q. This is January 16th, 10:00. Are you with me?
18   A. Yeah. She probably asked if I wanted --
19   Q. There's no question, Brad.
20   A. Okay.
21   Q. Work with me. This is another Refusal of Clinical Services?
22   A. Yes.
23   Q. Signed by you, correct?
24   A. Yes.
25   Q. Here you refused a physical exam? Right?

19 (Pages 64 to 67)

**Kane & Trap Court Reporting, Inc.**
services@kaneandtrap.com                              (616) 742-0700

## Page 68

1  A.  Yes.
2  Q.  So you wouldn't even let the nurse, the medical staff, perform
3      a physical when you got to the jail, would you?
4  A.  I just saw my doctor today at 1:00.  What did I need a
5      physical for?  That was my opinion.
6  Q.  Do you do yoga?
7  A.  Yes, I do.
8  Q.  Does that help your back?
9  A.  Yes, it does.
10 Q.  Did you do yoga while at the facility?
11 A.  In jail?
12 Q.  Yes.
13 A.  Yes.
14 Q.  Were you able to do that?
15 A.  It took a while to get back into doing it, but yes, I was able
16     to do it and it seems to have helped with some of my back
17     pain.  Just out of curiosity, how did that subject come up?
18 Q.  We know all.
19 A.  Yeah.  I'm sure there's probably something in there that I
20     missed, but --
21 Q.  Well, in other words, your back wasn't giving you such a
22     problem that you weren't able to do your yoga as the record
23     indicates?
24 A.  No.
25          (Exhibit No. 12 marked for identification.)

## Page 69

1  BY MR. SMIT:
2  Q.  I'm showing you what's marked as Exhibit 12.  These are
3      the chronological notes from the medical staff.  I think we
4      produced these to you.  And they go like e-mails.  In other
5      words, go to the last one.
6  A.  Yeah.
7  Q.  It's the first one on the second page.  On January 16 she
8      says, "Inmate presented as calm, alert and oriented.  Inmate
9      denied current s/i or sibs."
10 A.  Hold on.
11 Q.  Bottom of the second page.
12 A.  Oh, bottom.
13 Q.  It goes backwards.
14 A.  "Met with" --
15 Q.  "Met with inmate at intake."
16 A.  Yeah.  Sibs.
17 Q.  "Inmate reported being in residential substance abuse
18     treatment at the Jeltema Treatment Center at Pine Rest
19     before his arrest."  Did you tell her it was for methadone
20     addiction?
21 A.  I don't recall what I told her.
22 Q.  If this says, "Inmate's denied having any withdrawal concern,"
23     is that accurate?
24 A.  I may have told them that, yeah.
25 Q.  Do you suffer from depression?

## Page 70

1  A.  Do I?
2  Q.  Yes.
3  A.  I have.
4  Q.  Is it depression that is of such clinical nature that you've
5      needed medication for it?  Prozac or other Serotonin drugs?
6  A.  Well, I have tried these drugs before.  Generally the
7      depression that I experienced was related to pain issues
8      and generally the issue of pain resulted in depression and
9      depression resulted in more pain.  So it was, like, sort of
10     cyclical.  And I have seen several psychiatrists for pain
11     issues related to depression.
12 Q.  Well, if you go up a page here, this is again on January 16.
13     I'm sorry.  This is on June 19, 2012.  It says, "Met with
14     Mr. Sleighter per notification of med refusal."  So again in
15     June you're refusing certain medications, right?  It says, "He
16     denied having any suicidal thoughts.  He reported an interest
17     in changing his medication, citing the Prozac is ineffective."
18 A.  What date is this?  Oh, 6-19.
19 Q.  Yes, June 19.
20 A.  Yeah.
21 Q.  So in June they prescribed Prozac for your depression and
22     you're refusing to take Prozac.  You said, "It's no good"?
23 A.  Well, I mean, I had took it before.  What the problem was
24     is that I was sleeping an awful lot and they've got some
25     antidepressant medications that help you sleep and some that

## Page 71

1      will help you be a little bit more alert.  And she suggested
2      that the Prozac might make me a little more alert during
3      the day because I had told her that there were other
4      medications that I took and she said, "Well, I can't give you
5      that, I can't give you that."  So it's like, "Well, okay, I'll
6      try that."  I took it for, like, two or three days and it did
7      nothing but made me sleep all day.  So I told them I didn't
8      want to take it anymore.
9  Q.  So then go up one and it says, "Patient was seen by Dr. Zara
10     on June 8.  He complained to her the Norpramin wasn't helping
11     him.  She discontinued it and started him on Prozac."
12 A.  Right.
13 Q.  So you didn't like the Norpramin and you quit that.  And then
14     she put you on Prozac and you refused to take that?
15 A.  Right.  Unfortunately, just because a doctor prescribes a
16     medication for you doesn't imply that it's going to work or do
17     what they thought.
18 Q.  Then if you go to the first page, in the middle here is the
19     yoga.
20 A.  Okay.
21 Q.  "Saw inmate with DSU placement.  He was in a lotus yoga
22     position and reported he was meditating."  That's September 2,
23     correct?
24 A.  Yeah, I think I was in -- DSU some kind of a segregation
25     unit where they put you in, like, isolation.

20 (Pages 68 to 71)

## Page 72

1  Q.  Were you -- by September you had been off methadone --
2  A.  Probably six months, eight months.
3  Q.  Yes, about eight months.  So you were methadone clean by then,
4      fair?
5  A.  Yes.
6  Q.  Were you on any other pain medication for your back?
7  A.  No.
8  Q.  And in September you were -- I take it one of the reasons you
9      were doing the yoga is that that was good back stretching and
10     good for your back?
11  A.  Yes.
12  Q.  And your pain was such that you were able to do that, sit in a
13     lotus position and do your yoga?
14  A.  Yes.
15         (Exhibit No. 13 marked for identification.)
16  BY MR. SMIT:
17  Q.  Let me show you the Correctional Health Care Progress Notes.
18     January 16 is your check-in.  This is when you signed those
19     medical refusals, right?
20  A.  Yes.
21  Q.  It says, "I've taken methadone for my back for six years and
22     have low blood pressure."  Or is it -- no, "low back pain."
23  A.  "Lower back pain."
24  Q.  Okay.  And that's what you told her, right?
25  A.  Possibly.  I don't know.  But, yeah, I'm sure.

## Page 73

1  Q.  Okay.  It says, "I don't want any pills here.  You make me
2     drink them dissolved and that makes me sick."  Is that what
3     you told her?
4  A.  Yes.
5  Q.  "Unable to do" -- I can't read that.
6  A.  I can't either.
7  Q.  Okay.  Then it says, "Signed Refusal of Services since we use
8     pills in H2O and won't give him methadone here."
9  A.  Yeah.  Very much.
10  Q.  Okay.  Then on the 24th she reports you saying, "I feel great,
11     except I get" -- "I feel great, except after I eat, I get
12     stomach cramps."  Do you remember that?
13  A.  No.
14  Q.  You don't remember the stomach cramps?
15  A.  Not right off, but I'm sure I've had -- you know, by the 24th
16     I'm sure I was sick.  I can't see if it's the 27th.  It says
17     24th, but then it says 1-27.
18  Q.  No.  This is -- 1-24 is a different note about it.
19  A.  Right.
20  Q.  Here is January 27.  So we're about 11 days after you get
21     checked in there.  You say, "I feel great, except after I eat,
22     I get stomach cramps"?
23  A.  Yeah, I may have.  I don't remember that.
24  Q.  Then go down to where it says, "O."  It says, "Patient states,
25     'I only take maybe 30 milligrams of methadone every couple

## Page 74

1     days - it's not really a withdrawal issue.'"  What were you
2     saying there?
3  A.  What I was saying was that I hoped that they would give me
4     some kind of treatment for being sick.  I remember being down
5     there.  I was throwing up.  I had been throwing up and they
6     took me down there.
7  Q.  But you're telling them you're not in withdrawal?
8  A.  Well, I knew they weren't going to treat me for withdrawal.
9  Q.  Right.
10  A.  So I was attempting to get some treatment for throwing up.
11  Q.  Right.  But you're telling them, "Look, this is not a
12     withdrawal situation from the methadone," right?  That's what
13     you're saying?
14  A.  Right.  You know, I probably knew that it was, but like I
15     said, attempting to get treatment for something else is a lot
16     easier.  The attitude sort of is, "Well, you're going through
17     withdrawal, you'll just have to ride through it and there's
18     not a lot we can do for it."  But if you're sick and you're
19     throwing up, then they're a little bit more willing to treat
20     you for the symptoms as opposed to the idea of going through
21     withdrawal.
22  Q.  So you're telling them that you're nauseated, you're sick to
23     your stomach, but it's not withdrawal from methadone?
24  A.  Possibly I told them that and very well could have.
25  Q.  Okay.  Then the next note on the 28th says, "Patient refuses

## Page 75

1     to sign consents.  Has also been refusing withdrawal checks.
2     Will send to doctor for review."  Were you refusing to
3     participate in any type of withdrawal treatment or sign
4     consents for treatment on withdrawal?
5  A.  I don't know exactly what they're referring to, but I probably
6     was refusing to participate in their withdrawal program, which
7     entailed basically taking my blood pressure three to four
8     times a day.
9  Q.  You just didn't want the hassle?
10  A.  That's right.
11        MR. SMIT:  Can you mark this, please?
12        (Exhibit No. 14 marked for identification.)
13  BY MR. SMIT:
14  Q.  Let me show you a document marked Exhibit 14.  Take a look at
15     that a minute and tell me what that is.
16        (Short pause)
17  A.  Okay.  Well, it says I want the medical --
18  Q.  Well, first, what is the form?  Is that a kite?
19  A.  Yeah, I think it is what they refer to as a kite or a medical
20     request form.
21  Q.  And did you fill that out?
22  A.  Yes.
23  Q.  That's your writing?
24  A.  Yes.
25  Q.  Tell me what you are asking for here.

**Kane & Trap Court Reporting, Inc.**
services@kaneandtrap.com        (616) 742-0700

## Page 76

1   A.  Well, one, the date is 3-29, so I've already obviously been
2       in jail for several months and they told me I couldn't
3       participate in any of the work programs to be able to, like,
4       you know, sweep the halls or work in the kitchen or anything
5       because I had this medical withdrawal hold on me. So,
6       therefore --
7   Q.  Wait. So they were still monitoring you and treating you for
8       methadone withdrawal as of then?
9   A.  They never took me off of it.
10  Q.  Okay. So they were monitoring you medically and treating you
11      for methadone withdrawal until roughly March 29? Do I have
12      that right?
13  A.  It's one of those deals like where it gets put in the computer
14      and doesn't get took out. So it had to have been removed and
15      apparently you have to speak to the doctor before it can be
16      removed. I wasn't still in withdrawal in March.
17  Q.  But you told them that you weren't.
18  A.  Yeah, I wasn't in withdrawal at that point. My withdrawal
19      went probably for the first month and that was it.
20  Q.  So even though you're telling them, "Look, I don't have
21      withdrawal problems," they're still medically monitoring you
22      and keeping you in the withdrawal program?
23  A.  Yeah, basically.
24  Q.  And by the end of March, you've just about had it? You've had
25      enough?

## Page 77

1   A.  Well, I wanted to do something different, move to a different
2       part of the jail or something, yeah.
3   Q.  So you send them this kite and say, "Take me off of whatever
4       this withdrawal program is" --
5   A.  Exactly.
6   Q.  -- "so that I can get out and do work and sweep the halls and
7       do something," right?
8   A.  Yes.
9   Q.  And did they do that?
10  A.  I believe they did.
11          (Exhibit No. 15 marked for identification.)
12  BY MR. SMIT:
13  Q.  Let me show you what's been marked as Exhibit 15. That's
14      another kite, right? Dated April 11th?
15  A.  Uh-huh.
16  Q.  Yes?
17  A.  Yes.
18  Q.  And here you're upset about what they've prescribed for you
19      and provided for your blood pressure?
20  A.  Exactly.
21  Q.  And you don't want to take it due to side effects and, in
22      fact, say you'd rather be dead than feel like this?
23  A.  Yeah, it felt pretty bad.
24  Q.  "I need to be seen for proper medication." So, again, you're
25      disagreeing with the medical staff?

## Page 78

1   A.  Well, you know, I've had high blood pressure since I was
2       35 years old. My doctors have tailored the medication down.
3       I know exactly what medication I need and exactly what dose I
4       take. And I've been taking that same dose for probably six or
5       more years with Dr. Garza. I come to jail and they want to
6       change it to another drug that caused me a lot of side
7       effects, you know. The medication when I stood up, it made me
8       feel like I was getting dizzy. Later they conceded that they
9       probably gave me too high of a dose when they started me out
10      on it, but they eventually put me on the medication that
11      Dr. Garza had prescribed.
12  Q.  So you just disagree with their medical judgment, right?
13  A.  Absolutely.
14          MR. SMIT: Can you mark that one?
15          (Exhibit No. 16 marked for identification.)
16  BY MR. SMIT:
17  Q.  How many times would you estimate in the ten months that you
18      were at the facility you saw a doctor?
19  A.  Okay. If we include "the" doctor and --
20  Q.  Any medical doctor at the facility.
21  A.  Right. Now, he appoints, like, physician assistants and
22      nurse practitioners to handle those duties that they --
23  Q.  Let's include them all. How many times did you see a
24      professional medical --
25  A.  I would say probably 12 times.

