**FILED - GR**

August 30, 2013 10:51 AM
TRACEY CORDES, CLERK
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY _ald_/_____  SCANNED BY _____

# UNITED STATES OF AMERICA
# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

BRADLEY KEITH SLEIGHTER,

        Plaintiff,                           Case No. 1:12-cv-1008

                                              Honorable Judge:
                                              GORDON J. QUIST

v.

KENT COUNTY, by and through the
  KENT COUNTY JAIL ADMINISTRATION,

        Defendants.

## PLAINTIFF'S LEGAL BRIEF IN OPPOSITION TO SUMMARY JUDGMENT IN FAVOR OF THE DEFENDANTS

## IDENTIFICATION AND CLARIFICATION OF CLAIMS IN § 1983 COMPLAINT

Plaintiff received treatment, as a patient, for a chronic osteo-neurological pain condition, from Ricardo Garza MD, from February 13th, 2007 through January 16th, 2012, before being incarcerated in Kent County Correctional Facility (KCCF).

35 Dr. Ricardo Garza is a licensed medical doctor (MD), in good standing within the local

36 medical community, the State of Michigan, and is licensed by the DEA to prescribe controlled

37 substances; including, methadone.

38 Plaintiff received a legal prescription for methadone on January 16th, 2012 and was

39 incarcerated in the KCCF later that day with prescription in hand (See Exhibit #1).

40 Methadone is approved by the US Food and Drug Administration for the treatment of

41 moderate to severe pain. Methadone is also approved for use in "Methadone Maintenance

42 Programs" (MMP)(see Exhibit #2), to treat opioid addiction. Plaintiff, Bradley Keith Sleighter,

43 was incarcerated in the Kent County Correctional Facility (KCCF) from January 16th, 2012

44 through November 15th, 2012.

45 Plaintiff was denied his medication, without seeing a medical doctor to order the

46 discontinuation of the medication Dr. Garza had just prescribed the same day he was lodged,

47 January 16th, 2012, at KCCF.

48 He was informed that KCCF's policy prohibits the use of opioid medications, and said

49 policy was created and implemented by the jail administration.

50 Due to being denied his medication he experienced a classical withdrawal syndrome

51 which methadone produces upon abrupt discontinuation, and is fully described in Exhibit #3,

52 titled: "Incarceration and opioid withdrawal: The experiences of methadone patients and out-of-

53 treatment heroin users". This is only 10 pages of the whole report, and the Plaintiff relies on the

54 description of in this US Government publication which details the opioid withdrawal he

55 experienced at the hands of the Defendants.

56 **CONCISE SUMMARY OF COMPLAINT**

57   Plaintiff's complaint is clear, concise and simple, even though it was not as developed as

58 his "Second Amended Complaint" will be; and upon leave of Court, the Defendants will have no

59 doubts left as to his claim and legal standing.

60   For the Defendants benefit, the Plaintiff will enumerate the essential elements, but not

61 limit them to, the complaint as follows:

62 1). Plaintiff had a valid legal prescription for methadone.

63 2). He went to jail and was denied his medication.

64 3). He suffered a painful withdrawal.

65 4). Defendant's policy prohibited him from receiving his medication.

66   Thus stating a claim upon which relief is plausible. He has meet the requirements to

67 maintain his § 1983 litigation and relies on his legal standing set forth henceforth in this brief, to

68 maintain this § 1983 litigation.

69

70 **PLAINTIFF'S ARGUMENT TO MAINTAIN HIS § 1983 LITIGATION**

71   Defendants are using legal gamesmanship attempting to manipulate the Court into a

72 ruling in their favor by alleging a complaint that the Plaintiff never made; presenting a meritless

73 legal theory in support of summary judgment and/or dismissal of Plaintiff's clear and concise

74 meritorious claim(s).

3

75    Defendants are trying to use a defeasible legal defense utilizing nonexistent statements
76    that the Plaintiff never made or inferred and also using the affirmative responses that he gave in
77    the deposition in response to specific questions and applying them to statements he never agreed
78    to and/or made

79    Plaintiff will not attempt to address every "defense" and "claim", or dissect every aspect
80    of Defendant's Brief in Support of Summary Judgment.  He will leave the "material" facts *res*
81    *ipsa loquitur.*

82    In Defendant's Brief in Support of Summary Judgment Section I, Facts and Issues,
83    paragraph 2 it is claimed that "Even the Plaintiff's complaint (Doc. #1), however, concedes that
84    the Plaintiff was not denied medical care...His complaint further concedes that he was given
85    and/or had available other medications." Plaintiff states that he never made any such concessions
86    and upon examination of Plaintiff's complaint this will be it to *res ipsa loquitur*. In the 5th and
87    final paragraph the Plaintiff denies this.