## Page 79

1   Q.  Twelve times?
2   A.  Yeah.
3   Q.  In ten months?
4   A.  Yeah, probably.
5   Q.  And out of those 12, how many times did you say, "You know,
6       I've got a back pain issue and need something for it"?
7   A.  Probably once or twice at the most.
8   Q.  And the only time you can remember for certain he prescribed
9       you Motrin, correct?
10  A.  Yes.
11  Q.  And you didn't like it and you quit taking it?
12  A.  Yes.
13  Q.  Let me show you what's been marked as Exhibit 16. Is this
14      the one time that you asked to see the doctor for the back,
15      arthritis pain?
16  A.  It very well could be, yes.
17  Q.  It's a May 17 kite, correct?
18  A.  Uh-huh.
19  Q.  Yes?
20  A.  Yes.
21  Q.  Is this the one where you, in fact, saw Dr. Yacob?
22  A.  I'm not sure. This is more like a referral.
23  Q.  Right.
24  A.  But I'm sure I began making references to arthritis and back
25      pain, yeah.

| Page 80 |
|---|

1   Q.  And it's your belief that this is most likely the time when
2       they prescribed the Motrin?
3   A.  I'm not sure when they prescribed it, but I know they did
4       prescribe it at one time.
5   Q.  How many times did you see a psychiatrist or a psychologist?
6   A.  Maybe three times.  Maybe three.
7   Q.  Each time that you wrote a kite asking to see a doctor, did
8       you get to see some health care professional?
9   A.  Not always, no.
10  Q.  What percentage of it?  Most of them?
11  A.  Maybe 20 percent.
12  Q.  Only 20 percent?
13  A.  Sure.
14  Q.  So if you saw them 12 times, we can assume that you wrote
15      60 kites?
16  A.  Probably.
17  Q.  Do you have a copy of your kites?
18  A.  They do in the medical file that you gave me.
19  Q.  And out of the 60 kites that you wrote for seeing medical,
20      about 12 of the times you saw a nurse practitioner or a
21      doctor?
22  A.  Yes.
23  Q.  How many times out of the -- what did you say -- three times
24      you asked for a psychologist?
25  A.  I probably asked to see a psychiatrist or a psychologist

| Page 81 |
|---|

1       probably ten times and probably saw one maybe three or four
2       times.
3           (Exhibit No. 17 marked for identification.)
4   BY MR. SMIT:
5   Q.  Let me show you what's been marked as Exhibit 17.  Now, you
6       have dismissed Corizon, correct?
7   A.  Yes.
8   Q.  So is it fair to say that within the constraints put on them
9       by the jail, you are satisfied with the medical care that you
10      received from Corizon while at the facility?
11  A.  Absolutely not.
12  Q.  Then why did you dismiss them?
13  A.  Because Corizon doesn't qualify under the 42 USC 1983 as
14      operating under the color of law.  They're subcontracted.
15      They don't meet the qualifications of the lawsuit.  Therefore,
16      there was no point in proceeding against them because they
17      would have been dismissed down the road.
18  Q.  So you don't believe that Corizon provided you with adequate
19      medical care?
20  A.  Oh, absolutely not.  But from what I can see, if I want to sue
21      them, I have to sue them through a different manner, which
22      would probably be the state court, to start in a state court.
23      It would be more like a malpractice lawsuit as opposed to a
24      violation of civil rights.
25  Q.  Do you believe that the people at Corizon were deliberately

| Page 82 |
|---|

1       indifferent to your medical needs?
2           (Short pause)
3   A.  I'm not sure that I can answer that question because there's
4       a lot of factors that have to be taken into account, under-
5       staffing, restrictions that are placed on them.  Obviously
6       concerns about medication being diverted.  I also know that
7       they're a contracted medical facility and it's about costs
8       and -- when somebody has medical problems that are going to
9       cost them a lot more money, they will generally try to find
10      a way to avoid treatment until the person is released from
11      jail.
12  Q.  So do you believe that Corizon deliberately gave you
13      insufficient or improper medical treatment while you were at
14      the facility?
15  A.  Yes.
16  Q.  All right.  Take a look at the statement of your claim on
17      page 3 of Exhibit 17.
18  A.  This is in the original complaint.
19  Q.  This is your original complaint.
20  A.  Okay.
21  Q.  Is that accurate?
22  A.  Okay.  What is it saying?
23  Q.  That's your handwriting?
24  A.  Yes.
25  Q.  I'd like you to read -- just take a minute and read through

| Page 83 |
|---|

1       those two pages and tell me if now there's anything you would
2       change or if it's an accurate statement.
3   A.  About Corizon?
4   Q.  No, the whole thing.
5           (Short pause)
6   A.  Well --
7   Q.  First, why don't you do this.  Read through those two pages
8       and then tell me if anything you wrote there is not accurate,
9       okay?
10  A.  All right.  I'll go ahead and read through it.
11          (Short pause)
12          Yeah, that's accurate.
13  Q.  All right.  Then let me ask you just a couple of questions on
14      it.  You say in the middle of that page that you informed the
15      nurse that you had a prescription for methadone?
16  A.  Yes.
17  Q.  And that she told you the jail doesn't allow inmates to
18      receive opioid pain medication per policy, right?
19  A.  Yes.
20  Q.  You then say, "I did not see a doctor and did not receive my
21      medication."  Well, obviously, we know you saw lots of doctors
22      lots of times?
23  A.  Right, but I didn't see a doctor in the initial interview.
24  Q.  On the 16th?
25  A.  The 16th or any time shortly thereafter.

**Kane & Trap Court Reporting, Inc.**
services@kaneandtrap.com                              **(616) 742-0700**

## Page 84

1  Q. Did you specifically ask to see a doctor for back pain on the
2     16th or the 17th?
3  A. No.
4        (Exhibit No. 18 marked for identification.)
5  BY MR. SMIT:
6  Q. Let me show you what's been marked as Exhibit 18. This is the
7     amended complaint that you attached to one of your pleadings.
8     It hasn't been filed yet?
9  A. Right. And I'm sure that -- well, I'm going to make a motion
10    that this be recognized as a first amended complaint, unless
11    the defendants are willing to just grant me permission to file
12    it as a first amended complaint.
13 Q. No, we won't agree to that.
14 A. I didn't think you would.
15 Q. You've now done your meet-and-confer.
16 A. I suspected that when Mr. Greenwald had objected to it as a
17    first amended complaint.
18 Q. No, you need to file a motion now.
19 A. Yeah, I'm going to file a motion for the court to accept this
20    as a first amended complaint.
21 Q. Going back a moment to the last one which is your complaint
22    that's on record now.
23 A. Yes.
24 Q. In your damage section, you say you're asking for damages in
25    the form of punitive action.

## Page 85

1  A. Yes.
2  Q. What do you want?
3  A. Monetary compensation.
4  Q. As punitive?
5  A. Yes.
6  Q. How much? It's your suit. You've got to --
7  A. I understand that. As you know, I'm doing this by myself. I
8     have no idea how to value or assess a damage claim. I guess
9     I'm assuming the courts would either give me an opportunity at
10    some point to -- or the courts, if they ruled in my favor,
11    would make that decision based on prior or similar situations.
12 Q. All right. Let me ask you this question then. You also want
13    damages for pain and suffering. Describe for me what pain and
14    suffering you suffered.
15 A. Pain and suffering was not being able to sleep for 30 days.
16    Vomiting for countless days, sweating.
17 Q. Countless meaning five, ten?
18 A. Probably five days.
19 Q. Okay.
20 A. Five days throwing up.
21 Q. All right. And this is from the methadone withdrawal?
22 A. Yes, this is from the methadone withdrawal.
23 Q. What other pain and suffering?
24 A. Temperature changes in the body and a heightened sense of
25    pain. So the pain that I had from before was heightened to a

## Page 86

1     much greater degree.
2  Q. For how long? I mean the methadone --
3  A. Probably slowly for about 30 days.
4  Q. All right.
5  A. You know, it goes through different phases. Methadone is a
6     long-acting opioid. It stays in your system for a good
7     72 hours until you start experiencing anything. And generally
8     it's about a week, seven days, before you start getting to the
9     worst part of it and that's when I started throwing up. It
10    was painful. The vomiting was painful.
11 Q. The back pain was roughly about 30 days before that got to
12    where --
13 A. Yeah, probably. I still had back pain at 30 days, but I mean
14    at that point it was probably about at the same level it would
15    have been at when I was prescribed the medication originally.
16 Q. Okay.
17 A. Realizing that I wasn't going to get any kind of physical
18    therapy or anything.
19 Q. Well, you did your yoga.
20 A. I started doing that.
21 Q. Which is kind of your own physical therapy.
22 A. Absolutely.
23 Q. Okay.
24 A. That's what I tried to do is to, you know, do something to
25    help myself. But, I mean, in this amended complaint that I

## Page 87

1     had listed what are some of the physical and --
2  Q. I'm just asking you to describe for me the pain and
3     suffering you're asking damages for and you've explained the
4     temperatures and the nausea, the vomiting, the periods that
5     you had it, the month or so that your back pain was worse.
6  A. Yes.
7  Q. Have we generally covered it?
8  A. I mean, I was agitated. There was anxiety. There were
9     chills.
10 Q. Well, the anxiety, you were turning down antidepressants like
11    Prozac and the like, which are --
12 A. Those were not given to me until long after the withdrawal was
13    over.
14 Q. Okay. And the withdrawal was over by what? February? End of
15    February?
16 A. Yeah. I had vomiting, I had nausea, I had diarrhea, I had
17    chills. I did have tachycardia. I also had very high blood
18    pressure that they -- that's when they tried to give me the
19    Catapres for the blood pressure and it made me just feel
20    worse. I was weak.
21 Q. So the withdrawal was not -- the withdrawal from the methadone
22    was not pleasant?
23 A. No, it was very unpleasant.
24 Q. Okay. And for a while your back pain was worse?
25 A. Yes.

24 (Pages 84 to 87)

**Kane & Trap Court Reporting, Inc.**

## Page 88

1    Q.  And then by the time you asked to be off the program the end
2         of March --
3    A.  Yes.
4    Q.  -- by that time, I take it, the withdrawal was over?
5    A.  Yeah, withdrawal was over.  I was feeling better.
6    Q.  And your back was doing better and you were --
7    A.  Yes.
8    Q.  -- back to doing yoga?
9    A.  Yes.
10   Q.  Okay.  Did you give any consideration to filing a grievance?
11   A.  The issue about filing a grievance -- oh, you happen to have
12        the handbook with you.
13   Q.  Yes.  Is this the --
14   A.  Yeah.  I'll show you right in there.  I attempted to file
15        several grievances.
16   Q.  Did you fill out forms to do that?
17   A.  Yes.  Well, you fill out the medical kite.  I sent numerous
18        kites about numerous issues for grievances.  And I don't
19        remember all the things that are not allowed to file a
20        grievance for, but medical issues are definitely an issue
21        that you can't file a grievance with.  "Inmate grievance
22        procedures.  The inmate grievance system is not for appeal of
23        discipline, classification decisions, any facility policies or
24        discrepancies, commissary problems, inmate services, medical
25        concerns, court decisions or educational or religious

## Page 89

1         services."  So these are all the things you can't file a
2         grievance for.
3    Q.  So instead you addressed it by a kite to the medical staff?
4    A.  Well, yeah.  And I think I attempted to file grievances with
5         the medical prior to even being aware of the fact that you
6         couldn't grieve medical issues.
7    Q.  So since you couldn't formally grieve, the method that
8         you used on -- the method used by inmates on medical is to
9         send a kite asking to be seen by medical?
10   A.  Exactly.  But if you have a problem and you don't agree with
11        something, you're basically left with no other alternative
12        other than to seek, you know, relief through the courts.
13   Q.  The doctor's decision is final?
14   A.  Pretty much.
15   Q.  Okay.
16   A.  Or jail policy.
17   Q.  Well, if you're not happy with what the doctor is doing, like,
18        for example, they had you on Prozac or the like and they
19        decide to do something, what you're telling me -- or are you
20        telling me there's some appeal somewhere from that?
21   A.  No, there isn't.
22   Q.  Okay.  That's a final decision by the doctor?
23   A.  Yeah, it's a final decision.
24   Q.  Okay.
25   A.  But I would add that if I was not in jail and I went to a

## Page 90

1         doctor and the doctor says, "Well" -- I didn't agree with the
2         doctor, then I can always go for a second opinion.  You're not
3         afforded that opportunity in jail.
4    Q.  That's one of the downsides of stealing, isn't it?
5    A.  It is and I can understand that.  But I guess the question
6         would be is at this point I haven't been convicted of
7         stealing.  So I should have been presumed innocent and allowed
8         all the protections that I would have been allowed --
9    Q.  That's not my client's job, is it?
10   A.  Well, I don't know.
11   Q.  We just house you.
12   A.  Right.  And this is what the argument is is I think that the
13        federal courts have pretty much made it clear that it is the
14        jail's responsibility to ensure that my civil rights are not
15        violated.
16   Q.  We have nothing to do in terms of how things sort out for you
17        in the courts, whether you plead, whether you're found guilty,
18        whether you're found innocent.
19   A.  Not criminal.  I'm talking about civil.
20   Q.  That's what I'm saying.  We have nothing to do with the fact
21        that you're there.
22   A.  I understand that.
23   Q.  Okay.
24   A.  But what I'm saying is is the fact that I am there, they're
25        required to ensure --

## Page 91

1    Q.  Oh, I understand that.
2    A.  -- that my rights are --
3    Q.  Sure.  You and I may disagree as to how that's done and what's
4         the right --
5    A.  That's why we're here today.
6    Q.  I understand.  Since then, have you seen any doctors besides
7         Dr. Amat?  Since November of 2012.
8    A.  No.
9    Q.  Have you been to any hospitals or clinics other than Heartside
10        and Dr. Amat?  Or is it Turning Point and Amat?
11   A.  Well, Turning Point, I haven't been there since I got out.
12   Q.  I'm sorry.  Amat is with Heartside?
13   A.  She's with Heartside.
14   Q.  Okay.  Have you been anywhere besides Dr. Amat and Heartside?
15        Any clinics, any hospitals, any doctors?
16   A.  I did go to the hospital.  I did go to the hospital.  I had
17        a -- I guess -- I don't know.  I passed out in the bathroom
18        and my wife called an ambulance and I went to the hospital
19        in the ambulance and they did some CAT scans and made some
20        referrals and then I followed up with Dr. Amat.
21   Q.  What was the diagnosis of the incident?
22   A.  I don't know what they -- it had to do with blood pressure I'm
23        sure.  I had had problems with it before.  When I stood up, I
24        got dizzy and passed out and they wanted to make sure I didn't
25        have any head injury.  They noticed some abnormalities in one

**Kane & Trap Court Reporting, Inc.**

services@kaneandtrap.com                                    (616) 742-0700

## Page 92

1  of the blood vessels and wanted me to follow it up with an MRI
2  and that was pretty much the extent of it.
3  Q. Did everything check out okay?
4  A. Yeah, basically. Yes.
5  Q. I think it's called postural hypotension.
6  A. Exactly. That's exactly what it was.
7  Q. You get up too fast and you swoon.
8  A. Yes.
9  Q. Okay. How is your back now?
10 A. I mean, my back hurts right now. I mean, I experience pain
11 from my back. I also have arthritis in my shoulders and am
12 starting to have it in my upper neck.
13 Q. And what, if anything, are you taking for your back today?
14 A. I take this Ultram. But, you know, the thing is that I
15 just am not to the point where I want to seek, you know, like
16 pain clinic assistance or anything like that for the back
17 pain. I mean, I'm not going to say that there aren't
18 problems with pain relief that's obtained by the use of opiate
19 medication.
20     I think a good example is, like, Rush Limbaugh. He
21 had received pain treatment and it -- for a legitimate reason.
22 I think there's an inherent risk in these types of drugs.
23 I've come to learn over the years of using them that they are
24 very, very problematic in their outcome as far as treatment
25 goes. Possibly some people do real well with them, but then