88    In section III, paragraph 1, it is stated "Instead he was offered a withdrawal protocol by
89    medical staff which he turned down". Plaintiff objects to the introduction, as evidence, any
90    statements he made in the deposition concerning his refusal/denial of the withdrawal protocol,
91    and any other denial/refusal he made for any other medical treatment(s), because the Defendants
92    are drawing a "conclusion" from this denial/refusal and only an expert witness, such as a medical
93    specialist in this field, other than the medical staff associated with Corizon Health Inc. and/or of
94    the Defendants, could draw these type of conclusions. Defendant's attorneys do not even know
95    what the "withdrawal protocol" is and if it is, in fact, what it claims to be? It cannot be
96    introduced to support their motion.

4

97      Plaintiff claims that the Defendant's medical provider does not provide an approved

98      medical protocol and that: **The Drug Addiction Treatment Act of 2000 (DATA 2000)**, Title

99      XXXV, Section 3502 of the Children's Health Act of 2000 (Exhibit #4), which permits

100     physicians who meet certain qualifications to treat <u>opioid</u> addiction with Schedule III, IV, and V

101     <u>narcotic</u> medications that have been specifically approved by the Food and Drug Administration

102     for that indication.

103     Since there is only one narcotic medication approved by the FDA for the treatment of

104     opioid addiction within the Schedules given, DATA 2000 basically refers to the use of

105     <u>buprenorphine</u> [Subutex and Suboxone] for the treatment of opioid addiction. <u>Methadone</u> is a

106     <u>Schedule II</u> narcotic approved for the same purpose within the highly regulated methadone clinic

107     setting (see Exhibit #4).

108     Plaintiff also relies on the fact that this entire litigation revolves around the Defendant's

109     policy that denied him access to the manufacture's detailed "withdrawal protocol" for the

110     discontinuation of methadone for pain; not the Kent County Jail's "withdrawal protocol", in

111     which he has another liberty interest at bar for his claim.(see Exhibit #2, Section 2.3).

> "**<u>Discontinuation of Methadone for Pain.</u>** When a patient no longer requires therapy with methadone for pain, use a gradual downward titration, of the dose every two to four days, to prevent signs and symptoms of withdrawal in the physically-dependent patient. **Do not abruptly discontinue methadone.**"

112

113        Plaintiff claims that the Defendant's policy prohibiting methadone in the jail also

114    prohibits "buprenorphine" (Subutex and Suboxone), the only FDA approved medication for

115    opioid addiction outside a methadone clinic. (See Exhibit #4).

116        Plaintiff has a legal right, protected by federal interests, to continue receiving his

117    medication, as his personal physician sees fit. He claims that as a pretrial detainee, innocent in

118    the eyes of the law, retains all the rights and liberties that his bailed counterpart enjoys, except

119    those necessarily lost through the fact of confinement[i] [1]

120        Given this permissible deprivation of liberty, due process and its concept of fundamental

121    fairness dictate that a pretrial detainee should not be subjected to additional punishment or loss,

122    unless such further deprivation receives justification from a valid interest of the state. Included in

123    the ban of punishment without due process is forced and involuntary rehabilitation which in this

124    instance the defendant jail officials seek to impose on the plaintiff.[2] As aptly stated in Hamilton

125    v. Love, supra, 328 F.Supp. at 1192: "If the conditions of pre-trial detention derive from

126    punishment rationales, such as retribution, deterrence, or even involuntary rehabilitation, then

127    those conditions are suspect constitutionally and must fall unless also clearly justified by the

128    limited . . . purpose and objective of pre-trial detention . . .." [ii] [3]

129        Recent cases have held that pretrial confinement must be consistent with the least

130    restrictive means available to achieve this valid governmental objective.[iii] [4]

---

[1] Cudnik v. Kreiger, 395 F. Supp. 305, at 311 (quotation marks omitted).

[2] *Id*

[3] *Id.*

[4] *Id*

131       In *Hamilton v. Love, supra, 328 F.Supp. at 1182,* the court held: "It is manifestly
132  obvious that the conditions of incarceration for detainees must, cumulatively, add up to the least
133  restrictive means of achieving the purpose requiring and justifying the deprivation of liberty." [iv] [5]

134       The state's sole interest in detaining an individual prior to trial is to assure that person's
135  appearance at trial. A corollary to this is the state's interest in the security and internal order of its
136  jails.[v] If the jail policy, here involved, furthers neither of the above interests and plaintiffs are
137  shown to suffer a deprivation of liberty enjoyed by methadone addicts able to post bail, they are
138  entitled to relief. [6]

139       Plaintiff's complaint (Doc. #1) clearly raises a liberty interest. He relies on the Courts
140  clear and concise definitions given in their **6th Circuit Court of Appeals** opinion of Cudnik v.
141  Kreiger; which if read replacing the Plaintiff's and the Defendant's name in that decision, with
142  Sleighter v. Kent County et al., one would be lead to think it was the same § 1983 litigation.