## Page 93

1  there are others who don't and I'm one of the ones that
2  doesn't do good with that type of pain treatment.
3  Q. You can think of, I take it, a decent reason as to why as a
4  policy the jail doesn't want those drugs administered?
5  A. I can understand their position and I think the position is
6  archaic.
7  Q. But given the type of population you have in a jail, having
8  opioids in a jail, you can see that there would be significant
9  risks, fair?
10 A. I could see that risk if the dispensing of the medication
11 wasn't as strict as it is. I mean, technically the medication
12 is -- even your blood pressure medication is dispensed
13 directly by a nurse. You are required to take it right in
14 front of them and they often will check your mouth to make
15 sure that you're not saving the medication.
16 Q. But even setting aside security, you do have addiction issues
17 with those types of medications. It's a risky business.
18 A. Absolutely. And I would say that probably -- I would probably
19 say that a large percentage of the people that go to jail have
20 some form of a substance abuse problem. I think the issue is
21 is the idea that there is a policy that prohibits treating
22 addiction with medically established protocols for detoxifying
23 somebody off the medication.
24 Q. But it's your medical opinion that the only thing that is
25 appropriate and effective for back pain such as yours is the

## Page 94

1  opioid class of medications? Nothing else is medically
2  acceptable?
3  A. Okay. I think there is a difference between saying what is
4  acceptable. In my case I had tried a number of other
5  medications to get to the point where I was on methadone. I
6  didn't just go see a doctor and he put me on methadone.
7  This went through years and years of trial and error in
8  medications. Finally that seemed to be the medication that
9  worked the best for my back pain.
10 Q. But you're getting along -- you're getting along without it
11 now?
12 A. That's right.
13 Q. And you don't have any addictions?
14 A. And that doesn't necessarily mean that I may not in the future
15 require that type of treatment.
16 Q. But the proof is in the outcome. Your back pain is manageable
17 without opioids?
18 A. Absolutely.
19     MR. SMIT: Okay. That's all I have. Thank you.
20     (Deposition concluded.)
21
22
23
24
25

## Page 95

1                 CERTIFICATE
2
3  STATE OF MICHIGAN   )
4                      )
5  COUNTY OF KENT      )
6
7      I, REBECCA S. RENZEMA, Certified Shorthand Reporter
8  and Notary Public, do hereby certify that the foregoing matter
9  was taken before me at the time and place hereinbefore set
10 forth.
11     I FURTHER CERTIFY that this matter was taken in
12 shorthand and thereafter transcribed by me and that it is a
13 true and accurate transcript.
14     IN WITNESS WHEREOF, I have hereunto set my hand this
15 12th day of April of 2013 at Caledonia, Michigan.
16
17
18 _____
   REBECCA S. RENZEMA, CSR-1435
19 Notary Public for Kent County
20 My Commission Expires: 12-31-2016
21
22
23
24
25

26 (Pages 92 to 95)

**Kane & Trap Court Reporting, Inc.**

UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

BRADLEY KEITH SLEIGHTER

                        Plaintiff,

    v

KENT COUNTY JAIL
ADMINISTRATION, and
CORIZON MEDICAL SERVICES,
                        Defendants.

Case No. 1:12-cv-001008

Hon. Gordon J. Quist
U.S. District Judge

Hon. Ellen S. Carmody
U.S. Magistrate Judge

**EXHIBIT # 1**

---

Bradley Keith Sleighter **(In Pro Per)**
82 50th SW, Apt. 323
Wyoming, MI 49548

Paul J. Greenwald (P25368)
Peter A. Smit (P27886)
VARNUM LLP
Attorneys for Defendant Kent County Jail
Administration
Bridgewater Place
333 Bridge Street NW
P.O. Box 352
Grand Rapids, MI 49401-0352
(616) 336-6000

Kimberly A. Koester (P48967)
Ronald W. Chapman (P37603)
CHAPMAN AND ASSOCIATES, P.C.
Attorneys for Corizon Medical Services
40950 N. Woodward Avenue, Suite 120
Bloomfield Hills, MI 49304
(248) 644-6326

---

## NOTICE OF DEPOSITION *DUCES TECUM* OF BRADLEY KEITH SLEIGHTER

Please take notice that Defendants, through their counsel, VARNUM LLP, will take the

deposition *duces tecum* on oral examination of **Bradley Keith Sleighter** as follows:

        DATE:        Tuesday, April 9, 2013

        TIME:        10:00 a.m.

PLACE:     Varnum LLP
           Bridgewater Place
           333 Bridge St., N.W., Suite 1700
           Grand Rapids, MI 49504
           (616) 336-6000

The deponent is requested to produce at the deposition the following documents:

1.      Any and all documents which in any way relate to or reference the allegations in his Complaint in the above-referenced matter.

2.      Any and all psychological, psychiatric, or medical records in Plaintiff's possession which in any way substantiate Plaintiff's claim for medical, mental and/or emotional damages.

3.      Any and all e-mails or other computer records which in any relate to, reference, or reflect on Plaintiff's claims set forth in his Complaint.

4.      Any and all profiles, postings, or messages from social networking sites that refer or relate to claims set forth in Plaintiff's Complaint.

This deposition will be taken before a duly qualified court reporter pursuant to and for all purposes permitted by the Federal Rules of Civil Procedure, and you may appear at the time and place designated for the purpose of examining the witness.

Respectfully submitted,

VARNUM LLP
Attorneys for Kent County Jail Administration

Date: 3/28/13

By: _____
    Peter A. Smit (P27886)
    Paul J. Greenwald (P25368)
Business Address & Telephone:
    Bridgewater Place, P.O. Box 352
    Grand Rapids, MI 49501-0352
    (616) 336-6000

cc:     Kane & Trap Court Reporting, Inc.

6008023_1.DOCX

2

UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

BRADLEY KEITH SLEIGHTER

                   Plaintiff,        Case No. 1:12-cv-001008

v                            Hon. Gordon J. Quist
                               U.S. District Judge
KENT COUNTY JAIL
ADMINISTRATION, and
CORIZON MEDICAL SERVICES,      Hon. Ellen S. Carmody
               Defendants.     U.S. Magistrate Judge

---

Bradley Keith Sleighter (In Pro Per)     Kimberly A. Koester (P48967)
82 50th SW, Apt. 323                Ronald W. Chapman (P37603)
Wyoming, MI 49548               CHAPMAN AND ASSOCIATES, P.C.
                               Attorneys for Corizon Medical Services
Paul J. Greenwald (P25368)         40950 N. Woodward Avenue., Suite 120
Peter A. Smit (P27886)              Bloomfield Hills, MI 49304
VARNUM LLP                     (248) 644-6326
Attorneys for Defendant Kent County Jail
Administration
Bridgewater Place
333 Bridge Street NW
P.O. Box 352
Grand Rapids, MI 49401-0352
(616) 336-6000

---

## CERTIFICATE OF SERVICE

I certify that on March 28, 2013, the Notice of Deposition *Duces Tecum* of Bradley Keith

Sleighter was served on:

     Bradley Keith Sleighter         Ronald W. Chapman, Esq.
     82 50th SW, Apt. 323             Chapman and Associates, P.C.
     Wyoming, MI 49548             40950 N. Woodward Ave., Suite 120
                               Bloomfield Hills, MI 49304

by placing a true and correct copy in the United States mail, postage prepaid.

By:    <u>/s/ Peter A. Smit</u>
          Peter A. Smit (P27886)
Business Address & Telephone:
          Bridgewater Place, P.O. Box 352
          Grand Rapids, MI 49501-0352
          (616) 336-6000

6008701_1.DOCX

2

Case 1:12-cv-01008-GJQ-ESC Doc #18-2 Filed 03/13/13 Page 3 of 3 Page ID#103

**Ricardo Garza Quintero MD PC**
2000 Burton Road SE
Grand Rapids, MI 49506-4670
**(616) 245-1947      (616) 245-7151**

Ricardo GarzaQuintero MD
Lic #: RG067451    NPI #: 1528023421

Name: Sleighter, Brad
232 Himes SE
Wyoming, MI 49548

DOB:        5/5/1958

---

*Rx*                                                                                      1/16/2012

methadone Oral Tablet 10 mg
SIG: take 3 tablets by oral route in the morning and 3 at night. The patient will be going out of the City; this is the reason I am going him this prescription.
Disp: (180) one hundred eighty  tablets with 0 refills

---

## NO MEDICATIONS PRESCRIBED BEYOND THIS POINT



# Medications Prescribed: (1) one

_____
Dispense As Written

_____
Product Selection Permitted



## AUTHORIZATION TO RELEASE MEDICAL INFORMATION TO
## VARNUM, RIDDERING, SCHMIDT & HOWLETT LLP

(The execution of this form does not authorize the release of information other than that specifically described below)

| TO:<br>Ricardo Garza, M.D.<br>2000 Burton St. S.E.<br>Grand Rapids, MI 49506 | PATIENT:<br>NAME: Bradley Keith Sleighter<br><br>SOC. SEC. #: xxx-xx-9141<br><br>BIRTH DATE: 5/5/1958 | RELEASE TO:<br>VARNUM, RIDDERING, SCHMIDT<br>& HOWLETT LLP<br>Attn: Peter A Smit<br>333 Bridgewater Place–P.O. Box 352<br>Grand Rapids, MI 49501-0352<br>Phone: (616) 336-6000 |
|---|---|---|

I request and authorize the above-named doctor or health care provider to release the information specified below to the organization, agency or individual named on this request. I understand that the information to be released includes information regarding the following condition(s):

☐ Drug Abuse, if any                                      ☐ Alcoholism or alcohol abuse, if any
☐ HIV/AIDS/STDs and/or other Communicable Diseases        ☐ Psychological or psychiatric conditions, if any

**Information Requested:**                                **Dates Covered:**
☒ Copy of physician's complete office chart including all  ☒ All admissions or care at this facility or by these
   correspondence & reports                         Doctors
☐ Copy of outpatient & E.R. admissions                   ☐ Limited to treatment dates & for conditions
☐ Copy of complete hospital chart                           described below:
☐ Other (specify) Legible photocopies of all office notes,
   reports, test results, correspondence and billing records
   concerning this patient

**Purpose(s) or need for which information is to be used:**
☐ Damage or claim evaluation and presentation            ☒ Pending litigation
☐ Other (Attorney Evaluation)

AUTHORIZATION - I certify that this request has been made voluntarily and that the information given above is accurate to the best of my knowledge. I understand that I may see and copy the information described on this form if I ask for it and that I may revoke this authorization at any time, except to the extent that action has already been taken to comply with it. This authorization may be used or reused to obtain subsequently prepared records pertaining to treatment of any type after the date of this release as long as this authorization remains valid. I further understand that the information used or disclosed pursuant to this authorization may be re-disclosed by the receiving entity, without further authorization. This authorization shall be valid for one year from the date of my signature hereon.

☐ Copies of records to be supplied to my attorneys upon their request and at their expense
☐ Other

OTHER CONDITIONS - A copy of this authorization or my signature thereon: ☒ may, ☐ may not be utilized with the same effectiveness as an original.

| DATE<br><br>4-9-13 | SIGNATURE OF PATIENT<br><br>*Brad Sleighter* | PERSON AUTHORIZED TO SIGN FOR PATIENT<br><br>Print or type name. State how authorized: |
|---|---|---|

5781876_1.DOCX



## AUTHORIZATION TO RELEASE MEDICAL INFORMATION TO
## VARNUM, RIDDERING, SCHMIDT & HOWLETT LLP

**(The execution of this form does not authorize the release of information other than that specifically described below)**

| TO:<br>**Dr. Belen Amat-Martinez**<br>**Saint Mary's Healthlink-Heartside**<br>**359 South Division**<br>**Grand Rapids, MI  49503** | PATIENT:<br>NAME: Bradley Keith Sleighter<br><br>SOC. SEC. #: xxx-xx-9141<br><br>BIRTH DATE: 5/5/1958 | RELEASE TO:<br>VARNUM, RIDDERING, SCHMIDT<br>& HOWLETT LLP<br>**Attn:  Peter A Smit**<br>333 Bridgewater Place–P.O. Box 352<br>Grand Rapids, MI  49501-0352<br>Phone:  (616) 336-6000 |

I request and authorize the above-named doctor or health care provider to release the information specified below to the organization, agency or individual named on this request.  I understand that the information to be released includes information regarding the following condition(s):

| | | | |
|---|---|---|---|
| ☐ | Drug Abuse, if any | ☐ | Alcoholism or alcohol abuse, if any |
| ☐ | HIV/AIDS/STDs and/or other Communicable Diseases | ☐ | Psychological or psychiatric conditions, if any |

**Information Requested:**

☒ Copy of physician's complete office chart including all correspondence & reports
☐ Copy of outpatient & E.R. admissions
☐ Copy of complete hospital chart
☐ Other (specify) Legible photocopies of all office notes, reports, test results, correspondence and billing records concerning this patient

**Dates Covered:**

☒ All admissions or care at this facility or by these Doctors
☐ Limited to treatment dates & for conditions described below:

**Purpose(s) or need for which information is to be used:**

☐ Damage or claim evaluation and presentation          ☒ Pending litigation
☐ Other (Attorney Evaluation)

AUTHORIZATION - I certify that this request has been made voluntarily and that the information given above is accurate to the best of my knowledge.  I understand that I may see and copy the information described on this form if I ask for it and that I may revoke this authorization at any time, except to the extent that action has already been taken to comply with it.  This authorization may be used or reused to obtain subsequently prepared records pertaining to treatment of any type after the date of this release as long as this authorization remains valid.  I further understand that the information used or disclosed pursuant to this authorization may be re-disclosed by the receiving entity, without further authorization.  This authorization shall be valid for one year from the date of my signature hereon.