143       Plaintiff is not going to try this case in pretrial filings because he cannot possibly
144  introduce the 1000 U.S. Government documents in support of his position, nor will he be able to
145  present the unlimited Federal Case Law supporting his position, at this time.

146       The jail policy of denying methadone to pretrial detainees, who were receiving treatment
147  at a methadone program prior to incarceration, is in essence a state sanctioned measure of
148  involuntary rehabilitation. It is fostered by governmental officials and constitutes state action
149  under section 1983. The policy does not effectuate the state's narrow interests in pretrial
150  confinement and causes a deprivation that is not suffered by bailed methadone addicts. The

---

[5] *Id*
[6] *Id at 312*

7

151  policy thus constitutes punishment imposed without a finding of criminal culpability and, as

152  such, is violative of fundamental due process rights. [7]

153         In section IV, paragraph 2, the Defendants claim "In fact, the Plaintiff has admitted that

154  this is a dispute over the type of care and the particular medications he was offered and given."

155  Plaintiff denies this as being true and relies on his Original Complaint as self evident as to any

156  such alleged admission. Plaintiff further denies making any such admission(s), or similar

157  statement(s), or admission(s), implied or otherwise, during his deposition (Defendant's Exhibit #

158  3), and Defendants cite no such references.

159         In the same paragraph, last sentence, Defendant's attorney writes "He wanted

160  Methadone and nothing else would do in his mind." This claim draws for a conclusion as to the

161  state of the Plaintiff's thoughts and state of mind. This conclusion is speculative and is an

162  opinion requiring expert testimony, which can be submitted by a licensed professional who deals

163  with such subjects, and then the Court can determine if it meets the requirements of FRE 702

164  Testimony by Expert Witnesses. Therefore, since the Defendant's attorney has no such authority

165  to make such a claim, without direct evidence and being deemed an expert witness qualified by

166  the Court, the statement is inadmissible. Hypothetically, if in fact, he had taken that position and

167  "He wanted Methadone and nothing else would do..." does he not retain the liberties enjoyed

168  before he was incarcerated as a pretrial detainee? Does the Defendants get to pick and chose

169  what treatments the Plaintiff elects?

170         In section V, Conclusion, 1st paragraph, the Plaintiff claims its content to be misleading

171  and untrue. Concerning the 2nd paragraph, the Plaintiff asserts that its content expresses an

---

[7] *Id at 313*

172 opinion that requires expert testimony in such professional fields as medical treatment. It is also

173 inadmissible.

174       Plaintiff now relies on his deposition for the Defendant's (Defendant's Exhibit #3) to

175 establish that they admit to the Kent County Jail's policy which prohibits the use of opioids in

176 the jail.

177       Defendant's Exhibit #3, page 81, lines 8, 9, and10, Mr. Smit, the attorney, asks: "So is it

178 fair to say that within the constraints put on them by the jail, you are satisfied with the medical

179 care you received from Corizon while at the facility?"

180       This question would suggest that he was aware of "constraints put on them by the jail".

181 This does not imply or say what the "constraints" are, but it does establish that the Defendants

182 place constraints on its medical provider.

183       Then on page 93, line 3 and 4, he asks: "You can think of, I take it a decent reason as to

184 why as a policy the jail doesn't want those drugs administered?" This question establishes that

185 the policy in question does exist, or at least the Defendant's attorney believes it exists.

186       Then, lines 16 and 17 he states: "But even setting aside security, you do have addiction

187 issues with those types of medications. It's a risky business" This further supports that there is

188 the policy in question raised by the Plaintiff in his Complaint.

189       In Defendant's Exhibit #1, the "Affidavit of Captain Randy Demory" page 2, paragraph

190 1, he states that he is the "Jail Administrator".

191       . Then on page 3, paragraph 3, he states: "Consultation with those companies and

192 professionals has taken place to make sure that medication and pain medications sufficient to

9

193 treat medical conditions that inmates may have are available for use by medical providers at the

194 Kent County Correctional Facility."

195        Then the Defendant's attorneys in their Motion for Summary Judgment (Doc. #48),

196 section III, paragraph 3, last line, he states: "Finally, the Kent County Jail Administration is not a

197 medical practitioner or licensed medical entity..."

198        Plaintiff also states the exact same fact in his complaint, posing the question as to the

199 legality of a governmental official, with no statutory authority in hand, to dictate policies that

200 affect the access to his medical care and treatment. This raises another liberty interest, to be

201 presented at trial.

202        So, what he would like to know is why Captain Randy Demory is consulting "to make

203 sure that medications and pain medications [are] sufficient...and are available for use...at the

204 Kent County Correctional Facility"? How is he knowledgeable enough to know what

205 medications the inmates at KCCF need and do not need? Supra, lines 181-186, this document.