☐ Copies of records to be supplied to my attorneys upon their request and at their expense
☐ Other

OTHER CONDITIONS - A copy of this authorization or my signature thereon:  ☒ may, ☐ may not be utilized with the same effectiveness as an original.

| DATE<br><br>4-9-13 | SIGNATURE OF PATIENT<br><br>*Brad Sleighter* | PERSON AUTHORIZED TO SIGN FOR PATIENT<br><br>Print or type name.  State how authorized: |

6031104_1.DOCX



## AUTHORIZATION TO RELEASE MEDICAL INFORMATION TO
## VARNUM, RIDDERING, SCHMIDT & HOWLETT LLP

**(The execution of this form does not authorize the release of information other than that specifically described below)**

| TO:<br>John N. Campbell, M.D.<br>1676 Viewpond Dr., S.E.<br>Grand Rapids, MI 49508 | PATIENT:<br>NAME: Bradley Keith Sleighter<br><br>SOC. SEC. #: xxx-xx-9141<br><br>BIRTH DATE: 5/5/1958 | RELEASE TO:<br>VARNUM, RIDDERING, SCHMIDT & HOWLETT LLP<br>Attn: Peter A Smit<br>333 Bridgewater Place–P.O. Box 352<br>Grand Rapids, MI 49501-0352<br>Phone: (616) 336-6000 |
|---|---|---|

I request and authorize the above-named doctor or health care provider to release the information specified below to the organization, agency or individual named on this request. I understand that the information to be released includes information regarding the following condition(s):

| ☐ Drug Abuse, if any<br>☐ HIV/AIDS/STDs and/or other Communicable Diseases | ☐ Alcoholism or alcohol abuse, if any<br>☐ Psychological or psychiatric conditions, if any |
|---|---|

| **Information Requested:**<br>☒ Copy of physician's complete office chart including all correspondence & reports<br>☐ Copy of outpatient & E.R. admissions<br>☐ Copy of complete hospital chart<br>☐ Other (specify) Legible photocopies of all office notes, reports, test results, correspondence and billing records concerning this patient | **Dates Covered:**<br>☒ All admissions or care at this facility or by these Doctors<br>☐ Limited to treatment dates & for conditions described below: |
|---|---|

**Purpose(s) or need for which information is to be used:**
☐ Damage or claim evaluation and presentation          ☒ Pending litigation
☐ Other (Attorney Evaluation)

AUTHORIZATION - I certify that this request has been made voluntarily and that the information given above is accurate to the best of my knowledge. I understand that I may see and copy the information described on this form if I ask for it and that I may revoke this authorization at any time, except to the extent that action has already been taken to comply with it. This authorization may be used or reused to obtain subsequently prepared records pertaining to treatment of any type after the date of this release as long as this authorization remains valid. I further understand that the information used or disclosed pursuant to this authorization may be re-disclosed by the receiving entity, without further authorization. This authorization shall be valid for one year from the date of my signature hereon.

☐ Copies of records to be supplied to my attorneys upon their request and at their expense
☐ Other

OTHER CONDITIONS - A copy of this authorization or my signature thereon: ☒ may, ☐ may not be utilized with the same effectiveness as an original.

| DATE<br>4-9-13 | SIGNATURE OF PATIENT<br>*Brad Sleighter* | PERSON AUTHORIZED TO SIGN FOR PATIENT<br><br>Print or type name. State how authorized: |
|---|---|---|

5808320_1.DOCX



## AUTHORIZATION TO RELEASE MEDICAL INFORMATION TO
## VARNUM, RIDDERING, SCHMIDT & HOWLETT LLP

**(The execution of this form does not authorize the release of information other than that specifically described below)**

| TO:<br>Pine Rest Christian<br>    Mental Health Services<br>300 - 68th St. S.E.<br>Grand Rapids, MI 49548 | PATIENT:<br>NAME: Bradley Keith Sleighter<br><br>SOC. SEC. #: xxx-xx-9141<br><br>BIRTH DATE: 5/5/1958 | RELEASE TO:<br>VARNUM, RIDDERING, SCHMIDT<br>& HOWLETT LLP<br>Attn:  Peter A Smit<br>333 Bridgewater Place–P.O. Box 352<br>Grand Rapids, MI 49501-0352<br>Phone:  (616) 336-6000 |

I request and authorize the above-named doctor or health care provider to release the information specified below to the organization, agency or individual named on this request.  I understand that the information to be released includes information regarding the following condition(s):

☒ Drug Abuse, if any                                       ☒ Alcoholism or alcohol abuse, if any
☐ HIV/AIDS/STDs and/or other Communicable Diseases        ☒ Psychological or psychiatric conditions, if any

**Information Requested:**

☒ Copy of physician's complete office chart including all correspondence & reports
☐ Copy of outpatient & E.R. admissions
☒ Copy of complete hospital chart
☐ Other (specify) Legible photocopies of all office notes, reports, test results, correspondence and billing records concerning this patient

**Dates Covered:**

☒ All admissions or care at this facility or by these Doctors
☐ Limited to treatment dates & for conditions described below:

**Purpose(s) or need for which information is to be used:**

☐ Damage or claim evaluation and presentation            ☒ Pending litigation
☐ Other (Attorney Evaluation)

AUTHORIZATION - I certify that this request has been made voluntarily and that the information given above is accurate to the best of my knowledge.  I understand that I may see and copy the information described on this form if I ask for it and that I may revoke this authorization at any time, except to the extent that action has already been taken to comply with it.  This authorization may be used or reused to obtain subsequently prepared records pertaining to treatment of any type after the date of this release as long as this authorization remains valid.  I further understand that the information used or disclosed pursuant to this authorization may be re-disclosed by the receiving entity, without further authorization.  This authorization shall be valid for one year from the date of my signature hereon.

☐ Copies of records to be supplied to my attorneys upon their request and at their expense
☐ Other

OTHER CONDITIONS - A copy of this authorization or my signature thereon: ☒ may, ☐ may not be utilized with the same effectiveness as an original.

| DATE | SIGNATURE OF PATIENT | PERSON AUTHORIZED TO SIGN FOR PATIENT |
|---|---|---|
| 4-9-13 | Brad K. Sleighter | Print or type name. State how authorized: |

5781806_1.DOCX

# AUTHORIZATION TO RELEASE MEDICAL INFORMATION TO VARNUM, RIDDERING, SCHMIDT & HOWLETT LLP



**(The execution of this form does not authorize the release of information other than that specifically described below)**

| TO: | PATIENT: | RELEASE TO: |
|---|---|---|
| **Salvation Army Turning Point**<br>**72 Sheldon Blvd. SE**<br>**Grand Rapids, MI 49503** | NAME: Bradley Keith Sleighter<br><br>SOC. SEC. #: xxx-xx-9141<br><br>BIRTH DATE: 5/5/1958 | VARNUM, RIDDERING, SCHMIDT & HOWLETT LLP<br>Attn: Peter A Smit<br>333 Bridgewater Place–P.O. Box 352<br>Grand Rapids, MI 49501-0352<br>Phone: (616) 336-6000 |

I request and authorize the above-named doctor or health care provider to release the information specified below to the organization, agency or individual named on this request. I understand that the information to be released includes information regarding the following condition(s):

☐ Drug Abuse, if any                 ☐ Alcoholism or alcohol abuse, if any
☐ HIV/AIDS/STDs and/or other Communicable Diseases   ☐ Psychological or psychiatric conditions, if any

**Information Requested:**
☒ Copy of physician's complete office chart including all correspondence & reports
☐ Copy of outpatient & E.R. admissions
☐ Copy of complete hospital chart
☐ Other (specify) Legible photocopies of all office notes, reports, test results, correspondence and billing records concerning this patient

**Dates Covered:**
☒ All admissions or care at this facility or by these Doctors
☐ Limited to treatment dates & for conditions described below:

**Purpose(s) or need for which information is to be used:**
☐ Damage or claim evaluation and presentation     ☒ Pending litigation
☐ Other (Attorney Evaluation)

<u>AUTHORIZATION</u> - I certify that this request has been made voluntarily and that the information given above is accurate to the best of my knowledge. I understand that I may see and copy the information described on this form if I ask for it and that I may revoke this authorization at any time, except to the extent that action has already been taken to comply with it. This authorization may be used or reused to obtain subsequently prepared records pertaining to treatment of any type after the date of this release as long as this authorization remains valid. I further understand that the information used or disclosed pursuant to this authorization may be re-disclosed by the receiving entity, without further authorization. This authorization shall be valid for one year from the date of my signature hereon.

☐ Copies of records to be supplied to my attorneys upon their request and at their expense
☐ Other

OTHER CONDITIONS - A copy of this authorization or my signature thereon: ☒ may, ☐ may <u>not</u> be utilized with the same effectiveness as an original.

| DATE | SIGNATURE OF PATIENT | PERSON AUTHORIZED TO SIGN FOR PATIENT |
|---|---|---|
| 4-9-13 | *Brad Sleighter* | Print or type name. State how authorized: |

6038777_1.DOCX

# Medical Screening Form

Inmate's Name: SLEIGHTER, BRADLEY KEITH     Bk #: 1201032  Book D/T: 1/16/2012  7:43:00PM DOB: 05/05/1958
Screening Completed by Nurse:  PHS195     Screening Date and Time:  1/16/2012  8:04:43PM

MEDICAL HEALTH HISTORY:     1. Do you have any current or past medical illness or health condition? Explain    [Yes]  *HIGH BLOOD PRESSURE*

2. Do you have seizures or epilepsy?    [No]

3. Do you have asthma? Have you been hospitalized for this in the previous year? Steroid dependant? Ever been intubated?    [No]

4. Do you have diabetes?    [No]

5. Are you vomiting?    [No]

6. Do you have HTN?    [Yes]  *LISINIOPRIL 40 BID*

7. Do you have a heart condition? If yes, are you taking asprin?    [No]

8. Do you have an abnormal skin condition?    [No]

9. Do you have allergies?    [No]

10. Do you have any infected wounds?    [No]

11. Have you recently had a head injury?    [No]

12. Do you have any dental problems?    [No]

13. Are you currently pregnant? (If yes, what is the EDD?)    [No]

14. Have you given birth within the last 6 weeks? (If yes, where? When is the follow up?)    [No]

15. Do you suffer from gynecological problems?    [No]

16a. Have you been hospitalized due to a medical condition within the past month? (If yes, please give location and date.)    [No]

16b. Were you seen in the emergency room prior to coming to jail?    [No]

17. Are you currently receiving treatment for a medical condition? (If yes, what?)    [Yes]  *METHADONE FOR MY BACK FOR 6 YEARS, DR WRITES SCRIPT*

18. Are you under a physician's care? (If yes, what is their name and location? When was your last visit?)    [Yes]  *DR GARZA. ON BURTON ST*

19. Are you taking any medications? (Are they with you? Name & dosages? When last taken? Pharmacy & location?)    [Yes]  *MEIJERS ON 28TH ST/KAL*

20. Is there anything else we need to know about your medical health history?    [No]

INFECTIOUS DISEASE HISTORY:     1. Do you have any current or past history of an infectious disease?    [No]

2. Do you have any current or past history of TB? (If yes, what, where and when was the treatment? What was length of treatment?)    [No]

EXHIBIT
#8
RR 4/9/13
PENDAD 000431-0000

**Inmate's Name:** SLEIGHTER, BRADLEY KEITH          **Bk #:** 1201032  **Book D/T:** 1/16/2012  7:43:00PM **DOB:** 05/05/1958
**Screening Completed by Nurse:** PHS195          **Screening Date and Time:** 1/16/2012  8:04:43PM

3. Current symptoms of TB - Do you have a chronic cough with blood?  Are you currently coughing up blood?

No

4. Current symptoms of TB - Have you had recent weight loss?

No

5. Current symptoms of TB - Have you had a recent appetite loss?

No

6. Current symptoms of TB - Do you have a fever?

No

7. Current symptoms of TB - Do you have night sweats?

No

8. Current symptoms of TB - Do you have fatigue?

No

9. Do you have any current sexually transmitted illnesses?  (If yes, what are they?)

No

10. Do you currently have crabs?

No

11. Do you have currently have scabies?

No

12. Do you have hepatitis?

No

13. Is there anything else we need to know about your infectious disease history?

No

OBSERVATIONS:                              1. A&O x 3

Yes

2. Normal gait?  (If no, explain - limp, shuffle, stumbling, etc.)

Yes

3. Normal breathing?  (If no, explain - SOB, hyperventilation, wheezing, etc.)

Yes

4. Normal skin appearance?  (If no, explain - jaundice, rashes, bruises, needle marks, scars, etc.)

Yes

5. Tremors?

No

6. Sweating?

No

7. Anxious?

No

8. Disheveled?

No

9. Lethargic?

No

10. Angry or agressive behavior?

No

11. Dilated pupils?

No

12. Presents as Cognitively challenged?

No

13. Presents as Confused and/or disoriented?

No

14. Crying?

No

**Inmate's Name:** SLEIGHTER, BRADLEY KEITH
**Screening Completed by Nurse:** PHS195

**Bk #:** 1201032 **Book D/T:** 1/16/2012 7:43:00PM **DOB:** 05/05/1958
**Screening Date and Time:** 1/16/2012 8:04:43PM

15. Any other important observations? (List details.)

No

INCIDENTALS:                    1. Dental Screening Performed?        *VIEWED*

Yes

2. Do you want a jail physical?

No

3. Do you want a TB skin test?

No

4. Do you want a test for STI?

No

5. Have you informed the inmate on how to access medical treatment within this facility?

No

REFERRALS MADE:                 1. Nursing?