206        This would establish that he is involved in setting restrictions as well as to "what

207 medications and pain medications" will **not** be available at the Kent County Correctional

208 Facility, and this is accomplished through the jail's "policy" that is the theme and causative

209 moving factor in the violations of the Plaintiff's civil right and the initiation of this complaint

210 under the provisions of 42 USC § 1983.

211        Then, in Defendant's Exhibit #2, the Affidavit of Nasim Yacob MD, page 3, paragraph 3,

212 he states: "The pain medications and/or other medications **available an allowable** for use at the

10

213 Kent County Correction Facility are sufficient to treat conditions and meet the medical needs of

214 inmates."

215      His use of the words "available" and especially "allowable" reasonably implies and/or

216 suggests that there is a "list" of these medications and/or a "policy" governing their availability

217 and/or what pain medications and other medications are "allowable" (most restricted and/or

218 prohibited) for use at the Kent County Correctional Facility.

219      Plaintiff finds it hard to believe that Dr. Yacob would, as a Doctor, encourages this

220 and/condones this practice. Plaintiff cites Cudnik v. **392 F.Supp. 305 (1974),** Vickie CUDNIK et

221 al., Plaintiffs,v. **Ralph KREIGER et al., Defendants.** No. C74-275, **United States District**

222 **Court, N. D. Ohio, E. D.** July 16, 1974, at 308; "But since the sheriff, who is charged with

223 policy making, is opposed to the use of methadone at the county jail, Dr. Besst has no medical

224 choice of treatment. He can only offer his "withdrawal kit" to afford some measure of relief to

225 withdrawing addicts. Dr. Besst is also of the opinion that jail confinement provides an excellent

226 opportunity to *require* an addict to withdraw. When asked whether the State ought to force

227 withdrawal on a pretrial detainee, he replied: "Whereas they may not be guilty of the charge that

228 they are there for, they have admitted guilt to addiction . . . and I think that they should have

229 withdrawal and rehabilitation enforced upon them as a matter of the State's obligation."

230      The Defendant's policy has prohibited its inmate medical doctor, the opportunity to either

231 approve of or deny the use of approved methods treating opioid addiction and withdrawal.

232 Giving him the benefit of doubt, it should be assumed that he would make the right choice and

233 not perpetuate a grave injustice and violation of human rights. This is more than the Defendants

234 have done, since they do not have confidence enough in their doctor to let him determine what is

235   best. Unfortunately, it is now too late for them to let him try because the Defendant's policy has

236   set the stage for their being hauled into Federal Court, to address the issues at bar.

237        The Plaintiff, *pro se, sui juris,* is calling attention to the Defendant's ongoing disregard

238   for Federal Law and the rights of its inmate population. One of the issues at bar, is whether the

239   Plaintiff will be able to realize his pursuit of justice and set a legal precedence in both pain

240   management and Medication Assisted Addiction Treatment in the KCCJ. Plaintiff claims that the

241   Kent County Correctional Facility Administration can show no compelling governmental

242   interest(s) in their practices and their "policy" is not the least restrictive means to accomplish

243   these illusive interests. This raises a liberty interest.

244        Plaintiff claims that the "policy" in question holds no statutory authority and is not a

245   promulgated policy, nor has it ever been promulgated by any governmental entity entitled to do

246   so. Neither have the Defendants ever received any guidance from any qualified addiction

247   specialists in their construction and implementation of the policy in question.

248        Plaintiff claims that the justification of this "policy" is based on nothing more than the

249   Defendant's moral belief that inmates at the Kent County Correctional Facility are there because

250   they have broken the law and should be punished, and their archaic views about drug addiction,

251   and their lack of education or unwillingness to be educated on the subject.

252        In support of that position he relies on personal observation, as well as the extensive

253   scientific and judicial publications readily available, through The National Institute of Medicine,

254   National Institutes of Health, and "The Office of Justice Programs" CrimeSolutions.gov which

255   uses rigorous research to inform practitioners and policy makers about **what works** in criminal

256   justice, juvenile justice, and crime victim services."