No

2. Physician?

No

3. Dentist?

No

4. Mental Health?

No

5. Vital Signs Taken? BP / P / R / T / BS / Peak flow rate

No

6. Do you have health insurance? (If yes, list name of provider.)

No

**STREET DRUGS**                **OVER THE COUNTER DRUGS**

Comments: SIGNED OFF ALL MEDICAL CARE, THE REASON HE GAVE ME WAS THAT WE PUT PILLS IN CUPS OF WATER AND EXPECT HIM TO SWOLLOW THEM AND THEY TASTE BITTER AND MAKE HIM NAUSOUS

Signature: _____    Employee Number: _____    Date: 1/16/2012

Page #5

# Mental Health Screening Form

| | Yes or No: | Text Answer: | Comment: |
|---|---|---|---|
| Screening Date:  1/16/2012  7:53:41PM | | | |
| Inmate's Name: SLEIGHTER, BRADLEY KEITH | | | |
| Booking #:  1201032 | | MAUREEN HOGAN RN | |
| Screening completed by: | | | |
| te: | No | | |

**SUBSTANCE ABUSE:**

| | | | |
|---|---|---|---|
| Are you currently taking medication that has not been prescribed to you? (If yes, what drugs, when last taken and who prescribed.) | No | | |
| Are you currently drunk or high? (If yes, state details.) | No | | |
| 3a. Do you use illegal drugs? (If yes, state details like what type of substance, amount of daily consumption, mode, last date/time of usage.) | No | | |
| 3b. Do you have any drug withdrawal concerns? | No | | |
| 4a. Do you currently use alcohol? (If yes, state details.) | No | | |
| 4b. Do you have any alcohol withdrawal concerns? | No | | |
| 5. Have you ever had alcohol or drug withdrawal? (If yes, state details like what type of substance, amount of daily consumption, mode, last use, & withdrawal symptoms experienced such as seizures or hallucinations.) | No | | |
| 6. Have you ever received treatment for substance abuse? (If yes, when and where?) | Yes | | PINE REST RECENT, TURNING POINT |
| 7. Is there anything else we need to know about your substance abuse history? | No | | DENIES |

**MENTAL HEALTH:**

| | | | |
|---|---|---|---|
| 1. Are you taking medications for mental health issues? (If yes, list what, where, when and by whom or what organization.) | No | | |
| 2. Have you ever been treated for ADHD? (If yes, where, when, and by whom.) | No | | |
| 3. Have you ever been treated for developmental disorders? (If yes, state where, when, and by whom.) | No | | |
| 4. Have you ever been treated for an eating disorder? (If yes, state where, when and by whom.) | No | | |
| 5. Have you ever been in special education? (If yes, state where, when and by whom.) | No | | |
| 6a. Have you ever been diagnosed as bipolar? (if yes, where, when, by whom?) | No | | DENIES |
| 6b. Have you every been diagnosed with schizophrenia? | | | |

EXHIBIT #9  PR 4/9/13

Name: SLEIGHTER, BRADLEY
Booking #: 1201032

Ser
Text Answer:
g Date: 1/16/2012  7:53:41PM

Comment:

| | Yes | No | |
|---|---|---|---|
| 7. Have you ever had learning disability? | | No | |
| 8. Does anyone in your family have or had a mental illness? (If yes, who and what diagnosis). | | No | |
| 9. Have you ever been case managed for mental illness? (If yes, where, when and by what agency.) | | No | |
| 10. Have you ever been treated in a psychiatric hospital? (if yes, state where and when & why). | | No | |
| 11. Have you ever been self-abusive or engaged in self mutilation behavior or feeling homicidal now? (explain) | | No | |
| 12. Are you feeling homicidal now? | | No | |
| 13. Have you ever been physically abused? (If yes, explain if as a child, adolescent, adult.) | | No | |
| 14. Have you ever had suicidal attempts or thoughts, now or ever? (If yes, explain when, where, how). | | No | |
| 15. Have you having suicial thoughts now or thinking of harming yourself now? | | No | DENIES |
| 16. Do you have any current or past losses that you are feeling grief and depression over? (Explain if yes.) | | No | DENIES |
| 17. Has anyone in your family ever taken their own life? | | No | |
| 18. Have you ever experienced or witnessed a life threatening or abusive event that still bothers you today? | | No | |
| 19. Are you currently having feelings of hopelessness or helplessness, or that you see no future for yourself? | | No | |
| 20. Do you have a support system in the community that you can depend on? | | No | |
| 4. Have you ever experienced auditory, visual, ofactory, or tactial hallucinations? | | No | |
| 5. Has inmate ever had or experienced delusional thinking, examples? | | No | |

NURSING STAFF STOP HERE

****INTAKE SCREENING NOW COMPLETE****
JAIL MENTAL HEALTH CLINICAL ASSESSMENT
AND TREATMENT PLAN

Comments:    SO, DENIES SELF HARM TODAY.

Report Printed On: 1/16/2012



EXHIBIT #10
LR 4/9/13

 PHS

## Refusal of Clinical Services

### DEMOGRAPHICS

Facility Name: KCQF     Inmate Number: 16848

Inmate Name: Bradley Bradley     Date of Birth: 5,5,55

Housing Location: ○ General Population ○ Segregation ○ Infirmary ○ Other ____    Sex: ☑ Male ☐ Female

### CURRENT CONDITION

I, _____ , have been told that I have _____
      Name of Inmate

indicating a need for: _____

The risks and benefits have been explained to me.

☐ Refused medication (List) _____

☐ Refused laboratory services      ☐ Refused Chronic Care Clinic

☐ Refused x-ray services      ☐ Refused outside medical appointment

☐ Refused Other diagnostic tests _____    ☐ Other: _____

☐ Refused physical examination

☐ Refused dental care ○ Extraction ○ Exam ○ Other: _____

### REASON / POTENTIAL CONSEQUENCES

Reason For Refusal: A can not swallow pills that have been disolved in water.

I understand there are the following possible risks, complications, and/or side effects involved in refusing clinical services.

Potential Risks Explained to Patient (Describe): altered conlusionant put's risk of WD from Methalone

### ACKNOWLEDGEMENT CLAUSE

I acknowledge that I have been fully informed of and understand the above recommendation(s), and the risks involved in refusing them. I hereby release and agree to hold harmless the City/County/State, statutory authority, all correctional personnel, my health care provider, and all medical personnel from all responsibility and any ill effects which may result from this action/refusal and I personally assume all responsibility for my refusal.

I understand that I will continue to have access to health care, and may resubmit a request for this service.

### SIGNATURE / WITNESS

I understand the information on this form and have had the opportunity to ask questions.

Brad Sleighter
Signature of Inmate        Additional Witness (if required)

Date _____ Time _____ AM/PM     Date _____ Time _____ AM/PM

☐ Patient has refused to sign this form. This requires the signature of at least one witness in addition to that of the medical staff member.

| INTERVIEWER | REFERRAL |
|---|---|
| Monroe HOF<br>Signature | Referral for additional follow up: ☐ no ☐ yes<br>Describe: _____ |
| Printed/Stamped<br>1/6/13    20:02<br>Date    Time    AM/PM | _____ |

© Prison Health Services, Inc. 2008   All rights reserved

PHS

**Refusal of Clinical Services**

EXHIBIT
#11
PR 4/9/13

## DEMOGRAPHICS

| | |
|---|---|
| Facility Name: KCCF | |
| Inmate Name: *Sleighter Doellin* | Inmate Number: 46846 |
| Housing Location: ○ General Population ○ Segregation ○ Infirmary ○ Other | Date of Birth: 5-25-58 |
| | Sex: ☑ Male ☐ Female |

## CLINICAL CONDITION

I, _____ FREE PHYSICAL
                Name of Inmate , have been told that I have
indicating a need for   PHYSICAL EXAM & TESTING

The risks and benefits have been explained to me.

☐ Refused medication (List) _____
☐ Refused laboratory services
☐ Refused x-ray services
☐ Refused Other diagnostic tests _____
☑ Refused physical examination
☐ Refused dental care  ○ Extraction  ○ Exam  ○ Other_____

☐ Refused Chronic Care Clinic
☐ Refused outside medical appointment
☑ Other: STD & TB TESTING

## REASON / POTENTIAL CONSEQUENCES

Reason For Refusal:   REFUSED PHYSICAL EXAM
_____
_____
_____

I understand there are the following possible risks, complications, and/or side effects involved in refusing clinical services.
Potential Risks Explained to Patient (Describe):   MAY RESULT IN MISSED PHYSICAL
                        ABNORMALITIES OR DISEASE STATES
_____
_____

## ACKNOWLEDGEMENT CLAUSE

I acknowledge that I have been fully informed of and understand the above recommendation(s), and the risks involved in refusing them. I hereby release and agree to hold harmless the City/County/State, statutory authority, all correctional personnel, PHS Correctional Healthcare and all medical personnel from all responsibility and any ill effects which may result from this action/refusal and I personally assume all responsibility for my refusal.

I understand that I will continue to have access to health care, and may resubmit a request for this service.

## SIGNATURE / WITNESS

I understand the information on this form and have had the opportunity to ask questions.

X *Brad Sleighter*
        Signature of Inmate

_____
        Additional Witness (if required)

| Date | Time | AM/PM | Date | Time | AM/PM |
|---|---|---|---|---|---|
| ☐ Patient has refused to sign this form. This requires the signature of at least one witness in addition to that of the medical staff member | | | | | |

## INTERVIEWER

*Damien Hogan*
Signature

Printed/Stamped

Date 1/16/12   Time 20:00 AM/PM

## REFERRAL

Referral for additional follow up:  ☐ no  ☐ yes

Describe:_____
_____

© Prison Health Services, Inc 2010   All rights reserved



Search Criteria
Booking #        1201032        SLEIGHTER, BRADLEY KEITH W/M  S0 / R2 / ME / ME        Draft?        All
                               [00046848] D3B 114 [MEDIUM (4)] 05/05/1958 ACT/GEN SS
RID #                                                                                   Record Type   All
Note Date/Time
From                            To

Search Results                                                                                        1 of 43

| Booking # | RID # | Inmate Name | Book Date/Time | User | Note Date/Time | Draft? | Record Type |
|---|---|---|---|---|---|---|---|
| 1201032 | 00046848 | SLEIGHTER, BRADLEY KEITH | 01/16/2012 19:43 | AOT025 | 09/27/2012 20:08 | No | GENERAL |

Notes:  Per kite request 9-21-12, referred to psychiatrist. aot025 martin

| 1201032 | 00046848 | SLEIGHTER, BRADLEY KEITH | 01/16/2012 19:43 | AOT051 | 09/12/2012 09:08 | No | GENERAL |

Notes:  Saw IM due to D1A placement and D1A rounds. No Mh issues were reported or observed and IM was calm and coherent at this interaction. aot051dillard

| 1201032 | 00046848 | SLEIGHTER, BRADLEY KEITH | 01/16/2012 19:43 | AOT051 | 09/11/2012 11:26 | No | GENERAL |

Notes:  Saw IM during D1A rounds. No Mh issues were reported and no Mh stressors were observed. IM was calm at this interaction. aot051dillard

| 1201032 | 00046848 | SLEIGHTER, BRADLEY KEITH | 01/16/2012 19:43 | AOT051 | 09/10/2012 09:53 | No | GENERAL |

Notes:  Saw IM per D1A rounds. IM was calm and did not report any Mh issues or concerns at this time. aot051dillard

| 1201032 | 00046848 | SLEIGHTER, BRADLEY KEITH | 01/16/2012 19:43 | PHS372 | 09/07/2012 13:38 | No | GENERAL |

Notes:  Seen 1:1 with psych nurse 9/6/12

| 1201032 | 00046848 | SLEIGHTER, BRADLEY KEITH | 01/16/2012 19:43 | AOT051 | 09/07/2012 11:02 | No | GENERAL |

Notes:  Saw IM during D1A rounds. No Mh issues were observed or reported and IM was calm during these rounds. aot051dillard

| 1201032 | 00046848 | SLEIGHTER, BRADLEY KEITH | 01/16/2012 19:43 | AOT051 | 09/06/2012 09:57 | No | GENERAL |

Notes:  Saw IM in D1A housing during rounds.No alert change. IM presented with a calm affect and did not report any Mh issues or concerns. aot051dillard

| 1201032 | 00046848 | SLEIGHTER, BRADLEY KEITH | 01/16/2012 19:43 | AOT051 | 09/05/2012 10:59 | No | GENERAL |

Notes:  IM was seen per D1A rounds. No alert change. IM was calm at this interaction and did not show any signs of mental health distress. No concerns were voiced. aot051dillard

| 1201032 | 00046848 | SLEIGHTER, BRADLEY KEITH | 01/16/2012 19:43 | AOT051 | 09/04/2012 10:06 | No | GENERAL |

Notes:  Saw IM per D1A rounds. IM did not report any Mh issues at this time and was calm and appropriate. aot051dillard

| 1201032 | 00046848 | SLEIGHTER, BRADLEY KEITH | 01/16/2012 19:43 | AOT051 | 09/02/2012 15:24 | No | GENERAL |

Notes:  Saw IM with DSU placement. He was in a lotus yoga position and reported he was meditating. Stated he is aware why he was sent to DSU and KCCF procedure was explained to him. IM was calm and respectful. aot051dillard

| 1201032 | 00046848 | SLEIGHTER, BRADLEY KEITH | 01/16/2012 19:43 | CFJGILLES | 09/02/2012 12:02 | No | GENERAL |

Notes:  DEP RODRIGUEZ CALLED TO REQUEST THAT INMATE SLEIGHTER BE MOVED. INMATE SLEIGHTER HAS BEEN CAUSING ISSUES IN THE AREA AND CONTINUES TO DO SO AFTER MANY WARNINGS. WHILE I WAS SPEAKING TO DEP RODRIGUEZ HE HEARD INMATE SLEIGHTER ON THE PHONE STATING HE WOULD NOT MOVE AND WE COULD NOT MOVE FROM H2A PER LT. NEUMAN. INMATE MOVED TO D1A AND THE MATTER WOULD BE TAKEN LT NEUMAN WHEN HE RETURNS ON TUESDAY. JG

| 1201032 | 00046848 | SLEIGHTER, BRADLEY KEITH | 01/16/2012 19:43 | CFABACON | 08/28/2012 23:09 | No | GENERAL |

Notes:  recieved 1 book on Yoga.

| 1201032 | 00046848 | SLEIGHTER, BRADLEY KEITH | 01/16/2012 19:43 | CFPGREENE | 08/28/2012 10:49 | No | GENERAL |

Notes:  Per conversation with Sgt Seaman, Sleighter received paperwork from accounting @1048 hrs., 8/28/12

| 1201032 | 00046848 | SLEIGHTER, BRADLEY KEITH | 01/16/2012 19:43 | CFPGREENE | 08/25/2012 13:17 | No | GENERAL |

Notes:  New ID

| 1201032 | 00046848 | SLEIGHTER, BRADLEY KEITH | 01/16/2012 19:43 | CFENELSON | 08/19/2012 04:14 | Yes | GENERAL |

Notes:  Inmate has asked me several times to get a Sgt. regarding Notary services. I have instructed him to send a kite to classification for Notary services per the policy and procedure manual. Inmate is not pleased with these instructions, is somewhat demanding, and expects to speak with someone upon immediate request.