257     Plaintiff would like to introduce the following from [illegible] National Library of Medicine

258     National Institutes of Health: "Forced withdrawal from methadone maintenance therapy in

259     criminal justice settings: A critical treatment barrier in the United States", lines 17-32 (Exhibit

260     #5), "The World Health Organization classifies methadone as an essential medicine, yet

261     methadone maintenance therapy remains widely unavailable in criminal justice settings

262     throughout the United States. Methadone maintenance therapy is often terminated at the time of

263     incarceration, with inmates forced to withdraw from this evidence-based therapy. We assessed

264     whether these forced withdrawal policies deter opioid-dependent individuals in the community

265     from engaging methadone maintenance therapy in two states that routinely force inmates to

266     withdraw from methadone ($N$=205). Nearly half of all participants reported that concern

267     regarding forced methadone withdrawal during incarceration deterred them engaging methadone

268     maintenance therapy in the community. Participants in the state where more severe methadone

269     withdrawal procedures are used during incarceration were more likely to report concern

270     regarding forced withdrawal as a treatment deterrent. Methadone withdrawal policies in the

271     criminal justice system may be a broader treatment deterrent for opioid-dependent individuals

272     than previously realized. Redressing this treatment barrier is both a health and human rights

273     imperative."

274     Plaintiff then relies on "Ethical and Human Rights Imperatives to Ensure Medication-

275     Assisted Treatment for Opioid Dependence in Prisons and Pre-trial Detention", which on page

276     four. Lines 16-24 is as follows: LEGAL CONSEQUENCES OF WITHHOLDING

277     TREATMENT: "Upon incarceration, many opioid dependent prisoners are forced to undergo

278     abrupt opioid withdrawal (**both from legally prescribed agonist therapy such as methadone**

279     **as well as illicit opioids**). Physical and psychological symptoms attendant to withdrawal may

280    impair capacity to make informed legal decisions, and heighten vulnerability to succumb to

281    police pressure to admit to false charges or confess guilt before having had access to counsel,

282    been before a judge, or been able to digest and understand the potential criminal charges and

283    consequences, in order to avoid detention or to secure release from confinement."

284        This US Government Publication continues with four full pages addressing the legal

285    theory the Plaintiff will rely on to present his position against the Defendants  for the violating

286    his civil rights during his incarcerations.

287                                                **<u>PROOFS</u>**

288        Plaintiff relies on the Defendant's Exhibits, including but not limited to; Exhibit #18,

289    "Plaintiff's Fist Amended Complaint"; especially paragraph #7, which is as follows: "Contrary

290    to Defendants' belief and argument Plaintiff is not alleging dissatisfaction with medical

291    treatment while incarcerated, but rather is claiming that the Defendants "*illegal policy*" of not

292    allowing "opioid" drugs to be used in the jail violates it's inmate population's and Plaintiff's

293    civil rights; relying on the information contained herein, "Statement of Facts", to detail and

294    support the allegations as to the extent of these violations."  Defendants were put on notice as

295    what was at bar in his complaint early on.

296        Plaintiff also relies on his complaint (Doc. #1) and Defendant's Exhibit #17 (Plaintiff's

297    "First Amended Complaint"), Plaintiff's Exhibit #1, his affirmations in the accompanying

298    motion to this brief, all the above proofs in this brief, the following Legal Standards and the

299    Conclusion to this brief.

300

                                                    14

301

## **DEFENDANT'S FAILURE TO MEET THE BURDEN OF APPLICABLE LEGAL**

302

## **STANDARDS FOR DISMISSAL**

303

304     When deciding a motion to dismiss, a court must accept "all factual allegations in the

305     complaint as true and constru[e] them in the light most favorable to the nonmoving party."

306     Skilstaf, Inc. v. CVS Caremark Corp., 669 F.3d 1005, 1014 (9th Cir. 2012); OSU Student

307     Alliance v. Ray, 699 F.3d 1053, 1058 (9th Cir. 2012); see also Guillen v. Bank of America

308     Corp., No. 5:10-cv-05825, 2011 WL 4071996 (N.D. Cal. 2011). Moreover, a court must "draw

309     all reasonable inferences in favor of the nonmoving party." Usher v. City of Los Angeles, 828

310     F.2d 556, 561 (9th Cir. 1987). "To survive a motion to dismiss, a complaint must contain

311     sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

312     Lacey v. Maricopa County, 693 F.3d 896, 911 (9th Cir. 2012) (quoting Ashcroft v. Iqbal, 556

313     U.S. 662, 677 (2009)). A complaint meets this standard when "the plaintiff pleads factual content

314     that allows the court to draw the reasonable inference that the defendant is liable for the

315     misconduct alleged." Id.

316     The admonishment to construe the plaintiff's claim liberally when evaluating a motion to

317     dismiss does not relieve a plaintiff of his obligation to satisfy federal notice pleading

318     requirements and allege more than bare assertions of legal conclusions. Wright, Miller &

319     Cooper, Federal Practice and Procedure: § 1357 at 596 (1969). "In practice, a complaint . . . must

320     contain either direct or inferential allegations respecting all of the material elements [in order] to

321     sustain a recovery under some viable legal theory." Car Carriers, Inc. v. Ford Motor Co., 745

322     F.2d 1101, 1106 (7th Cir. 1984), quoting In Re: Plywood Antitrust Litigation, 655 F.2d 627, 641

323   (5th Cir. 1981); Wright, Miller & Cooper, Federal Practice and Procedure, § 1216 at 121-23

324   (1969). **The United States Court of Appeals for the Sixth Circuit** clarified the threshold set

325   for a Rule 12(b)(6) dismissal: "[W]e are not holding the pleader to an impossibly high standard;

326   we recognize the policies behind Rule 8 and the concept of notice pleading. A plaintiff will not

327   be thrown out of court for failing to plead facts in support of every arcane element of his claim"

328   (cite location lost).