E. Nelson

| 1201032 | 00046848 | SLEIGHTER, BRADLEY KEITH | 01/16/2012 19:43 | PHS372 | 08/09/2012 13:00 | No | GENERAL |

Notes:  Seen 1:1 with Dr Zara 8/8/12

| 1201032 | 00046848 | SLEIGHTER, BRADLEY KEITH | 01/16/2012 19:43 | CFJQUAKKE | 08/02/2012 18:59 | No | GENERAL |

Notes:  Inmate Sleighter was observed trading food items at the PM meal on the above date and time. NOTE: Inmate is currently placed on a food log. Inmate was warned that trading items is not permitted and that any additional instances would follow in discipline. Verbal Warning given.

-Quakkelaar

| 1201032 | 00046848 | SLEIGHTER, BRADLEY KEITH | 01/16/2012 19:43 | JLRODRIG | 08/02/2012 05:42 | No | GENERAL |

Notes:  Inmate Sleighter turned in a kite at breakfast (08/02/12) addressed to administration concerning hunger pains and the request for a specific diet. It was witnessed by Deputy Decker that inmate Sleighter had consumed the contents of three trays at breakfast, from which he collected from two other inmates.

J Rodriguez

| 1201032 | 00046848 | SLEIGHTER, BRADLEY KEITH | 01/16/2012 19:43 | CFRSTONEH | 07/31/2012 10:39 | No | GENERAL |

Notes:  Cell did not pass inspection. Inmate Bradley Sleighter and Inmate Dana Miles continue to ignore my daily reminder that it is against the rules to hang clothing and/or sheets off of their bunks to obstruct my view into their bunks, at ANY time. This ha., been an on/off problem for the last few weeks, it has now turned into an everyday problem. I circled the rule violation today in the current handbook and gave it to Sleighter. I then explained the issue to the entire cell. I explained that if one or more persons in the cell commit the rule violation, the entire cell gets timed in due to the half capacity rule. A category only offense is not serious enough offense to write an individual up and move them for; thus, the entire cell MGE-052 is timed in for the day. Stonehouse.

| 1201032 | 00046848 | SLEIGHTER, BRADLEY KEITH | 01/16/2012 19:43 | CFRTOWNS EN | 07/26/2012 13:42 | No | GENERAL |

Notes:  the sgt.'s office called and had me inform inmate above that he would not be given a special diet that he requested. entered as a f.y.i.

| 1201032 | 00046848 | SLEIGHTER, BRADLEY KEITH | 01/16/2012 19:43 | CFMENSING | 07/25/2012 15:20 | No | REENTRY |

Notes:  Recieved kite from Inmate Sleighter asking why he was removed from Diet List  I told him I would contact Medical. He was on a "no meat/vegetarian diet  The Sheriff's Department has never recognized or served any type/kind of religious diets.Yvonne from medical



informed me that UnderSheriff Hess removed him from the list on 7/20/12. According to Aramarks diet book "written permission must be obtained" from this Administration(no document signed from the UnderSheriff) so he never should have been placed on this diet in the first place. This is an error on my part. Inmate Sleighter will be offered a regular tray from this time forward.

| 1201032 | 00046848 | SLEIGHTER, BRADLEY KEITH | 01/16/2012 19:43 | CFTFOX | 07/20/2012 12:09 | No | GENERAL |
| Notes: | Inmate was taken off no meat diet as of yesterday, inmate throwing a fit about it during lunch today. FYI Marshall | | | | | | |

| 1201032 | 00046848 | SLEIGHTER, BRADLEY KEITH | 01/16/2012 19:43 | CMS151 | 07/11/2012 16:53 | No | GENERAL |
| Notes: | SEEN 1:1 WITH DR ZARA EARLIER THIS SHIFT | | | | | | |

| 1201032 | 00046848 | SLEIGHTER, BRADLEY KEITH | 01/16/2012 19:43 | CMS151 | 07/10/2012 12:00 | No | GENERAL |
| Notes: | SEEN 1:1 WITH PSYCH NURSE EARLIER THIS SHIFT | | | | | | |

| 1201032 | 00046848 | SLEIGHTER, BRADLEY KEITH | 01/16/2012 19:43 | AOT022 | 07/08/2012 15:15 | No | MENTAL |
| Notes: | Mr. Sleighter seen for medical referral. He had questions about medication and wanted to speak to someone. He has an appnt on 07/11/12. He denied suicidal thoughts. Staff allowed him to vent some of his frustration while at KCCF. aot022 Bacon. | | | | | | |

| 1201032 | 00046848 | SLEIGHTER, BRADLEY KEITH | 01/16/2012 19:43 | CFTFOX | 07/02/2012 13:24 | No | GENERAL |
| Notes: | During a suik for m6e dayroom I came to Inmate's cell and there were only him and another inmate in the cell. I told them both they had to go to the dayroom because there needed to be at least 3 inmates in the 6 man cell. Inmate began to argue and threatened to get in a fight in the dayroom if someone turned the tv channel while he was watching it. I advised Inmate against doing that and told him that whatever happens it will be dealt with accordingly. Inmate has a very bad attitude. | | | | | | |

| 1201032 | 00046848 | SLEIGHTER, BRADLEY KEITH | 01/16/2012 19:43 | CFAENO | 06/29/2012 19:12 | No | GENERAL |
| Notes: | Inmate did not recieve diet tray today for dinner. He was informed that medical has cancelled his diet tray and he stated that he has approval from US Hess that he receive an "administrative diet". Inmate had no documentation of this and was offered a regular tray in which he refused to eat. Eno | | | | | | |

| 1201032 | 00046848 | SLEIGHTER, BRADLEY KEITH | 01/16/2012 19:43 | CMS151 | 06/22/2012 17:16 | No | MEDICAL |
| Notes: | PT WAS SEEN BY DR ZARA ON 6-8-12 HE COMPLAINED TO HER THE NORPRAMINE WASN'T HELPING HIM, SHE D/C'd THE NORPRAMIN & STARTED HIM ON PROZAC, HE TOOK THE PROZAC 3 DAYS & THEN BEGAN TO REFUSE IT (DIDN'T TAKE PROZAC FOR THE NEXT 10 DAYS THEN ON THE 19 th AOT 050 SENT A NOTIFICATION THAT INMATE WOULD LIKE A MED REVIEW SAYING PROZAC IS INEFFECTIVE. | | | | | | |

| 1201032 | 00046848 | SLEIGHTER, BRADLEY KEITH | 01/16/2012 19:43 | AOT050 | 06/19/2012 19:17 | No | GENERAL |
| Notes: | Met with Mr. Sleighter per notification of med refusal. Cont. S0. He presented as calm, stable, and oriented. He denied having any suicidal thoughts. He reported an interest in changing his medication, citing the Prozac as ineffective. I will refer to psychiatry. aot050 Woodford/Intern | | | | | | |

Reviewed by aot049 westerhof

| 1201032 | 00046848 | SLEIGHTER, BRADLEY KEITH | 01/16/2012 19:43 | CMS151 | 06/08/2012 12:05 | No | GENERAL |
| Notes: | SEEN 1:1 WITH DR ZARA EARLIER THIS SHIFT | | | | | | |

| 1201032 | 00046848 | SLEIGHTER, BRADLEY KEITH | 01/16/2012 19:43 | AOT049 | 06/05/2012 21:22 | No | GENERAL |
| Notes: | Per kite request, referral made to psychiatry/medical for review of medications. aot049 westerhof | | | | | | |

| 1201032 | 00046848 | SLEIGHTER, BRADLEY KEITH | 01/16/2012 19:43 | PHS367 | 06/02/2012 13:32 | No | GENERAL |
| Notes: | IM PUT ON NO MEAT DIET PER REQUEST MIKE ENSING. | | | | | | |

| 1201032 | 00046848 | SLEIGHTER, BRADLEY KEITH | 01/16/2012 19:43 | CFWARAMA RK | 05/27/2012 17:13 | No | GENERAL |
| Notes: | On sunday May 27th during the lunch rush Brad was just walking around and talking and Brenda asked him to stop and he said what i cant even talk and things were already hectic so he was broke down and sent back upstairs. Aramark staff | | | | | | |

| 1201032 | 00046848 | SLEIGHTER, BRADLEY KEITH | 01/16/2012 19:43 | CFGJAMES | 05/27/2012 11:46 | No | GENERAL |
| Notes: | KITCHEN SENT SLEIGHTER BACK AT LUNCH TIME, DON'T WANT HIM, CAUSING PROBLEMS. TOLD THEM TO WRITE A CASE NOTE ON THIS. | | | | | | |

| 1201032 | 00046848 | SLEIGHTER, BRADLEY KEITH | 01/16/2012 19:43 | CFKMARSHA L | 05/20/2012 14:36 | No | GENERAL |
| Notes: | Came back from the kitchen this afternoon after seeing medical for a recently pulled tooth. Inmate will be seeing the doctor this evening to assess his infected tooth. | | | | | | |

| 1201032 | 00046848 | SLEIGHTER, BRADLEY KEITH | 01/16/2012 19:43 | AOT025 | 05/16/2012 21:33 | No | GENERAL |
| Notes: | Met with Mr. Sleighter regarding notification indicating that his mother had a heart attack. Cont S0. Mr. Sleighter acknowledged that he has seen death before and might have a different reaction than most to death. He did not seem affected or in distress about this news. He was mostly concerned with receiving Vitamin D for his depression which was allegedly stopped. I will refer to medical. aot025 martin | | | | | | |

| 1201032 | 00046848 | SLEIGHTER, BRADLEY KEITH | 01/16/2012 19:43 | CFNEDWAR DS | 05/16/2012 11:10 | No | GENERAL |
| Notes: | inmate's nephew caleb sleighter stopped to schedule a visit and stated that he was going to inform Bradley that his mother had a heart attack and is not doing well, they do not expect her to make it. A psyr was enter and Deputy Gary james in H2C was notified. Edwards | | | | | | |

| 1201032 | 00046848 | SLEIGHTER, BRADLEY KEITH | 01/16/2012 19:43 | CFDSIGNS | 05/15/2012 10:33 | No | GENERAL |
| Notes: | Inmate late for work today. Given warning and instructed that if this continues, he will be removed from trustee. D. Signs | | | | | | |

| 1201032 | 00046848 | SLEIGHTER, BRADLEY KEITH | 01/16/2012 19:43 | CMS151 | 05/07/2012 15:46 | No | GENERAL |
| Notes: | SEEN 1:1 WITH DR JONES EARLIER THIS SHIFT | | | | | | |

| 1201032 | 00046848 | SLEIGHTER, BRADLEY KEITH | 01/16/2012 19:43 | AOT025 | 04/26/2012 21:46 | No | GENERAL |
| Notes: | Met with Mr. Sleighter per kite and deputy request. Cont S0. Mr. Sleighter denied having any suicidal thoughts or plans. He reports noticying that he is suffering from depression and would like to be referred back for meds. I will refer to medical. aot025 martin | | | | | | |

| 1201032 | 00046848 | SLEIGHTER, BRADLEY KEITH | 01/16/2012 19:43 | CFNBOWMA N | 04/09/2012 01:09 | No | GENERAL |
| Notes: | Informed inmate Sleighter per Nurse Kubiak that he is to eat nothing. Also informed that he would have breakfast after the medical procedure is complete. Bowman | | | | | | |

| 1201032 | 00046848 | SLEIGHTER, BRADLEY KEITH | 01/16/2012 19:43 | PHS197 | 04/09/2012 00:22 | No | GENERAL |
| Notes: | PT NOTHING TO EAT OR DRINK BY MOUTH AFTER MIDNIGHT - NO BREAKFAST - PT HAS FASTING LABS IN A.M. - OFFICERS INFORMED - WILL NOTIFY AND MONITOR PT - INFORMED BREAKFAST BAG WILL BE DELIVERED AFTER LABS BY MEDICAL - DIETARY ALSO AWARE OF PLAN. CHERYL KUBIAK RN | | | | | | |

| 1201032 | 00046848 | SLEIGHTER, BRADLEY KEITH | 01/16/2012 19:43 | AOT049 | 01/16/2012 21:07 | Yes | GENERAL |
| Notes: | Met with inmate in intake. Rec red to S0. Inmate presented as calm, alert, and oriented. Inmate denied current s/i or sibs. Inmate reported being in residential substance abuse treatment at the Jellema Treatment Center at Pine Rest before his arrest. Inmate denied having any withdrawal concern. Inmate denied he was receiving any mental health treatment, services, or medications. Inmate denied having any other questions or concerns for aot. Inmate was future-oriented during interview and stated he would be safe while in the jail. aot049 westerhof | | | | | | |







**PHS | CORRECTIONAL HEALTHCARE**

## PROGRESS NOTES

| Date/Time | PATIENT NAME: _Sylvester Bunkow(?)_ | D.O.B.: _5/5/55_ |
|---|---|---|

1/16/13  20:00  S: I've taken methadone for my back for 6 years and none b/f. I don't want pain pills here, I paid Dr. ___ me desk them dissolved but that makes me sick, O: unable to be r/s, to attend various outpatient's safety. P: Signed Refusal of Services since he ___ pills in N.O and I don't give. He withdrew here.

Bharti(?)  Note

1/24/12  18:00  none noted _____ J Mollion(?)

1/27/12  ___ — Chart found — want to document ____ states
S: ___ administrator(?) I at I get ___ ___ ___ ___ has not signed consents ___

___ PA2  BP 120/82 — see ___
pt states ___ take maybe 80mg of methadone every night dose — it's not really a WD issue ___
A: ___  P: foll. by 24 hrs — obtain consent
___

1/28/12  N02:  Pt refuses to sign consents. Has also been refusing vit checks. Will send to MD for review.  St Westenhorst RN
___

EXHIBIT
#14
PR 4/9/13

WRC 2.20

KENT COUNTY CORRECTIONAL FACILITY
HEALTH SERVICES REQUEST FORM

Print Name: Sleighter          Date of Request: 3-29-12

ID# 46848     Date of Birth: 5-5-58     Housing Location: U-6-E-51

You will be charged $2.00 for the nursing visit resulting from this request.
You are required to see the nurse prior to being seen by the physician or dentist.
Treatment will not be denied because of an inability to pay.