329       It is well established that "[c]ourts must consider the complaint in its entirety, as well as

330   other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss[.]"

331   Dunn v. Castro, 621 F.3d 1196, 1205n.6 (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd.,

332   551 U.S. 308, 322 (2007)); Magulta v. Samples, 375 F.3d 1269, 1274-75 (11th Cir. 2004) (when

333   reviewing a motion to dismiss for failure to state a claim, courts should read the complaint in its

334   entirety); 5 Wright & Miller, Federal Practice and Procedure § 1286 (3d ed. 2004); 5B Wright &

335   Miller, Federal Practice and Procedure § 1357 (3d ed. 2004).

336       Consideration of the Complaint as a whole demonstrates that it meets the requirements

337   established under the Federal Rules. "[A] complaint must contain sufficient factual matter. ... To

338   'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949

339   (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). This standard is met

340   where "the plaintiff pleads factual content that allows the court to draw the reasonable inference

341   that the defendant is liable for the misconduct alleged." Iqbal, 129 S.Ct. at 1949 (citing

342   Twombly, 550 U.S. at 556). Here, the Complaint presents a detailed recitation of Plaintiffs'

343   assertions that more than satisfies the pleading requirements. A review of the entire Complaint

344   demonstrates that the Complaint, in no way relies upon mere legal conclusions but contains a

345     detailed factual account of Defendants' illegal practices which establish their liability for the

346     violations of Plaintiff's civil rights and satisfies the requirements of a 42 USC § 1983 complaint.

347

348           **PLAINTIFF'S 42 USC § 1983 COMPLAINT SATISFIES THE PLEADING**

349           **REQUIREMENTS AND SURVIVES DEFENDANT'S REUEST FOR DISMISSAL**

350         Plaintiffs' complaints satisfy the notice pleading requirements under Fed. R. Civ. P. 8(a)

351     for a 42 U.S.C. § 1983 action. A Rule 12(c) motion may be filed "after the pleadings are closed –

352     but early enough not to delay trial." Fed. R. Civ. P. 12(c). The standard of review for a Rule

353     12(c) motion is the same as that for a motion to dismiss brought under Rule 12(b)(6). Jelovsek v.

354     Bredesen, 545 F.3d 431, 434 (**6th Cir. 2008**). "To survive a motion to dismiss, a complaint must

355     contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its

356     face." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (internal citation and quotation marks

357     omitted). To establish facial plausibility, the complaint must provide "'enough fact to raise a

358     reasonable expectation that discovery will reveal evidence of illegal [conduct].'" Arista Records,

359     LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 2010) (quoting Bell Atlantic Corp. v. Twombly, 550

360     U.S. 554, 556 (2007)). This plausibility standard does not equal a "probability requirement," but

361     requires "more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 129 S. Ct.

362     at 1949 (internal citation omitted). Although legal conclusions can provide the framework of a

363     complaint, they must be supported by factual allegations. Id. at 1950. "When there are well-

364     pleaded factual allegations, a court should assume their veracity and then determine whether they

365     plausibly give rise to an entitlement to relief." Id. Under Fed. R. Civ. P. 8(a)(2), a pleading must

366  contain a "short and plain statement of the claim showing that the pleader is entitled to relief."

367  Plaintiff's complaint meets theses requirements and proofs.

368  "[T]he pleading standard Rule 8 announces does not require detailed factual allegations,

369  but it demands more than an unadorned accession the defendant unlawfully 'harmed me

370  accusation.'" Iqbal, 129 S. Ct. at 1949 (internal citation and quotation marks omitted). "The

371  touchstone of Rule 8(a)(2) is whether a complaint's statement of facts is adequate to suggest an

372  entitlement to relief under the legal theory invoked and thereby put the defendant on notice of the

373  nature of the plaintiff's claim." In re: Insurance Brokerage Antitrust Litigation, 618 F.3d 300,

374  319 n. 18 (3d Cir. 2010), citing Twombly, 550 U.S. at 565 n.10.

375  However, a plaintiff "has no duty to present evidence upon filing a complaint; it must

376  merely plead a short and plain statement of the grounds for jurisdiction, the claim that entitles it

377  to relief, and a demand for relief sought." Wolcott v. Sebelius, 2011 U.S. App. LEXIS 5019 at

378  *34 (5th Cir. 2011) (citing Fed. R. Civ. P. 8(a)).