**Subjective:**
Nature of problem or request: I want medical withdrawl hold removed.

_____

PLACE THIS SLIP IN MEDICAL REQUEST BOX OR DESIGNATED AREA

## ..DO NOT WRITE BELOW THIS AREA

Date Received:                Triaged by:          Referred to: (Circle all that apply)
                                                   NSC    Physician SC    MH    Dental
Response Sent: Yes  No    MAR 3 0 2012             Commissary Purchase  Other: _____

by

### HEALTH CARE DOCUMENTATION

**Objective:** BP _____ T _____ P _____ R _____ Wt _____

Sent reply
Medical W/D was Removed on 1-29-12
P7 Rn

**Assessment:**

**Plan:**

ρ     Inmate treated per Nursing Protocol with _____
ρ     Inmate educated per written Nursing Protocol Resident Education.
ρ     Inmate educated regarding _____

Referred to: (Circle applicable)   Physician    MH    Dental    Other: _____

Signature & Title: _____    Date: _____    Time: _____



EXHIBIT
#15
KR 4/9/13



## KENT COUNTY CORRECTIONAL FACILITY
## HEALTH SERVICES REQUEST FORM

Print Name: Sleighter      Date of Request: 4-11-1?

ID #: 46848    Date of Birth: 5-5-58    Housing Location: 1-6-E-51

You will be charged $2.00 for the nursing visit resulting from this request.
You are required to see the nurse before you see the doctor or dentist.
Treatment will not be denied because of an inability to pay.

Subjective:

Nature of problem or request: I dont understand why I keep
receiving drugs for my BP that I cant
take due to side effects. I will not take
that. I'd rather be dead than feel like
that. I need to be seen for proper medication.

PLACE THIS SLIP IN MEDICAL REQUEST BOX OR DESIGNATED AREA

## DO NOT WRITE BELOW THIS AREA

Date Received: _____ Triaged by: _____ Referred to: (Circle all that apply)

Response Sent:   Yes   No    NSC   Physician SC   MH   Dental
    Commissary Purchase   Other: _____

### HEALTH CARE DOCUMENTATION

Objective: BP _____ T _____ P _____ R _____ Wt _____

_____

_____

_____

_____

Assessment:

Plan:

_____

_____

ρ   Inmate treated per Nursing Protocol with _____
ρ   Inmate educated per written Nursing Protocol Inmate Education.
ρ   Inmate educated regarding _____

_____

_____

Referred to: (Circle applicable)   Mid-level   Physician   MH   Dental   Other: _____

Signature & Title: _____    Date: _____   Time: _____

___ ___ COUNTY CORRECTIONAL FACIL.
HEALTH SERVICES REQUEST FORM

Print Name: _Sieighter   PRAD_   Date of Request: _3-17-12_

ID# _46848_   Date of Birth: _5-5-58_   Housing Location: _H2C-38_

You will be charged $2.00 for the nursing visit resulting from this request.
You are required to see the nurse prior to being seen by the physician or dentist.
Treatment will not be denied because of an inability to pay.

**Subjective:**
Nature of problem or request: _Can I see NP for chronic_
_knee arthritic pain, which has become_
_worse since last seen_

PLACE THIS SLIP IN MEDICAL REQUEST BOX OR DESIGNATED AREA

## DO NOT WRITE BELOW THIS AREA

Date Received: _____ Triaged by: _____ Referred to: (Circle all that apply)
NSC   Physician SC   MH   Dental
Response Sent: Yes No   Commissary Purchase  Other: _____

### HEALTH CARE DOCUMENTATION

**Objective:** BP _____ T _____ P _____ R _____ Wt _____

_Nursing sick call_

**Assessment:**

**Plan:**

EXHIBIT
#16
PRPAD 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
PR 4/9/13

ρ   Inmate treated per Nursing Protocol with _____
ρ   Inmate educated per written Nursing Protocol Resident Education.
ρ   Inmate educated regarding _____
_____

Referred to: (Circle applicable)   Physician   MH   Dental   Other: _____

Signature & Title: _____   Date: _____ Time: _____

**FILED - GR**
September 20, 2012 10:57 AM

In the United States District Court
For the Western District of Michigan

TRACEY CORDES, CLERK
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY__arm /____ Scanned___ em 9-20

Bradley Keith Sleighter
#46848

1:12-cv-1008
Gordon J. Quist
U.S. District Judge
Ellen S. Carmody
U.S. Magistrate Judge

(Enter above the full names of all plaintiffs, including prisoner number, in this action.)

v.

Kent County Jail Administration
Corizan Medical Services

EXHIBIT
#17
RR 4/9/13

(Enter above the full name of the defendant or defendants in this action.)

## COMPLAINT

I. **Previous Lawsuits**

**CAUTION: The Prison Litigation Reform Act has resulted in substantial changes in the ability of incarcerated individuals to initiate lawsuits in this and other federal courts without prepayment of the required $350 filing fee. Accurate and complete responses are required concerning your litigation history. Generally, a plaintiff's failure to accurately and completely answer the questions set forth below will result in denial of the privilege of proceeding *in forma pauperis* and require you to pay the entire $350 filing fee regardless whether your complaint is dismissed.**

A.  Have you ever filed a lawsuit while incarcerated or detained in any prison or jail facility?  Yes ☒ No ☐

B.  If your answer to question A was yes, for each lawsuit you have filed you must answer questions 1 through 5 below. Attach additional sheets as necessary to answer questions 1 through 5 below with regard to each lawsuit.

  1. Identify the court in which the lawsuit was filed. If it was a state court, identify the county in which the suit was filed. If the lawsuit was filed in federal court, identify the district within which the suit was filed.
  U.S District Court for Western District of Michigan

  2. Is the action still pending?  Yes ☒ No ☐
    a. If your answer was no, state precisely how the action was resolved: _____

  3. Did you appeal the decision?  Yes ☐ No ☐
  4. Is the appeal still pending?  Yes ☐ No ☐
    a. If not pending, what was the decision on appeal? _____

  5. Was the previous lawsuit based upon the same or similar facts asserted in this lawsuit?  Yes ☐ No ☒
  If so, explain: _____

II. **Place of Present Confinement** _____

If the place of present confinement is not the place you were confined when occurrence that is subject of instant lawsuit arose, also list the place you were confined: Kent County Correctional Facility

-1-

III.  **Parties**

A.  **Plaintiff(s)**

Place your name in the first blank and your present address in the second blank. Provide the same information for any additional plaintiffs. Attach extra sheets as necessary.

Name of Plaintiff Bradley Keith Sleighter #46849

Address 703 Ball Ave. N.E., Grand Rapids, MI 49503

B.  **Defendant(s)**

Complete the information requested below for each defendant in this action, including whether you are suing each defendant in an official and/or personal capacity. If there are more than four defendants, provide the same information for each additional defendant. Attach extra sheets as necessary.

Name of Defendant #1 Kent County Jail Administration

Position or Title _____

Place of Employment _____

Address 701 Ball Ave., Grand Rapids, MI 49503

Official and/or personal capacity? _____

Name of Defendant #2 Corizon Medical Services

Position or Title _____

Place of Employment Kent County Correctional Facility

Address 703 Ball Ave. N.E., Grand Rapids, MI 49503

Official and/or personal capacity? Inmate Health Care Provider

Name of Defendant #3 _____

Position or Title _____

Place of Employment _____

Address _____

Official and/or personal capacity? _____

Name of Defendant #4 _____

Position or Title _____

Place of Employment _____

Address _____

Official and/or personal capacity? _____

Name of Defendant #5 _____

Position or Title _____

Place of Employment _____

Address _____

Official and/or personal capacity? _____

-2-

IV. A  Statement of Claim

State here, as briefly as possible, the facts of your case.  Describe how each defendant is personally involved.  Include also, the names of other persons involved, dates and places.  Do not give any legal arguments or cite any cases or statutes.  If you intend to allege a number of related claims, number and set forth each claim in a separate paragraph.  Use as much space as you need.  Attach extra sheets if necessary.

On January 16, 2012 I saw my personal physician. A licensed medical doctor in good standing within the local medical community and with the State of Michigan. I received my monthly prescription for pain medication for a chronic deabilitating osteo-neurological pain condition he had been treating monthly for a number of years. I was incorcerated within the Kent County Jail later that day. Upon intake I informed the nurse that I had a prescription for pain medication which I needed to take daily to relieve a chronic pain condition and avoid withdrawl from the medication. She informed me that the jail administration does not allow inmates to receive opioid pain medication per policy. I did not see a doctor and I did not receive my medication. I was involuntarily forced into a painful opioid withdrawl syndrome which lasted close to 1 month. This is not the medically recommended proceedure for the discon- tinuation of an opioid pain medication. The general medical consensus, among experts, is that the dosage of the medication should be reduced over a peroid of a least, a minium of, several weeks until the dosage reaches 0 mg per day. My argument is hat this jail administration violated my right to receive medical treatment by imposing restrictions on its medical provider Corizon Medical Services, thus limiting their ability and obligation to provide me with treatment. The jail admin- istration is not a medical governing body and has no authority to implement said policy nor enforce it. The argument that opioid pain medication is a threat to the curity and/or the well order of the institution does not hold merit as all medication in this jail is administered under direct observation by licensed health care professionals. In addition, he jail is required by law to administer "methadone" (Last Revised: February 2009)

I.V. B



incarcerated pregnant women who were on methadon maintenance prior to incarceration in order to prevent an acute withdrawl syndrom and this practice is not deemed to be a threat to the security and/or the well order of the institution. Therefore, it cannot be argued tha pregnant women receiving methadone while in jail are a lesser-threa than chronic pain management patients taking opioids

I also charge that Corizon Medical Services is culpable for complying with an illegal practice implemented by the jail administration and for not chalenging this practice long ago.

I would also charge that by being forced into involuntary withdrawl and suffer from a prior chronic pain condition, with no other treatment option avaiable, the administration has made a moral decision to subject me to "cruel and unusual punishment" which we rely on our governin bodies to protect us from, not facilite.

The drug I was prescribed was prescribed by an experienced licensed medical doctor. The drug is approved by the FDA for pain management. I am a citizen of the U.S. and am protected by federal law preventing state or local government from Illegally interfering with my right to receive medical treatme

Kent County Jail Administration and Corizon Medical Services are guilty of violating my civil rights and I respectfully seek relief from the Federal Courts in this matter.

**V.    Relief**

State briefly and precisely what you want the court to do for you.

I seek relief through the courts in the form of punative action, as well as damages for pain and suffering from Kent County Jail and Corizon Medical Services. I also want to set presidence in the above matter so as to prevent this misuse of administrative authority from happening to others in the future.

9-17-2012
_Date_

_Bradley K. Leighton_
_Signature of Plaintiff_

## NOTICE TO PLAINTIFF(S)

The failure of a *pro se* litigant to keep the court apprised of an address change may be considered cause for dismissal.

(Last Revised: February 2009)

# UNITED STATES OF AMERICA
## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

BRADLEY KEITH SLEIGHTER,

         Plaintiff,

v.

KENT COUNTY CORRECTIONAL FACILITY
ADMINISTRATION,
UNDER SHERIFF HESS and
CAPTAIN RANDY DEMORY,

         Defendants.

Case No. 1:12-cv-1008

Honorable Judge:
GORDON J. QUIST



EXHIBIT
#18
PR 4/9/13

## "FIRST AMENDED COMPLAINT" IN SUPPORT OF MOITION TO CERTIFY CASE NUMBER 1:12-CV-1008 AS 'CLASS ACTION'

## STATEMENT OF FACTS

    1. The original "Complaint" (Docket #1) was filed solely upon the information provided for the Plaintiff's particular set of circumstances. The complaint was filed from the confines of the Kent County Correctional Facility (KCCF) and with limited access to legal material to advance and sustain a complaint under 42 USC § 1983. The Plaintiff now files a "First Amended Complaint" (FAC) under the provisions of 42 USC § 1983, and relies upon the information contained herein to support the *"claim(s)"* of the Plaintiff as well as to support the *"claim(s)"* of a *"Class"* and alleges the following herein:

    2. Plaintiff, Bradley Keith Sleighter, was incarcerated in the Kent County Correctional Facility from January 16th, 2012 through November 15th, 2012.

a. *"Prisoner"* is defined identically in 28 U.S.C. §§ 1915(h) and 1015A(c) and 42 U.S.C. § 1997e(h) as "any person subject to incarceration, detention, or admission in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program".

3. Plaintiff received treatment, as a patient, for a chronic osteo-neurological pain condition, from Ricardo Garza MD, from February 13th, 2007 through January 16th, 2012, before being incarcerated in KCCF.

a. Dr. Ricardo Garza is a licensed medical doctor (MD), in good standing within the local medical community, the State of Michigan, and is licensed by the DEA to prescribe controlled substances; including "opiates" and methadone.

b. Plaintiff received a legal prescription for the "opioid" pain medication, methadone, on January 16th, 2012 and was incarcerated in the KCCF later that day with prescription in hand (see exhibit #1).

(1). Methadone is approved by the US Food and Drug Administration for chronically moderate to chronically severe pain. Methadone is also approved for use in "Methadone Maintenance Programs" (MMP) to treat "illicit opiate" addiction.

4. Plaintiff was denied his medication, without seeing a jail physician and without receiving a medical doctor's order to discontinue the medication Dr. Garza had just prescribed for the Plaintiff, the same day he was arrested.

a. Plaintiff was informed that KCCF's *"policy"* prohibits "opioid" medications in the facility, and said *"policy"* was created and implemented by the jail administration and is not the *"policy"* of its medical provider, Corizon Health Services, Inc.

b. Due to Plaintiff being denied his medication he experienced a painful and burdensome withdrawal syndrome, detailed and supported in and by medical literature, and alleges *"injury"* as a result of both the *"physical"* symptoms and the *"cognitive"* symptoms (described below) for a period of 30 to 90 days.

(1). Withdrawal symptoms [from methadone] have shown to be up to twice as severe than those of morphine or heroin at equivalent doses and are significantly more prolonged; methadone withdrawal symptoms can last for several weeks or more. A general guideline is a 1:1 ratio for trouble free detoxification. Being on a constant dose of 100 mg. for one year, can take 18–24 months for safe detoxification. At high maintenance doses, sudden

**cessation of therapy can result in severe withdrawal symptoms lasting from weeks to months.[1]**

(2). "***Physical***" symptoms include[2]:

- Lightheadedness
- Tearing
- Runny nose
- Yawning
- Sneezing
- Nausea
- Vomiting
- Diarrhea
- Severe Itching
- Fever
- Sweating
- Chills
- Tremors
- Akathisia
- Tachycardia
- Aches and pains, often in the joints and/or legs
- Elevated pain sensitivity
- Elevated blood pressure (may cause stroke)

(3). "***Cognitive***" symptoms include[3]:

Suicidal Ideation

- Susceptibility to Cravings
- Depression
- Reduced breathing (may be fatal between 2–4 hours)
- Spontaneous orgasm
- Prolonged insomnia
- Delirium
- Auditory hallucinations
- Visual hallucinations
- Increased perception of odors (olfaction), real or imagined
- Marked decrease or increase in sex drive
- Agitation
- Anxiety
- Panic disorder
- Paranoia

---

[1] Taken from "METHADONE" citation, Wikipedia (Internet source).
[2] Ibid.
[3] Ibid.