379  Even where a complaint is not "a model of the careful drafter's art, under the Federal

380  Rules of Civil Procedure, a complaint need not pin [a] plaintiff's claim for relief to a precise

381  legal theory. Rule 8(a)(2) of the Federal Rules of Civil Procedure generally requires only a

382  plausible 'short and plain' statement of the plaintiff's claim, not an exposition of his legal

383  argument." Skinner v. Switzer, 131 S.Ct. 1289, 179 L. Ed. 2d 233, 242 (2011) (reversing and

384  remanding dismissal of plaintiff's § 1983 case), referencing 5 C. Wright & A. Miller, Federal

385  Practice & Procedure § 1219, pp. 277-278 (3d ed. 2004 and Supp. 2010).

386  In evaluating the sufficiency of a complaint, the place to begin is "by taking note of the

387  elements [the] plaintiff must plead to state [a] claim." Iqbal, 129 S. Ct. at 1947 (internal citation

388    omitted). Some claims necessarily will demand relatively more factual detail to satisfy this

389    standard, while others will require less. Arista Records, 604 F.3d at 120 (stating that the Supreme

390    Court's recent pleading decisions "require factual amplification [where] needed to render a claim

391    plausible") (internal quotation marks omitted) (alteration in original).

392         Here, Plaintiffs brought this action pursuant to 42 U.S.C. § 1983. The elements of a

393    claim under 42 U.S.C. § 1983 are (1) the violation of (a) right(s) secured by the federal

394    Constitution or federal law and (2) the violation was committed by a person acting under color of

395    state law. Brown v. Matauszak, 2011 U.S. App. LEXIS 2011, 2011 Fed. App. 0060N at *10 (**6th**

396    **Cir. 2011**), citing West v. Atkins, 487 U.S. 42, 48 (1988).

397         Plaintiff alleged enough facts in his complaint (Doc. #1) to adequately state all of the

398    elements of a 42 U.S.C. § 1983 claim and to put Defendants on notice of the that it's policy

399    prohibited it's contacted inmate medical provider, Corizon Health Inc., to evaluate the Plaintiff

400    to determine if he was required to continue receiving his pain medication upon incarceration or

401    whether the medication was not required in jail and then would be allowed to prescribe the

402    medication in gradual decreasing doses until cessation, to avoid withdrawal symptoms, and risk

403    to the Plaintiff's life, thus avoiding the subjection of the Plaintiff to a violation of his federally

404    protected civil rights; of which include, but are not limited to , the protection against; "cruel and

405    unusual punishment", "deliberate indifference to (a)severe medical need(s)", "wanton infliction

406    of pain and suffering", violation of "equal protection" and "due process" rights, denial of

407    "adequate medical care", and any other violations that may apply; even possibly death ("life and

408    liberty"). In case the Defendant's allege that these medical decisions were made *in abstencia*,

409    Plaintiff is prepared with Federal Case Law to refute their defense on those grounds.

410        Pleadings in this case are being filed by the Plaintiff, pro se, wherein pleadings are to be

411    considered **without** regard to technicalities. Pro se, pleadings are not to be held to the same high

412    standards of perfection as practicing lawyers. See Haines v. Kerner 92 Sct 594, also See <u>Power</u>

413    914 F2d 1459 (11th Cir1990), also See Hulsey v. Owens 63 F3d 354 (5th Cir 1995), also see In

414    Re: HALL v. BELLMON 935 F.2d 1106 (10th Cir. 1991)." In Puckett v. Cox, it was held that a

415    pro se pleading requires less stringent reading than one drafted by a lawyer (456 F2d 233 (1972

416    **Sixth Circuit USCA**). Justice Black in Conley v. Gibson, 355 U.S. 41 at 48 (1957) "The Federal

417    Rules rejects the approach that pleading is a game of skill in which one misstep by counsel may

418    be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a

419    proper decision on the merits." According to Rule 8(f) FRCP and the State Court rule which

420    holds that all pleadings shall be construed to do substantial justice."

421        States often attempt to use mootness to their advantage, litigating to judgment against

422    weaker claims brought by pro se inmates, while avoiding stronger claims backed by experienced

423    counsel. This gamesmanship deprives courts of the benefit of "sharply presented issues" with

424    "self-interested parties vigorously advocating opposing positions." Grant ex rel. Family

425    Eldercare v Gilbert, 324 F.3d 383, 390 (5thCir. 2003). It also gives States the benefit of

426    favorable precedent obtained in poorly litigated cases, while leaving them free in mooted cases

427    to "resume the complained of activity without fear of flouting the mandate of a court."