- <u>Delusions</u>
- <u>sudden death</u>

5. In *Prewitt v. Roos*, the United States Court of Appeals for the Ninth Circuit reviewed a case where it was alleged that jail officials had failed to properly administer pain medication and follow post-operative instructions after Prewitt's hand surgery. Prewitt had hand surgery while in jail and received discharge instructions from the hospital. "There is no factual dispute that numerous doctors' prescriptions for Prewitt's pain medication were deliberately not followed. As a result of the defendants' interference with Prewitt's prescribed medical treatment, his pain was allegedly considerably exacerbated. This interference violated Prewitt's constitutional rights."

a. The court rejected the defense that officers were following the jail's medication dispensing schedule as an excuse for failing to follow the doctor's orders. The court held: "a reasonable jury could find on the summary judgment record that the defendants' reliance on the jail's medication dispensing schedule is an insufficient justification for the defendants to prevail, particularly in light of the competing directive in the same <u>health care</u> manual that prescribed medication 'will be administered in the prescribed dosage at the prescribed time.'"

b. "A delay in providing medical treatment does not constitute deliberate indifference unless the delay was harmful. *Hunt v. <u>Dental</u> Dep't, 865 F.2d 198, 200 (9th Cir. 1989)* (internal citation omitted); *see also Hallett v. Morgan, 296 F.3d 732, 746 (9th Cir. 2002)* (*Eighth Amendment* is only violated if 'delays occurred to patients with problems so severe that delays would cause significant harm and that Defendants should have known this to be the case').

(1). Plaintiff alleges *"deliberate indifference"* to serious medical needs by institution and sustainment of the Defendants' *"illegal policy"* denying the Plaintiff his medication, which resulted in *"harm"* to the Plaintiff.

(2). Plaintiff alleges failure of *"due process"*.

(3). Plaintiff alleges *"cruel and unusual punishment"*.

(4). Plaintiff alleges Defendants violated his right to *"equal protection"* under the law.

(5). Plaintiff alleges that Defendants *"illegal policy"* *"inflicted unnecessary and wanton infliction of pain"* upon the Plaintiff.

(6). Plaintiff alleges that the Defendants' *"illegal policy"* denies prisoners *"adequate medical care"*; and

A. Prison officials are obligated under the Eighth Amendment to provide prisoners with adequate medical care, see Estelle v. Gamble, 429 U.S. 97, 103 (1976). This principle applies regardless of whether the

medical care is provided by governmental employees or by private medical staff under contract with the government; see West v. Atkins, 487 US 42, 57-58 (1988) and Richardson v. McKnight, 521 US 399 (1997).

6. Plaintiff claims that KCCF allows pregnant women on "Methadone Maintenance Programs", prior to their incarceration, to receive "methadone" during their stay in jail. This practice is neither viewed to be a threat to the security and/or the well order of the institution, nor is it seen as a "hindrance" or "obstacle" that would restrictive any means to further, secure or insure any compelling governmental interests; and

   a. as a result of allowing pregnant women "methadone" the Plaintiff claims denial of "*equal protection*" under the law by the defendants "*illegal policy*".

7. Contrary to Defendants' belief and argument Plaintiff is not alleging dissatisfaction with medical treatment while incarcerated, but rather is claiming that the Defendants "*illegal policy*" of not allowing "opioid" drugs to be used in the jail violates it's inmate population's and Plaintiff's civil rights; relying on the information contained herein, "Statement of Facts", to detail and support the allegations as to the extent of these violations.

## DEFENDANTS

8. Defendant Under Sheriff of KCCF is the ultimate decision maker with the authority to approve all KCCF policies. The current Under Sheriff of KCCF is Jon Hess, who is being sued in his "*official*" and "*personal*" capacity. The captain of KCCF operations is Captain Randy Demory, who initiated said sustains said "*illegal policy*", and played and/or plays a role in denying a class of medication(s) to the Plaintiff(s) and other inmates at KCCF, and is being sued in his "*official*" and "*personal*" capacity; as well as establishing a "*Class*" under the provisions of FRCP, Rule 23.

9. KCCF receives federal funding as well as funding from the State of Michigan and is an "*institution*" within the meaning of 42 U.S.C. § 1083 and 42 U.S.C. § 1997, therefore is required to comply with federal and state standards and laws, as well as, uphold and maintain its prisoners' civil rights.

10. KCCF Administration, Under Sheriff Jon Hess and Captain Randy Demory, have designed, implemented, enforced, and sustain an illegal "*illegal policy*" that is the sole moving force and /or factor in violating its inmate populations and the Plaintiff's civil rights.

## JURISDICTION AND VENUE

11. This court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 1345.

12. I am authorized to initiate this action against Defendants under 42 U.S.C. § 1983.

13. "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under [42 USC §] 1983." [Therefore, venue is proper]. (*Monell v. Dept. of Social Services of New York* (1978) 436 U.S. 658, 694 [98 S.Ct. 2018, 56 L.Ed.2d 611].)

14. Venue is proper in U.S. District Court for the Western District of Michigan Southern Michigan pursuant to 28 U.S.C. § 1391(b). Defendants operate KCCF, located in the State of Michigan, County of Kent and the City of Grand Rapids. Defendants incarcerate in the KCCF inmates who prior to incarceration, including pre-trial detainees, had been receiving prescription "opioid" medication through legal channels, including Methadone Maintenance Patients in compliance with Federal Law and the Defendants denied said patients access to their prescribed medication by their instituted "*illegal policy*" banning use of "opioid" medications; all of the events, actions, lack of actions, omissions giving rise to this claim have occurred in the KCCF, and were initiated and sustained by the Defendants.

## FACTUAL ALLEGATIONS

15. The plaintiff incorporates by reference the allegations and references set forth in paragraphs 1-14; and alleges that,

16. The Defendants have implemented an "*illegal policy*" or otherwise hindered its medical provider from providing medical treatment to inmates in their custody who require "opioid" medication (a "*Class*") in accordance with their medical needs and in accordance with what the law allows.

17. Defendants "*illegal policy*" of denying its inmate population "opioid" medications, an entire class of FDA approved pharmacological therapeutic agents, constitutes a "*substantial burden*" on the medical treatment of prisoners in their custody, and that the denial of this, by an through its "*illegal policy*", is not the least restrictive means to further, secure or insure any compelling governmental interests, as seen by allowing pregnant woman the medication(s).

18. Therefore, KCCF's "*illegal policy*" of refusing to provide medically appropriate "opioid" pain treatment and/or "Methadone Maintenance Treatment", violates the constitutional right(s) of those incarcerated and who require such medication(s), and especially in the case of

being a pretrial detainee, of which the Plaintiff was during his illegally enforced "opioid" withdrawal syndrome, which resulted in "*harm*" to the Plaintiff.

19. This complaint meets the burden of proof and fulfills the requirements outlined in 42 U.S.C. § 1983:

    a. This action fulfills the requirement of being against a "*person*" in that the Defendants acted in an "*individual*" capacity by implementing restrictions on its medical provider, which is something they are not entitled to in their "*official*" capacity which is judicial and custodial, not medical.

    (1). The Defendants are neither Medical Doctors, Pharmacologists, or part of any medical governing body and are not medically and/or legally qualified to make a "*policy*" which effects the treatment of its inmate population.

    b. The Defendants acted "*under the color of law*".

    (1). Defendants acted in an "*official capacity*".

    (2). The Defendants acted in a "*personal capacity*".

    c. The Defendants have violated a federal constitutional right(s) and/or (a) right(s) under federal law and Plaintiff relies on the above detailed arguments (paragraph 4a, b(1)(2)(3)(4)(5)(6) and fully incorporates them herein. The Plaintiff identifies the Defendants : KCCF Administration, Under Sheriff Jon Hess, and Captain Randy Demorys' "*actions*", "*lack of actions*", past, present, and future, as the sole moving force and/or factor that initiated violation(s) of prisoners civil rights resulting in "*injury*" to its' inmate population, and Plaintiff, at any given time and which Plaintiff is a member of the "***Class***".

    d. Plaintiff, Bradley Keith Sleighter, was incarcerated in the Kent County Correctional Facility from January 16th, 2012 through November 15th, 2012.

    (1). "*Prisoner*" is defined identically in 28 U.S.C. §§ 1915(h) and 1015A(c) and 42 U.S.C. § 1997e(h) as "any person subject to incarceration, detention, or admission in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program".

19. I, the plaintiff, was the recipient of the Defendant's "*action(s)*" and/or "*lack of action(s)*" suffered because of it, in both a "*physical*" and a "*cognitive*" manner and claim "*injury*" as a result thereof.

    a. The Defendants' "*illegal policy*" results in "*injury*" to its inmate population which is a "*Class*", of which Plaintiff is a member.

## CLAIM FOR RELIEF

20. Relief is appropriate under the provisions outlined in 42 USC § 1983 and can be realized by both the Plaintiff and a *"Class"* of which the Plaintiff is a member.

  a. Plaintiff seeks *"punitive"* relief against the Defendants for violating his civil rights which resulted in *"pain and suffering"*.

  b. *"Punitive"* relief is appropriate against the Defendants for its implementation of an *"illegal policy"* that, at its end result, which is/was to inflict *"pain"*, *"suffering"* and *"injury"* upon its inmate population (a *"Class"*), of which the Plaintiff was a member, from January 16th, 2012 to November 15th, 2012.

  c. *"Compensatory"* relief is appropriate for the Plaintiff's *"pain"*, *"suffering"* and *"injury"* as a result of Defendants' *"action(s)"* and/or *"lack of action(s)"*

  d. The *"Class"*, of which the Plaintiff is a member, can realize *"declaratory"* and/or *"injunctive"* relief.

  e. Such other relief as the interest of justice may allow and require; as to be determined by the Court(s); can be realized by the Plaintiff as well as the *"Class"*.

## FINAL STATEMENT OF FACT

21. The plaintiff incorporates by reference the allegations and information set forth in paragraphs 1-20 and is fully set forth herein in support of fulfilling the requirements of 42 USC § 1983.

22. This complaint meets the burden of proof and fulfills the requirements outlined in 42 U.S.C. § 1983:

  a. This action fulfills the requirement of being against a *"person"* in that the Defendants acted in an *"individual capacity"* by implementing an *"illegal policy"* on its medical provider, which is something they are not entitled to do in their *"official capacity"* which is judicial and/or custodial, not medical.

  b. The Defendants acted *"under the color of law"*.

  c. The Defendants violated a federal constitutional right(s) and/or a right(s) under federal law and state law.

     d. I, the plaintiff, was the recipient of the Defendant's "*action(s)*" and/or "*lack of action(s)*" suffered because of it in both a "*physical*" and "*cognitive*" manner, and suffered "*injury*" and/or "*harm*".

     e. The Plaintiff alone or as a member of a "*Class*" can realize relief.

     23. Plaintiff respectfully requests that the court accept this document as the "First Amended Complaint" in support of "*certifying*" case number 1:12-cv-1008 as "Class Action".

Dated: March 12th, 2013

                              Bradley Keith Sleighter
                              82 50th Street SW, Apt. 323
                              Wyoming, Michigan 49548

                              Phone: (616) 805-0885
                              Email: bradsleighter@gmail.com

## CERTIFICATE OF SERVICE

     I, the plaintiff, certify that on March 12th, 2013, a true and correct copy of "First Amended Complaint in Support of Motion to Certify Case Number 1:12-cv-1008 as Class Action", was sent to Kent County Facility by electronic email at kentsheriff@kentcountymi.gov and addressed to all Defendants. That a true and correct copy was placed in the US mail, postage prepaid, to The US District Court, 110 Michigan NW, Grand Rapids, Michigan 49503.

Mailed by:

                              Kathie Moore

Plaintiff:

                              Bradley Keith Sleighter
                              82 50th SW, Apt. 323
                              Wyoming, Michigan 49548

**FILED - GR**
March 13, 2013 11:37 AM
TRACEY CORDES, CLERK
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY __gr__ / _____ SCANNED BY _____ / _____

Dear Court Clerk

1:12cv1008

I forgot to attach this to
"First Amended Complaint", mailed at the
same time as this letter.

Please attach, Thank you!

Sincerely,
Brad Pleighter

Part of "First Amended Complaint" case number 1:12-cv-1008

# EXHIBIT #1

## MEDICAL PRESCRIPTION

**1/16/2012**

**From: Dr. Ricardo Garza**

**Ricardo Garza Quintero MD PC**
2000 Burton Road SE
Grand Rapids, MI 49506-4670
(616) 245-1947        (616) 245-7151

Ricardo GarzaQuintero MD
Lic #: RG087451   NPI #: 1528023421

Name:  Sleighter, Brad                                                    DOB:        5/5/1958
       232 Himes SE
       Wyoming, MI 49548

Rx                                                                              1/16/2012

methadone Oral Tablet 10 mg
SIG: take 3 tablets by oral route in the morning and 3 at night. The patient will be going out of the City; this is the reason I am going him this prescription.
Disp: (180) one hundred eighty  tablets with 0 refills

### NO MEDICATIONS PRESCRIBED BEYOND THIS POINT

# Medications Prescribed: (1) one

_____                                 _____
Dispense As Written                                      Product Selection Permitted

## <u>CERTIFICATE OF SERVICE</u>

I, the plaintiff, certify that on March 12th, 2013, a true and correct copy of "First Amended Complaint in Support of Motion to Certify Case Number 1:12-cv-1008 as Class Action", was sent to Kent County Facility by electronic email at kentsheriff@kentcountymi.gov and addressed to all Defendants. That a true and correct copy was placed in the US mail, postage prepaid, to The US District Court, 110 Michigan NW, Grand Rapids, Michigan 49503.

Mailed by:

Kathie Moore

Plaintiff:

Bradley Keith Sleighter
82 50th SW, Apt. 323
Wyoming, Michigan 49548