428    Sossamon, 560 F.3d at 324. In short, it allows States to pick and choose their opponents

429        Plaintiff relies on the following Federal Rules of Evidence to admit the contained

430    exhibits: <u>Rule 301</u> Presumptions in Civil Cases Generally, <u>Rule 402</u> General Admissibility of

431    Relevant Evidence, <u>Rule 702</u>(a)(b) and (c), Testimony by Expert Witnesses, <u>Rule 902</u>(5),

432   Evidence That Is Self-Authenticating and Rule 1001(c) A "photograph" means a photographic

433   image or its equivalent stored in any form.

434          Plaintiff, if justice so requires, will seek leave of the Court, to file a "Second Amended

435   Complaint" in compliance with FRCP 15a(2) since the Defendants continue to waste the Court's

436   time and resources pursuing   "defenses" of non-existent "claims" allegedly made in his

437   complaint; attempting to wear him down, catch him in a procedural error, or just be able to use

438   legal gamesmanship and experience in these proceedings to outwit and moot and/or have

439   dismissed Plaintiff's meritorious claims, as a pro se litigant; therefore, justice would so require

440   leave of Court to amend his complaint to put the Defendants back on tract and address the

441   allegations against them and halt their pursuit in defending a position that is not coming to bar.

442

443                              **CONCLUSION**

444

445          Defendants have fallen far short of meeting the applicable Federal legal standard and burden

446   of proof to realize either summary judgment in their favor and/or dismissal of Plaintiff's

447   Complaint. In fact, all said and done, based on the actual simplicity of the Plaintiff's Complaint

448   and the undisputed "material" facts, the Court could conclude that a jury would easily find in

449   favor of the Plaintiff and that he is entitled to summary judgment in the interest of justice; thus

450   avoiding any further undue burden on this Court and Plaintiff; ordering any other action(s) as

451   justice sees fit to address the violation(s) of his civil rights and bring this litigation to resolution.

452   Therefore, the Plaintiff respectfully requests, at a minimum, that the Honorable Court deny

453   Defendant's "Motion for Summary Judgment" and dismissal.

454    It is a sad commentary on our state judicial system, when the Plaintiff, has to drag the

455    Defendants into Federal Court for the vindication of his suffering; especially when the Federal

456    Government has spent millions of dollars and utilized the most advanced research techniques to

457    advance justice and make the information available to inferior governmental agencies, and that

458    the Defendants somehow think they exist outside the *status quo*. Hopefully, if this litigation does

459    nothing else, it will draw the Defendants attention to the abundant resources our Federal

460    Government provides, to law enforcement. It should educate the Defendants.

461

462    Respectfully Submitted: August 27, 2013

        Bradley Keith Sleighter

463

464

---

[i]  Inmates of Milwaukee County Jail v. Petersen, 353 F.Supp. 1157, 1160 (E.D.Wisc.1973); Collins v. Schoonfield, *supra*, 344 F.Supp. at 265. *Cf.* Coffin v. Reichard, 143 F.2d 443, 445 (6th Cir. 1944).

[ii]  *See also* Rhem v. Malcolm, *supra*, 371 F. Supp. at 622, 623; Inmates of Suffolk County Jail v. Eisenstadt, *supra*, 360 F. Supp. at 686; Conklin v. Hancock, 334 F.Supp. 1119, 1121 (D.N.H.1971); Seale v. Manson, 326 F.Supp. 1375, 1379 (D. Conn.1971).

[iii]  Brenneman v. Madigan, *supra*, 343 F.Supp. at 138, citing Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 5 L.Ed. 2d 231 (1960)

[iv]  *See also* Rhem v. Malcolm, *supra*, 371 F. Supp. at 622; Inmates of Suffolk County Jail v. Eisenstadt, *supra*, 360 F.Supp. at 686; Smith v. Sampson, 349 F.Supp. 268, 271 (D.N.H.1972); Collins v. Schoonfield, *supra*, 344 F.Supp. at 265.

[v]  Rhem v. Malcolm, *supra*, 371 F.Supp. at 623; Inmates of Suffolk County Jail v. Eisenstadt, *supra*, 360 F.Supp. at 685, 686; Smith v. Sampson, *supra*, 349 F.Supp. at 271, 272; Brenneman v. Madigan, *supra*, 343 F.Supp. at 137; Hamilton v. Love, *supra*, 328 F.Supp. at 1191

22

## CERTIFICATE OF SERVICE

I, the Plaintiff, certify that I have delivered to the Defendant's Attorney of record, Varnumn LLP, a true and correct copy of this Brief by electronic means through the internet to the email address of record, pigreenwald@varnumlaw.com and also to the U.S. District Court for the Western District of Michigan on this 30th, day of August, 2013

Bradley Keith Sleighter
82 50th Street S.W., Apt. 323
Wyoming, Michigan 49548
Email: bradsleighter@gmail.com